# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| COMMONWEALTH OF MASSACHUSETTS ) | |
| *ex rel.* MYKEL POWELL; ) | |
| COMMONWEALTH SECOND ) | |
| AMENDMENT, INC.; BRENT ) | |
| CARLTON; and MYKEL POWELL, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 18-11336-FDS |
| BRIAN HOLMES; JAMES ) | |
| O'CONNOR; DONNA M. McNAMARA; ) | |
| VILLAGE GUN SHOP, INC. d/b/a VILLAGE ) | |
| VAULT; PETER DOWD; CITY OF ) | |
| SPRINGFIELD; TOWN OF PLYMOUTH; ) | |
| TOWN OF WINCHESTER; CITY OF ) | |
| CHICOPEE; TOWN OF DEDHAM; CITY ) | |
| OF MEDFORD; TOWN OF READING; ) | |
| TOWN OF WAKEFIELD; TOWN OF ) | |
| WILMINGTON; TOWN OF ANDOVER; ) | |
| TOWN OF FOXBOROUGH; CITY OF ) | |
| GARDNER; TOWN OF HUDSON; and ) | |
| TOWN OF SAUGUS, ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS AND
## MOTION FOR JUDGMENT ON THE PLEADINGS

**SAYLOR, C.J.**

This case involves the allegedly improper disposal of firearms by cities and towns in

Massachusetts.  Plaintiff-relators Mykel Powell, Commonwealth Second Amendment, Inc., and

Brent Carlton, on behalf of the Commonwealth of Massachusetts, have sued 14 cities and towns

under the Massachusetts False Claims Act for improperly disposing of firearms surrendered

under state law.  They also assert claims on behalf of the Commonwealth against a local gun

shop and two police officers, in their individual and official capacities, for their participation in

the alleged firearms-disposal scheme.  Powell has brought two claims on his own behalf against

three police officers, in their individual and official capacities, and the owner of the gun shop

related to the allegedly improper sale of his firearms.

The municipalities and the police officers have moved to dismiss for failure to state a

claim upon which relief can be granted.  For the reasons set forth below, those motions will be

granted in part and denied in part.

I.      **Background**

A.      **Factual Background**

The following facts are presented as alleged in the complaint unless otherwise noted.

1.      **The Parties**

Mykel Powell is a citizen of Rhode Island.  (Compl. ¶ 8).

Commonwealth Second Amendment, Inc. ("Comm2A") is a Massachusetts corporation.

(*Id.* ¶ 9).  The president of Comm2A is Brent Carlton, who is a resident of Oregon.  (*Id.* ¶ 10).

Brian Holmes, James O'Connor, and Donna McNamara (collectively, the "Stoughton

Defendants") are members of the Stoughton Police Department.  (*Id.* ¶¶ 11-13).

Village Gun Shop, Inc., d/b/a Village Vault, is a Massachusetts corporation.  (*Id.* ¶ 14).

It is owned, at least in part, by Peter Dowd, who is a resident of Massachusetts.  (*Id.* ¶ 15).

The Cities of Springfield, Chicopee, Medford, and Gardner, and the Towns of Plymouth,

Winchester, Dedham, Reading, Wakefield, Wilmington, Andover, Foxborough, Hudson, and

Saugus (collectively, the "Municipality Defendants") are municipalities organized under

Massachusetts law.  (*Id.* ¶¶ 16-29).

2

### 2.     <u>Seizure and Sale of Powell's Firearms and Ammunition</u>

On November 26, 2015, Powell was arrested by the Stoughton Police Department.  (*Id.* ¶ 36).  He was charged with breaking and entering, assault and battery, and intimidation of a witness.  (*Id.*).  As a result of that arrest, the Stoughton Police Department suspended his License to Carry ("LTC") a firearm.  (*Id.* ¶ 37).  After advising Powell of the suspension, Holmes took custody of Powell's LTC as well as his handgun, rifle, rifle ammunition, and rifle carrying bag.  (*Id.*).

The criminal charges against Powell resulted in a continuance without a finding and a period of probation.  (*Id.* ¶ 38).  The charges were ultimately dismissed on August 3, 2016.  (*Id.*).

Over the following two months, Powell, who had since moved to Rhode Island, repeatedly attempted to contact Holmes about his property.  (*Id.* ¶¶ 39-40).  He eventually made contact on September 29, 2016.  (*Id.* ¶ 40).  According to the complaint, Holmes informed Powell that he would not reinstate his LTC until he made "lifestyle changes."  (*Id.*).  He would, however, transfer the property to a licensed firearms dealer in Rhode Island if Powell obtained the appropriate firearms license for that state.  (*Id.*).

The complaint alleges that less than one week later, O'Connor instead transferred Powell's property to Village Vault.  (*Id.* ¶ 44).  Village Vault then sold the handgun but retained custody of the rifle.  (*Id.*).[1]

On October 24, 2016, about a month after speaking with Holmes, Powell obtained a Rhode Island Pistol/Revolver Safety Certificate, which authorized him to purchase pistols and revolvers.  (*Id.* ¶ 41).  According to the complaint, no license is necessary to purchase or possess

---

[1] It is unclear from the complaint whether the ammunition and carrying bag were sold or retained by Village Vault.

rifles or shotguns in Rhode Island.  (*Id.*).  He then again contacted Holmes, who in turn told him to contact O'Connor.  (*Id.* ¶ 42).  O'Connor told Powell that his property had been sent out for "disposal" and could not be returned to him.  (*Id.* ¶ 43).

Powell sued Holmes and O'Connor on May 3, 2017.  (*Id.* ¶ 2).  The complaint in that action asserted two counts under 42 U.S.C. § 1983, one for the loss of use of his property and one for the loss of value of his property.  Holmes and O'Connor filed a motion to dismiss, which the Court denied.  *See Powell v. Holmes*, 2018 WL 662482 (D. Mass. Feb. 1, 2018).  During discovery, Powell "learned of the factual bases" underlying the present action.  (Compl. ¶ 2).  He then moved to dismiss the action against Holmes and O'Connor voluntarily under Fed. R. Civ. P. 41(a)(2).  The Court granted that motion, and the case was dismissed without prejudice on June 29, 2018.

Shortly thereafter, on July 5, 2018, O'Connor advised Powell that the Stoughton Police Department had "re-acquired" the rifle and that Powell could "sell or transfer the firearm to a person or entity with a valid firearm license (FID, LTC and/or FFL)."  (*Id.* ¶ 45).  A designee of Powell has since taken possession of the rifle.  (*Id.* ¶ 57).

### 3.    Arrangements Between Village Vault and Massachusetts Municipalities

The complaint alleges that Village Vault and Dowd maintain "arrangements" with several cities and towns in Massachusetts through which police departments transfer to Village Vault certain firearms that have been surrendered under Massachusetts law.  (*Id.* ¶ 46).  In exchange, Village Vault either pays the police departments by check or "credits" them an amount that can be used to make purchases from Village Vault.  (*Id.* ¶¶ 46, 48).  Village Vault then sells the firearms for its own profit.  (*Id.* ¶ 47).

The complaint identifies 15 municipalities—Stoughton and the fourteen named

Municipality Defendants—that operate pursuant to such alleged agreements.  (*Id.* ¶ 46).[2]  It details specific transactions between those municipalities and Village Vault, including the date of each transaction, the number of firearms transferred, and the payment or credit provided to the relevant police department.  (*Id.* ¶¶ 50-112).  It further alleges (on information and belief) that Village Vault and Dowd maintain similar arrangements "with police departments and/or police department personnel throughout the Commonwealth of Massachusetts."  (*Id.* ¶ 49).

### B.      Procedural Background

On June 27, 2018—two days before Powell's original action was dismissed—Powell and Comm2A filed this action on behalf of the Commonwealth of Massachusetts.  Powell also brought a claim under 42 U.S.C. § 1983 on his own behalf.  The Commonwealth declined to intervene.

The complaint has since been amended three times.  The third amended complaint asserts four claims.  Powell, Comm2A, and Carlton assert two claims on behalf of the Commonwealth of Massachusetts:  one against O'Connor, McNamara, Village Vault, and the Municipality Defendants for violating the Massachusetts False Claims Act ("MFCA"), Mass. Gen. Laws ch. 12, §§ 5A-5O, by failing to transfer surrendered firearms to the Massachusetts State Police for auction (Count 2) and one against O'Connor, McNamara, and Village Vault for civil conspiracy (Count 3).  Powell individually asserts two claims on his own behalf:  one against the Stoughton Defendants for violating 42 U.S.C. § 1983 for deprivation of property without due process (Count 1) and one against Dowd for violating the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), for engaging in racketeering

---

[2] At least one of the agreements—that between Springfield and Village Vault—is alleged to be set out in a written contract.  (Compl. ¶¶ 59, 61).

activity as the owner of Village Vault (Count 4).

The Stoughton Defendants have moved to dismiss Counts 1 and 3 for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  O'Connor, McNamara, and twelve of the fourteen Municipality Defendants have moved to dismiss Count 2 for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[3] The City of Chicopee, which previously answered the complaint, has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  It has incorporated by reference the arguments made by the other Municipality Defendants.

## II.   **Legal Standard**

Motions to dismiss under Fed. R. Civ. P 12(b)(6) and motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are treated similarly.  *See Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50, 54-55 (1st Cir. 2006).  To survive either type of motion, a complaint must state a claim that is plausible on its face*. See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir.

---

[3] O'Connor, McNamara, and twelve Municipality Defendants have moved to dismiss Count 2 in three filings:  a motion by the City of Springfield; a motion by O'Connor, McNamara, and ten Municipality Defendants; and a notice by the Town of Hudson that adopts the arguments made by O'Connor, McNamara, and the ten Municipality Defendants.  The City of Springfield subsequently filed a notice that also adopts their arguments.  The Town of Dedham has not filed or joined any motion to dismiss.

2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

An action brought by a relator on behalf of the Commonwealth of Massachusetts alleging violations of the MFCA must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b). *See Lawton ex rel. United States v. Takeda Pharm. Co.*, 842 F.3d 125, 132 (1st Cir. 2016) ("Rule 9(b)'s heightened pleading standard generally applies to state law fraud claims brought in federal court.").  Under that rule, a party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Even so, "conditions of a person's mind," such as knowledge, "may be alleged generally." *Id.*

In the context of an action brought by a relator, Rule 9(b) operates to require that the complaint specify the "time, place, and content of an alleged false representation." *United States ex rel. Willette v. University of Mass., Worcester*, 80 F. Supp. 3d 296, 302 (D. Mass. 2015) (quoting *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009)). Despite that requirement, "there is some 'flexibility for relators to leave some questions unanswered,' so long as the complaint demonstrates sufficient particularity overall." *Sheppard v. 265 Essex St. Operating Co.*, 299 F. Supp. 3d 278, 283 (D. Mass. 2018) (quoting *Willette*, 80 F. Supp. 3d at 303).

## III.  <u>Analysis</u>

### A.  <u>Count 1:  42 U.S.C § 1983</u>

Count 1 alleges a claim under 42 U.S.C. § 1983 against the Stoughton Defendants in their individual and official capacities.  It alleges that they deprived plaintiff of property without due

process "[b]y exchanging the guns and other items . . . for a 'credit'" without providing notice or an opportunity to be heard.  (Compl. ¶¶ 114-16).  The Stoughton Defendants contend that the claims against them in their individual capacities should be dismissed because, among other reasons, they are protected by qualified immunity.  They further contend that the claims against them in their official capacities should be dismissed because the complaint does not allege an unconstitutional pattern or practice by the Town of Stoughton.

### 1.    Timeliness

As an initial matter, plaintiff contends that the motion of the Stoughton Defendants is untimely.  He contends that they may not move to dismiss Count 1 or Count 3 because they "already answered these exact same claims when they filed their answer to the (First) Amended Complaint."  (Dkt. No. 111 ("Pl. Stoughton Opp.") at 1).  He further contends that they may not move for judgment on the pleadings either, reasoning that the pleadings have not closed, as required by Fed. R. Civ. P. 12(c), because other defendants have filed motions under Rule 12(b).

When an amended complaint is filed, it "normally supersedes" the original complaint.  *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) (citing *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003); 6 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 1476 (2d ed. 1984)).  From that point forward, "the earlier complaint is a dead letter and 'no longer performs any function in the case.'"  *Id.* (quoting *Kolling v. American Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003)).  As a result, "pleadings directed to the earlier complaint are a nullity."  *Yong Li v. Huffman*, 2012 WL 462828, at *1-2 (D. Mass. Jan. 3, 2012).  Here, the Stoughton Defendants' Answer to the First Amended Complaint is void in light of the further amendments to the complaint.  In fact, the Stoughton Defendants are not simply "allowed" to respond to the Third Amended Complaint; they are required to do so.  *See Bern Unlimited, Inc. v. Burton Corp.*, 25 F. Supp. 3d 170, 177 (D.

Mass. 2014) ("An amended complaint requires a 'response'—either a motion under Rule 12 or a new (that is, amended) answer."); *Yong Li*, 2012 WL 462828, at *1-2 ("A defendant must file a pleading in response to the amended complaint . . . .  [A] defendant cannot simply do nothing when an amended complaint is filed and assume that pleadings directed to the original complaint will automatically be made applicable to the amended complaint.").

Accordingly, the Stoughton Defendants are not barred from moving to dismiss the Third Amended Complaint.

### 2.   Claims Against McNamara

The Stoughton Defendants contend that Count 1 should be dismissed as to McNamara because the complaint fails to allege that she took any action that deprived plaintiff of property. In his opposition, plaintiff agrees; according to plaintiff, "nothing at the present time indicates that she was personally involved in the deprivation of Plaintiff Powell's property, so a dismissal of these claims as to her, without prejudice, would be proper."  (Pl. Stoughton Opp. at 10 n.2 (emphasis omitted)).

Accordingly, the Court will grant the motion to dismiss Count 1 as to McNamara in her individual and official capacities.

### 3.   Claims Against Holmes and O'Connor

#### a.   Individual Capacities

##### i.   Whether the Complaint States a Claim for Deprivation of Property Without Due Process

Section 1983 provides a private cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983.  To maintain a cause of action under § 1983, a plaintiff must allege "deprivation of a federally secured right."  *Harrington v. City of Nashua*, 610 F.3d

24, 28 (1st Cir. 2018).  Here, the complaint alleges that Holmes and O'Connor deprived plaintiff of property without due process in violation of the Fourteenth Amendment.

To assert a procedural due-process claim under § 1983, a plaintiff must show "that he was deprived of a protected property interest and that the deprivation of the property interest was accomplished without due process of law." *Khelfaoui v. Lowell Sch. Comm.*, 496 F. Supp. 3d 683, 691 (D. Mass. 2020) (citing *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008); *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011)).  According to the Supreme Court, however, "the Due Process Clause is . . . not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (emphasis omitted).  Furthermore, even intentional deprivations of property do not violate the Due Process Clause "if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

It does not appear that the Stoughton Defendants contest that plaintiff had a property interest in his guns and related items and that he was deprived of that interest.  They contend, however, that the procedure employed constituted adequate process.  Specifically, they contend that plaintiff was provided adequate notice when he was informed in writing that he was required to surrender his firearms.  They further contend that even if the pre-deprivation process was inadequate, plaintiff has adequate post-deprivation remedies.

As to notice, it is unclear at this stage whether the notice plaintiff received satisfies the requirements of due process.  The complaint simply alleges that Holmes "provided [plaintiff] with a letter advising him of the suspension" when he took custody of plaintiff's guns and related items.  (Compl. ¶ 37).  The complaint does not allege, among other things, whether that letter advised plaintiff that his property may be permanently disposed; indeed, as alleged in the

complaint, the letter concerns only plaintiff's suspension, not the confiscation—let alone the disposal—of his property.  (*Id.*).

Furthermore, and in any event, the complaint alleges that the Stoughton Defendants failed to follow the procedure for the disposal of confiscated firearms identified under Mass. Gen. Laws ch. 140, § 129D.  (*Id.* ¶ 54).  As a result, even if the letter described that procedure, it nevertheless would have been inadequate if the officers ultimately did not follow it.

The Stoughton Defendants also rely on the *Parratt-Hudson* doctrine.  They contend that plaintiff's ability to sue them for conversion constitutes an adequate state-law remedy that bars his due-process claim.  The *Parratt-Hudson* doctrine provides that "due process is not violated where the deprivation is caused by the random and unauthorized conduct of state officials and where the state provides adequate post-termination procedures."  *Mard v. Town of Amherst*, 350 F.3d 184, 193 (1st Cir. 2003).

The Court addressed this issue in the prior action.  *See Powell v. Holmes*, 2018 WL 662482 (D. Mass. Feb. 1, 2018).  In that case, the Court concluded that it was "doubtful" that "a state-law action for conversion against the individual officers"—which the Stoughton Defendants suggest is adequate here—"provides an adequate post-deprivation remedy."  *Id.*  The Court sees no reason to revisit that conclusion.  The ultimate resolution of that issue depended "to a significant degree on the facts of the case," which were undeveloped at that stage; it was therefore "not appropriate for resolution on a motion to dismiss."  *Id.* at *8.  That reasoning applies with equal force here.  Accordingly, the complaint adequately states a claim that Holmes and O'Connor violated the Fourteenth Amendment by depriving plaintiff of property without due process.[4]

---

[4] The Stoughton Defendants contend that the specific allegations concerning Holmes are inadequate to state a claim against him.  But the complaint alleges that he not only took plaintiff's property in the first instance but also

### ii.   <u>Qualified Immunity</u>

Holmes and O'Connor contend, however, that they are protected by the doctrine of qualified immunity.  Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is determined according to a two-part test.  *See Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  The court must determine (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *See id.*

As noted, the complaint plausibly alleges that Holmes and O'Connor violated plaintiff's right to due process under the Fourteenth Amendment.  The remaining inquiry is therefore limited to whether that right was clearly established.  *See Jordan v. Town of Waldoboro*, 943 F.3d 532, 548 (1st Cir. 2019) ("We have already concluded that the officers violated a federal constitutional right, so the sole question is whether the unlawfulness of their conduct was clearly established at the time." (internal quotation marks omitted)); *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) ("[W]e already have decided that a jury could find that Cummings violated Gray's Fourth Amendment rights.  We must now determine whether the alleged right was clearly established at the time of Cummings's violation.").

Holmes and O'Connor contend that plaintiff cannot show that they violated any clearly established constitutional right.  Specifically, they contend that plaintiff alleges that they violated

---

refused to return it.  (*See* Compl. ¶¶ 37, 39-40).  Those allegations are sufficient to state a claim against Holmes for deprivation of property without due process.

his rights under Mass. Gen. Laws ch. 140, § 129D, but that any such violation would be insufficient to show a "clearly established" constitutional right that is actionable under § 1983. They reason that § 1983 "protects against the violation of Federal statutes and constitutional provisions" but not "against the violation of state statutes such as c. 140, § 129D, unless the statutory violation is also a violation of Federal right." (Dkt. No. 103 ("Stoughton Def. Mem.") at 7).

But that mischaracterizes plaintiff's claim. The § 1983 claim is premised on the deprivation of his property without due process in violation of the Fourteenth Amendment; it is not premised on a violation of Mass. Gen. Laws ch. 140, § 129D. (*See* Compl. ¶¶ 113-20). Of course, the statute may be relevant to that claim. For example, to the extent that the officers deviated from the prescribed statutory procedure, that deviation may vitiate the adequacy of any notice provided to plaintiff. But Mass. Gen. Laws ch. 140, § 129D is not the source of the right that plaintiff seeks to vindicate through his claim; that source is instead the Due Process Clause of the Fourteenth Amendment.

More than thirty years ago, the First Circuit found that it had "long been 'clearly established' that due process safeguards must be afforded" when "persons are deprived of property interests." *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990) (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972)). Indeed, Holmes and O'Connor offer no argument to the contrary. Furthermore, no reasonable officer would have understood that their conduct as alleged in the complaint—disposing of plaintiff's guns and other items without notice, opportunity to be heard, or adequate state-law remedies— would come close to satisfying due-process requirements. (Compl. ¶¶ 114-16).

Accordingly, the Court will deny the Stoughton Defendants' motion to dismiss Count 1

as to Holmes and O'Connor in their individual capacities.

**b.** **Official Capacities**

Count 1 also alleges a claim under § 1983 against the Stoughton Defendants in their official capacities.  It is well-settled that "[a] suit against a public official in his official capacity is a suit against the government entity."  *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 62 (1st Cir. 2015) (citing *Surprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005); *Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 58 n.1 (1st Cir. 2003)).  The claim against the Stoughton Defendants in their official capacities is therefore effectively a claim against the Town of Stoughton.

The Town of Stoughton, as a municipality, is a "person" within the meaning of § 1983 and thus may be liable for constitutional deprivations under some circumstances.  *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978).  "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.*  They may also be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Id.* at 690-91.

Here, the complaint does not allege that the Town of Stoughton has a policy or custom of depriving individuals of property—either through Mass. Gen. Laws ch. 140, § 129D or otherwise—without due process.  And courts cannot infer the existence of such a policy or custom from an isolated instance of misconduct.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985).  Nor can a municipality be found liable on a theory of *respondeat superior*.  *See Monell*, 436 U.S. at 691.

14

In his opposition, plaintiff does not contest that the complaint fails to allege any constitutional deprivation arising from a policy or custom of the Town of Stoughton. Instead, he contends that the complaint "states a valid claim for prospective relief (*i.e.* a declaratory judgment) against the Defendants in their official capacities." (Pl. Stoughton Opp. at 11). He reasons that his claim against the Stoughton Defendants in their official capacities is governed by *Ex Parte Young* rather than *Monell*. That argument, however, is premised on several fundamental misunderstandings.

Plaintiff first contends that *Monell* does not apply to his claim because he is suing governmental officials rather than a governmental entity: "*Monell* provides that a governmental body, like the Town of Stoughton, is not liable in a § 1983 action unless a policy, custom or practice of that body causes the plaintiff's injury. It does nothing to shield a government official from being named as an official capacity defendant on account of actions that the government official took." (Pl. Stoughton Opp. at 9; *see also id.* at 11). But that ignores well-settled law that a suit against a government officer in his official capacity *is* a suit against the government entity itself. *See Rosaura Bldg. Corp.*, 778 F.3d at 62. To be sure, *Monell* does not "shield" the government official from liability; it does, however, effectively narrow the circumstances in which a government official, sued in his official capacity, may be found liable.

Plaintiff later acknowledges that "[i]t is generally true that '[a] § 1983 suit brought against a police officer or chief of a municipal police department in his or her official capacity is a suit against the municipality itself.'" (Pl. Stoughton Opp. at 11 (quoting Stoughton Def. Mem. at 15) (second alteration in original; internal citation omitted)). But according to plaintiff, that is of little significance here because "*Ex Parte Young* permits suits to proceed against government officials 'in their official capacities to compel them to comply with federal law.'" (*Id.* (quoting

*Monjitas v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009))).  He appears to contend that because he

seeks, among other relief, a judgment declaring that the Stoughton Defendants violated his right

to due process, his claim against them in their official capacities falls within the ambit of *Ex*

*Parte Young*.

        *Ex Parte Young*, however, represents an exception to Eleventh Amendment immunity

under which *state* officials may be sued in their official capacities for injunctive relief.  *See Town*

*of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015).  It is not relevant to the liability of

*municipalities* or *municipal* officers sued in their official capacities.  Nor does it allow for § 1983

liability to be imposed on municipalities outside the *Monell* framework.  Indeed, the Supreme

Court has specifically held that *Monell*'s "policy or custom" requirement does not turn on the

nature of relief sought by a plaintiff; it applies not only to claims for damages but also to those

for prospective relief, such as an injunction or a declaratory judgment.  *See Los Angeles Cnty. v.*

*Humphries*, 562 U.S. 29, 30 (2010); *see also Monell*, 436 U.S. at 690 ("Local governing

bodies . . . can be sued directly under § 1983 *for monetary, declaratory, or injunctive relief*

where . . . the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

officers." (emphasis added)).

        Furthermore, and in any event, even if plaintiff were suing state, rather than local,

officers in their official capacities, *Ex Parte Young* would still be unhelpful.  The judgment he

seeks—"a declaratory judgment that Defendants violated his right to due process of law when

they agreed to and did transfer Plaintiff's guns and other property to Defendant Village Vault

without providing notice or opportunity to be heard" (Compl. at 39)—is retrospective in nature.

Under *Ex Parte Young*, individuals can sue state officials only for *prospective* injunctive

relief.  *See Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002).  It does not

permit "judgments against state officers declaring that they violated federal law in the past" or

any other "claims for retrospective relief."  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf &

Eddy*, 506 U.S. 139, 145-46 (1993); *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see also Verizon

Md. Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 645 (2002) ("In determining whether the

doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law

and seeks relief properly characterized as prospective." (internal quotation marks and alterations

omitted)).  The claim therefore could not proceed under the doctrine of *Ex Parte Young*.

Accordingly, the Court will grant the motion of the Stoughton Defendants to dismiss

Count 1 as to Holmes and O'Connor in their official capacities.

## B.     Count 2:  Massachusetts False Claims Act

Count 2 alleges a claim for violation of the MFCA, Mass. Gen. Laws ch. 12, §§ 5A-5O.

Powell, Comm2A, and Carlton assert the claim on behalf of the Commonwealth of

Massachusetts against O'Connor (in his individual and official capacities), McNamara (in her

individual and official capacities), Village Vault, and the Municipality Defendants.  The

complaint alleges that defendants had an obligation under Mass. Gen. Laws ch. 140, § 129D to

transfer confiscated firearms in their custody for more than one year to the Massachusetts State

Police for auction and that they also had an obligation to pay any proceeds from the sale of such

guns to the state treasurer.  (Compl. ¶¶ 121-22).  It further alleges that they failed to satisfy those

obligations and retained the firearms and proceeds from the sales of guns rather than remit them

to the state.  (*Id.* ¶¶ 123-25).

### 1.     Standing

Defendants first contend that the plaintiff-relators—Powell, Comm2A, and Carlton—are

not proper relators under the MFCA.  They contend that Comm2A is not a proper relator because it is not a natural person and that Powell and Carlton are not proper relators because they do not have "direct and independent knowledge" of the facts underlying the claim.

### a.    Corporate Standing

Only the Massachusetts Attorney General or a relator may bring an action under the MFCA.  *See* Mass. Gen. Laws ch. 12, § 5C(1)-(2).  The MFCA defines a relator as "an individual" who can bring an action under the statute.  *Id.* § 5A.  The Supreme Judicial Court has held that for purposes of the MFCA, the term "individual" does not include corporations.  *See Phone Recovery Servs., LLC v. Verizon of New England, Inc.*, 480 Mass. 224, 228-30 (2018). Corporations, such as Comm2A, are therefore not proper relators.  *See id.* (concluding that corporation did not have standing to sue under the MFCA).[5]  Indeed, plaintiff-relators appear to concede as much in their opposition.  (*See* Dkt. No. 108 ("Pl. Municipality Opp.") at 19).  The claim of Comm2A as a relator will therefore be dismissed.

### b.    Individual Standing

Defendants contend that Powell and Carlton are improper relators because they do not have "direct and independent knowledge" of the alleged false claims.  It does not appear, however, that the MFCA requires that relators have such knowledge.  No requirement to that effect appears in the current version of the statute.  *See, e.g.*, Mass. Gen. Laws ch. 12, § 5C(2) ("An individual, hereafter referred to as relator, may bring a civil action in superior court for a violation of said sections 5B to 5O, inclusive, on behalf of the relator and the commonwealth or any political subdivision thereof."); *id.* § 5A (defining "relator" as "an individual who brings an

---

[5] This represents one notable distinction between the MFCA and the federal False Claims Act ("FCA"), under which corporations may bring claims.  *See Phone Recovery Servs.*, 480 Mass. at 229 (distinguishing MFCA from FCA).

action under paragraph (2) of section 5C").

Before the 2012 amendments to the MFCA, the statute expressly required that relators, under some circumstances, have direct and independent knowledge.  It defined the term "original source" as "an individual who has *direct and independent knowledge* of the information on which the allegations are based and has voluntarily provided the information to the attorney general, without public disclosure, before filing an action under this section which is based on such information."  Mass. Gen. Laws ch. 12, § 5A (2000) (emphasis added).  That language, however, has been removed from the "original source" definition.  *See* Mass. Gen. Laws ch. 12, § 5A.  Furthermore, and perhaps more importantly, "direct and independent knowledge" under the prior version of the MFCA was a requirement for a relator to qualify as a "original source." That qualification provided an exception to the public-disclosure bar, but it was not a requirement for an individual to qualify as a relator in the first instance.  *See* Mass. Gen. Laws ch. 12, § 5G(3) (2000) ("No court shall have jurisdiction over an action pursuant to sections 5B to 5O, inclusive, based upon the public disclosure of allegations or transactions . . . , unless the action is brought by the attorney general, *or the relator is an original source of the information*." (emphasis added)).  "Direct and independent knowledge" was thus required only when there was a prior public disclosure and the relator was claiming to be an original source.

It is true that since 2012, the Supreme Judicial Court has stated that the MFCA "provides an incentive for an individual, referred to as a relator, with 'direct and independent knowledge of information that an entity is defrauding the Commonwealth to come forward by awarding to such individuals a percentage of the Commonwealth's recovery from the defrauding entity.'"  *Phone Recovery Servs.*, 480 Mass. at 228 (quoting *Scannell v. Attorney General*, 70 Mass. App. Ct. 46, 48 (2007)).  Indeed, it has done so on more than one occasion.  *See Chawla v. Appeals Court*,

482 Mass. 1001, 1001 n.1 (2019) ("The False Claims Act 'encourages individuals with direct

and independent knowledge of information that an entity is defrauding the Commonwealth to

come forward by awarding to such individuals a percentage of the Commonwealth's recovery

from the defrauding entity.'" (quoting *Scannell*, 70 Mass. App. Ct. at 48)).  But in neither case

did the SJC require that an individual have "direct and independent knowledge" to qualify as a

relator; it merely quoted a 2007 Massachusetts Appeals Court case when describing the general

purpose of the MFCA.  It therefore appears that neither the previous nor current version of the

MFCA requires that relators have "direct and independent knowledge" of the alleged false

claims under most circumstances.  As a result, Powell and Carlton have standing to bring claims

as relators under the MFCA.

### 2.        Public-Disclosure Bar

The MFCA has long barred relators from bringing claims that have previously been

publicly disclosed.  Defendants contend that the public-disclosure bar blocks plaintiff-relators'

claims under Count 2, reasoning that "the underlying and allegedly fraudulent scheme

concerning Defendant Village Vault's arrangements with police departments was already

disclosed in prior public litigation"—namely, Powell's earlier case against Holmes and

O'Connor.  (Dkt. No. 100-1 ("Municipality Def. Mem.") at 11; *see also* Compl. ¶ 2).

The public-disclosure bar is codified in Mass. Gen. Laws ch. 12, § 5G(c).  It provides

that, unless opposed by the Commonwealth, courts "shall" dismiss actions or claims brought

under the MFCA "if substantially the same allegations or transactions as alleged in the action or

claim were publicly disclosed" from one of three sources:

> (1) in a Massachusetts criminal, civil or administrative hearing in which the
> commonwealth is a party; (2) in a Massachusetts legislative, administrative,
> auditor's or inspector general's report, hearing, audit or investigation; or (3) from
> the news media, unless the action is brought by the attorney general, or the relator
> is an original source of the information.

Mass. Gen. Laws ch. 12, § 5G(c).  Here, the relevant allegations were not disclosed from any of those three sources.  Even if the prior case between Powell and Holmes and O'Connor in federal court constituted a "Massachusetts . . . civil . . . hearing" and the allegations were disclosed in that case, it would still not bar the claim here because the Commonwealth was not a party to it.  The public-disclosure bar therefore does not prohibit Powell and Carlton from asserting claims under the MFCA.

<strong>3.</strong>      <strong><u>Presentment</u></strong>

Defendants next contend that plaintiff-relators failed to comply with the presentment requirements of the MFCA.

When a relator brings an action under the MFCA, he or she must serve the Massachusetts Attorney General with "a copy of the complaint and written disclosure of substantially all material evidence and information the relator possesses . . . pursuant to Rule 4(d)(3) of the Massachusetts Rules of Civil Procedure."  Mass. Gen. Laws ch. 12, § 5C(3).  The Attorney General then has a 120-day period during which he or she may decide whether "to intervene and proceed with the action on behalf of the commonwealth or political subdivision."  *Id.*  Before the end of that period, the Attorney General must "assume control of the action" or notify the court that he or she "declines to take over the action, in which case the relator shall have the right to conduct the action."  *Id.* § 5C(4).

The original complaint in this case was filed on June 27, 2018.  After she was served with the complaint, the Attorney General declined to intervene.  Defendants nonetheless contend that the action, in its present form, was never presented to the Attorney General.  They point out that the Attorney General declined to intervene only after the original complaint.  That complaint asserted claims on behalf of the Commonwealth against O'Connor, McNamara, and Village Vault, but it did not assert claims against the Municipality Defendants.  According to defendants,

however, the Third Amended Complaint "fundamentally changes the nature of the action" by adding 14 municipalities—subdivisions of the state itself—as defendants. (Municipality Def. Mem. at 9).

It is unclear whether plaintiff-relators were required to serve the amended complaint upon the Attorney General. The statute contains no such requirement, and Massachusetts case law does not provide a clear answer. *See, e.g.*, *Rosenberg v. JPMorgan Chase & Co.*, 2021 WL 1883085, at *3 (Mass. May 11, 2021) (describing procedural history, including the Commonwealth declining to intervene after the original complaint and the relator subsequently twice amending the complaint). Case law concerning the federal FCA indicates that re-service after amendment of a complaint may not be necessary. *See, e.g.*, *United States ex rel. Mikes v. Straus*, 931 F. Supp. 248, 259 (S.D.N.Y. 1996) (concluding that relator's failure to serve amended complaint, in which certain claims were asserted for the first time, on government did not bar action). Even after declining to intervene, the Commonwealth can request that the relator serve on it a copy of all pleadings in the action and reserve its right to intervene for good cause, as it did here. *See* Mass. Gen. Laws ch. 12, § 5D(6).

At the same time, there is some force to the argument that when an action fundamentally changes, relators should be required to serve the Commonwealth. The present case offers a particularly acute example, where the action not only dramatically expanded in scope but also is now brought against subdivisions of the Commonwealth itself.

In any event, for the reasons discussed below, the MFCA claim against the Municipality Defendants will be dismissed. As a result, the Court need not resolve whether the Commonwealth should have been afforded another opportunity to intervene. And even though the MFCA claim will survive as to O'Connor and McNamara in their individual capacities (and

as to Village Vault, which has not moved to dismiss), the original complaint that was served on the Commonwealth asserted that claim against those defendants.  Accordingly, to the extent that the MFCA claim survives, the presentment requirement was satisfied.

### 4.     Whether Municipalities Can Be Liable Under the MFCA

Defendants next contend that municipalities cannot be found liable under the MFCA.

The MFCA imposes liability on any "person" who, among other things, makes a false claim for payment from the Commonwealth or from one of its political subdivisions.  *See* Mass. Gen. Laws ch. 12, § 5B(a).  The statute defines "person" as "a natural person, corporation, partnership, association, trust or other business or legal entity."  *Id.* § 5A.  That broad definition could be read, as plaintiff-relators contend, to include cities and towns such as the Municipality Defendants.  But "cities" and "towns" are explicitly included in a part of the statute that defines "political subdivision" as "a city, town, county or other governmental entity authorized or created by law, including public corporations and authorities."  *Id.*  The fact that "person" and "political subdivision" are separately defined—and that "person" omits not only "political subdivision" but also any of the entities, such as cities and towns, that are included in the definition of "political subdivision"—strongly suggests that the term "person" does not include "political subdivisions."

The remainder of the MFCA reinforces that understanding.  The statutory text makes clear that "political subdivisions" are intended beneficiaries of the statute.  For example, the statute makes violators liable for a civil penalty and damages "to the commonwealth or a political subdivision thereof"; it directs the Attorney General to investigate violations "involving state funds or funds from any political subdivision"; and it allows for civil actions by relators "on behalf of the relator and the commonwealth or any political subdivision thereof."  Mass. Gen. Laws ch. 12, §§ 5B, 5C.  If municipalities could be held liable under the MFCA, actions against

them would be brought by the Commonwealth against its own subdivisions—a situation where a party would effectively be suing itself.  Any interpretation of the MFCA that allows for such a result would be nonsensical and should be rejected.

Plaintiff-relators nonetheless contend that "[g]iven the close relationship between the federal False Claims Act and the Massachusetts Act, we begin by looking to the federal Act and its understood meaning and application at the time the General Court took action."  (Pl. Municipality Opp. at 16).  It is true that because "[t]here is little decisional law interpreting the MFCA, and its legislative history is scant, . . . [courts] look for guidance to cases and treatises interpreting the Federal False Claims Act."  *Scannell*, 70 Mass. App. Ct. at 49 n.4.  But that maxim does not apply when there are material differences between the text of the two statutes. When such differences exist, courts must follow the text of the MFCA itself.  And here, there is a notable difference between the statutes:  the MFCA defines "person," but the federal FCA does not.  *Compare* Mass. Gen. Laws ch. 12, § 5A, *with* 31 U.S.C. § 3729(b).[6]

Plaintiff-relators also point to other Massachusetts statutes that define "person" to include, among other things, "other legal entity."  (*Id.* at 18 (citing Mass. Gen. Laws ch. 131, § 40; Mass. Gen. Laws ch. 132B, § 2; Mass. Gen. Laws ch. 214, § 7A)).  Because those statutes also define "person" to include "the commonwealth or political subdivision thereof" or "public or quasi-public corporation or body," plaintiff-relators reason that municipalities represent "other

---

[6] In *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003), the Supreme Court held that "person" under the federal FCA includes "municipal corporations."  *See id.* at 134.  But that interpretation is of little import here, where the MFCA expressly defines "person."

Furthermore, in *Chandler*, the Supreme Court explained that liability extends to municipalities under the FCA because, when it was originally passed, the term "persons" extended to corporations, including municipal corporations.  *See id.* at 126-27.  Plaintiff-relators do not follow that logic here.  Instead, they contend that municipalities are liable under the MFCA not because they are corporations but because they are "legal entities," which are included as a catchall category in the MFCA's definition of person.  (*See* Pl. Municipality Opp. at 17-18). In other words, plaintiff-relators urge the Court to follow the conclusion of *Chandler* without following its reasoning.

legal entities." (*Id.*). But those statutes in fact undermine their position. They indicate that the Massachusetts legislature expressly includes "political subdivisions" or "public or quasi-public corporation" in its definition of "person" when it intends to make such entities liable. Therefore, their omission from the definition of "person" in the MFCA indicates that they are not liable under that statute.[7]

Finally, defining "person[s]" in the MFCA to exclude municipalities does not, as plaintiff-relators contend, render ambiguous the provision of the MFCA that divests courts of jurisdiction over certain actions brought against "the governor, the lieutenant governor, the attorney general, the treasurer, the secretary of state, the auditor, a member of the general court, the inspector general or a member of the judiciary." *See id.* § 5G(a). Those individuals are plainly "natural person[s]" who might otherwise be liable under the MFCA.

In short, municipalities, like the Municipality Defendants, are not "person[s]" under the MFCA; therefore, they may not be found liable under the Act. To the extent that Count 2 is brought against the Municipality Defendants, it must be dismissed. And as noted, the claims against O'Connor and McNamara in their official capacities are effectively claims against the Town of Stoughton. Thus, to the extent that Count 2 is brought against them in their official capacities, it must also be dismissed.

But the same is not true as to the claims against them in their individual capacities. In those capacities, O'Connor and McNamara, as natural persons, are "person[s]" who may be found liable under the MFCA. *See* Mass. Gen. Laws ch. 12, § 5A. Accordingly, the Court will

---

[7] Following plaintiff-relators' argument to its logical conclusion would produce absurd results. If the term "other legal entity" in the MFCA includes "political subdivisions" because "political subdivisions" is identified in other statutory definitions of "person" that also include "other legal entity," then the same reasoning would apply to the Commonwealth itself. As noted, the statutes identified by plaintiff-relators define "person" to include, among other things, "the commonwealth" and "other legal entity." Following that reasoning, the MFCA would therefore include the Commonwealth as a "person" who could be liable under the Act.

consider whether Count 2 otherwise alleges a claim against them.

### 5.        Whether Count 2 States a Reverse False Claim

O'Connor and McNamara contend that the complaint fails to state a claim under the MFCA.  In particular, they contend that the type of false claim that the complaint asserts—a "reverse" false claim—requires that it allege that they knowingly used a false record to avoid an obligation to the Commonwealth and that the Commonwealth suffered damages as a result. According to them, the allegations in the complaint fall short on both elements.

The MFCA, like the federal FCA, imposes liability not only for false claims (where an individual seeks improper payment from the government) but also for so-called "reverse" false claims (where an individual withholds required payment to the government).  It makes liable any person who, among other things, "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."  Mass. Gen. Laws ch. 12, § 5B(a)(9).

O'Connor and McNamara first contend that the complaint fails to allege that they used a "false record" to avoid an obligation to the Commonwealth.  But that argument is based on an outdated version of the statute.  The MFCA previously limited liability for reverse false claims to situations where a person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or to transmit money or property to the commonwealth or political subdivision thereof."  Mass. Gen. Laws ch. 12, § 5B(8) (2000). Liability for such claims, however, was expanded in 2012.  That year, following similar amendments to the federal FCA, the Massachusetts legislature added to the MFCA a provision that imposes liability for reverse false claims when a person avoids an obligation to pay or transfer property to the Commonwealth even without the use of a false record.  *See* Mass. Gen. Laws ch. 12, § 5B(a)(9) (imposing liability on any person who "knowingly conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof").

The MFCA defines "obligation" as an established duty arising from, among other things, a statute. *See id.* § 5A. Here, plaintiff-relators contend that O'Connor and McNamara had an "obligation" to transfer firearms and related items to the Massachusetts State Police under Mass. Gen. Laws ch. 140, § 129D. That provision governs the surrender of firearms by individuals whose licenses have been suspended or revoked. It requires such individuals to deliver or surrender "all firearms, rifles, shotguns, and machine guns and ammunition" to the licensing authority "without delay." Mass. Gen. Laws ch. 140, § 129D. Although the person no longer has the right to possess the firearms himself, he may, within a year, give or sell them to another person who does have the right to possess them, whereupon the licensing authority must deliver the firearms to the transferee. *Id.* The licensing authority must give the person whose license was suspended written notice at the time the firearms are surrendered of his right to transfer them within one year. *Id.*

Upon receiving the firearms, the licensing authority may transfer possession of them "for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse," as long as the firearms are not evidence in a pending criminal case or investigation. *Id.* When that dealer takes possession, he shall "(i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section." *Id.* The dealer may auction any weapon in its possession if (1) authorized to do so by the licensing authority after one year, or (2) storage charges (which are

assessed on the gun owner) have been in arrears for 90 days.  *Id.*  The proceeds of that auction are applied first to the storage charges and then returned to the owner of the weapon.  *Id.*

If the licensing authority cannot reasonably "ascertain a lawful owner" of the weapon within 180 days of acquiring it, the licensing authority may "in its discretion, trade or dispose of surplus, donated, abandoned or junk firearms, rifles, shotguns, or machine guns or ammunition to properly licensed distributors and firearms dealers," and the proceeds will go to the municipality in which the authority presides.  *Id.*  And if, after a year, the weapons have not been disposed of in any other way, the colonel of the state police may sell the firearms at a public auction and remit the proceeds to the state treasurer.  *Id.*  ("Firearms . . . not disposed of after delivery or surrender[ed] according to the provisions of this section shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess said firearms . . . and the proceeds shall be remitted to the state treasurer.").

Here, O'Connor and McNamara contend that their actions were "expressly permitted" by § 129D, which allows the licensing authority to "trade or dispose" of surplus or abandoned firearms "to properly licensed distributors or firearms dealers" in exchange for the proceeds of the resulting sales.  *Id.*  But that provision applies only "[i]f the licensing authority cannot reasonably ascertain a lawful owner within 180 days of acquisition by the authority."  And the complaint repeatedly alleges that the firearms transferred under the agreements between Village Vault and the Municipality Defendants "had not been 'disposed of after delivery or surrender[ed] according to the provisions of' § 129D and were accordingly to be auctioned by the State Police for the benefit of the Treasurer."  (*See, e.g.*, Compl. ¶ 50).  It is possible that for at least some of the exchanged firearms, "the licensing authority [could not] reasonably ascertain a lawful owner within 180 days of acquisition," and therefore that O'Connor and McNamara were entitled to

transfer them to Village Vault in exchange for the proceeds of the resulting sales. But answering that question requires discovery. At this stage, the allegations that the exchanged firearms were not disposed of according to § 129D are sufficient.[8]

O'Connor and McNamara also contend that any violation of § 129D was not done "knowingly" as required by the MFCA. The MFCA defines "knowingly" as "possessing actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information or acting in reckless disregard of the truth or falsity of the information." Mass. Gen. Laws ch. 12, § 5A. But "no proof of specific intent to defraud" is required. *Id.* It is far from clear whether O'Connor and McNamara were in fact aware of their obligation under § 129D to turn over unclaimed firearms to the state police for auction. But in light of their apparently significant roles in the disposal of confiscated firearms by the Stoughton Police Department, it is a reasonable inference from the factual allegations of the complaint that they acted at least in reckless disregard of their obligation under the statute.

Finally, O'Connor and McNamara contend that even if they violated § 129D, the complaint fails to allege that the Commonwealth suffered damages as a result. They reason that any payments that were improperly withheld from the Commonwealth instead went to the municipalities, which are subdivisions of the Commonwealth, and that the complaint fails to allege that the state police held firearms auctions through which the Commonwealth would have collected proceeds under Mass. Gen. Laws ch. 140, § 129D.

It does not appear, however, that the complaint is required to allege that the Commonwealth suffered damages to state a claim under the MFCA. The First Circuit has

---

[8] It is clear based on the allegations in the complaint that ownership of at least some of the exchanged firearms—namely, Powell's—was ascertained by the licensing authority yet nevertheless transferred to Village Vault.

observed, in the context of considering a false claim under the federal FCA, that "a contractor

who submits a false claim for payment may still be liable under the FCA for statutory penalties,

even if it did not actually induce the government to pay out funds or to suffer any loss." *United*

*States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).  The court reasoned that "the statute attaches

liability, not to the underlying fraudulent activity or to the government's wrongful payment, but

to the 'claim for payment.'"  *Id.*  In the court's view, Congress believed that "fraud by

government contractors is best prevented by attacking the activity that presents the risk of

wrongful payment, and not by waiting until the public fisc is actually damaged." *Id.*; *see also*

Claire M. Sylvia, The False Claims Act:  Fraud Against the Government § 4:60 (Apr. 2021)

("The False Claims Act does not make any reference to a requirement that a plaintiff show that

the Government was damaged in order to establish liability and most courts have recognized that

damage to the Government is not an element of a cause of action under the Act.").

That reasoning would appear to apply with equal force to reverse false claims under the

MFCA.  An individual who violates the reverse false claims provision of the MFCA may be

liable for statutory penalties absent any damages.  *See* Mass. Gen. Laws ch. 12, § 5B(a) ("Any

person who . . . knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the commonwealth or a political subdivision

thereof . . . shall be liable to the commonwealth or political subdivision for a civil penalty of not

less than $5,500 and not more than $11,000 per violation, . . . plus 3 times the amount of

damages, including consequential damages, that the commonwealth or a political subdivision

thereof sustains because of such violation.").  And the MFCA is violated not only when the

government does not actually receive payment but also when an "obligation to pay" the

government is "conceal[ed]." *Id.*  The complaint therefore states a claim under the MFCA

against McNamara and O'Connor in their individual capacities, even though the Commonwealth may not have been damaged when its subdivisions retained property that should have been remitted to the state.[9]

*　　*　　*

Accordingly, the Court will grant the motion to dismiss of O'Connor, McNamara, and the Municipality Defendants to the extent that it seeks to dismiss Count 2 against the Municipality Defendants as well as O'Connor and McNamara in their official capacities.  It will also dismiss Comm2A as a relator.  It will otherwise deny the motion.

For the same reasons, the Court will grant the motion of the City of Springfield to dismiss Count 2, and the motion of the City of Chicopee for judgment on the pleadings as to Count 2.

### C.    Count 3:  Civil Conspiracy

Count 3 alleges a claim for civil conspiracy.  Powell, Comm2A, and Carlton assert that the claim on behalf of the Commonwealth of Massachusetts against O'Connor (in his individual and official capacities), McNamara (in her individual and official capacities), and Village Vault.[10]

To establish a civil conspiracy, "a plaintiff must demonstrate that 'a combination of persons [acted] pursuant to an agreement to injure the plaintiff.'" *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 415 (2002) (quoting J.R. Nolan & L.J. Sartorio, Tort Law

---

[9] In their reply memorandum, O'Connor and McNamara contend, for the first time, that they are protected by common-law immunity.  But "a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum." *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010) (citing *Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999)).  Instead, it is "limited to rebuttal of factual and legal arguments raised in the opposition." *Rivera Concepcion v. Puerto Rico*, 682 F. Supp. 2d 164, 169 n.5 (D.P.R. 2010) (citing *Wills*, 184 F.3d at 27; *United States v. Brennan*, 994 F.2d 918, 922 n.7 (1st Cir. 1993)).  Where, as here, a moving party raises an argument for the first time in a reply, that argument is waived. *See EnergyNorth Natural Gas, Inc. v. Century Indemnity Co.*, 2007 WL 776124, at *1 n.4 (D.N.H. Mar. 15, 2007).

[10] For the reasons set forth above, Comm2A is not a proper relator.

§ 99, at 136 (2d ed. 1989)).  In other words, "[i]t is not sufficient to prove joint tortious acts of

two or more persons"; rather, a plaintiff must show that those acts were taken in furtherance of

an agreement to cause injury.  *Id.*  Massachusetts recognizes two types of civil conspiracy, "so-

called 'true conspiracy[,]' and conspiracy based on section 876 of the Restatement (Second) of

Torts." *Taylor v. American Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009) (citing *Kurker v.

Hill*, 44 Mass. App. Ct. 184, 188 (1998)).

     "True conspiracy" is itself an independent tort—no other tortious acts must be shown.

*See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236,

244 (D. Mass. 1999); *Fleming v. Dane*, 304 Mass. 46, 50 (1939).  To rise to the level of an

independent tort, the "mere force of numbers acting in unison" must "make a wrong." *Fleming*,

304 Mass. at 50 (internal quotation marks omitted).  "[I]t must be shown that there was some

peculiar power of coercion of the plaintiff possessed by the defendants in combination which any

individual standing in a like relation to the plaintiff would not have had." *Id.* (internal quotation

marks and citations omitted).

     Here, the complaint contains no such allegations, and plaintiff-relators make no argument

in support of a true conspiracy.  Instead, plaintiff-relators contend that the complaint alleges a

civil conspiracy based on § 876 of the Restatement (Second) of Torts.  That type of conspiracy

extends liability for the torts of another when there has been a "concerted action." *Thomas v.

Harrington*, 909 F.3d 483, 490 (1st Cir. 2018) (quoting *Kurker*, 44 Mass. App. Ct. at 188).  It is,

in essence, a form of vicarious liability.  "Because it is vicarious liability, this type of civil

conspiracy requires an underlying tort and the conspiracy consists in agreeing to, or assisting in,

this underlying tort." *Id.* (quoting *Taylor*, 576 F.3d at 35) (alterations omitted).  Here, the

complaint fails to allege the existence of an underlying tort.  It alleges that O'Connor,

McNamara, and Village Vault were aware that their guns-for-credits scheme did not comply with Mass. Gen. Laws ch. 140, § 129D and that they each acted in furtherance of that scheme. (Compl. ¶¶ 127-30).  But the failure to comply with that statute does not constitute a tort; non-compliance therefore cannot underlie a civil-conspiracy claim.

Plaintiff-relators contend that "[t]he underlying tort isn't a violation of § 129D, but is instead the violation of the False Claims Act."  (Pl. Stoughton Opp. at 16).  That argument, however, ignores the allegations in the complaint.  Count 3 alleges a series of acts by O'Connor, McNamara, and Village Vault that the complaint explicitly alleges violated Mass. Gen. Laws ch. 140, § 129.  (Compl. ¶¶ 127-30).  It then alleges that they are "jointly and severally liable for their tortious common plan to evade the requirements of M.G.L. c. 140, § 129D."  (*Id.* ¶ 131). Wholly absent from Count 3 is any mention of the False Claims Act.  Whatever merit, if any, a civil-conspiracy claim premised on a False Claims Act violation may have, plaintiff-relators may not rewrite their complaint through their opposition. *See Driscoll v. Simsbury Assocs., Inc.*, 2018 WL 2139223, at *5 n.3 (D. Mass. May 9, 2018) (explaining that a plaintiff "may not amend her complaint through her opposition brief").[11]

Accordingly, the Court will grant the motion of the Stoughton Defendants to dismiss Count 3 as to McNamara and O'Connor in their individual and official capacities.

## IV.    Conclusion

For the foregoing reasons,

    1.   The Motion to Dismiss of the Stoughton Defendants (Dkt. No. 102) is

        GRANTED to the extent that it seeks to dismiss Count 1 against Holmes,

---

[11] The MFCA allows a relator to bring a claim against an individual under a conspiracy theory. *See* Mass. Gen. Laws ch. 12, § 5B(a)(3) (making liable any person who "conspires to commit a violation of this subsection"). But other than the fact that it is a "conspiracy" claim brought by plaintiff-relators on behalf of the Commonwealth, Count 3 does not indicate that it asserts such a claim.

O'Connor, and McNamara in their official capacities; Count 1 against McNamara in her individual capacity; and Count 3 against O'Connor and McNamara in their individual and official capacities, and is otherwise DENIED;

2. The Motion to Dismiss of O'Connor, McNamara, and the Municipality Defendants (Dkt. No. 100) is GRANTED to the extent that it seeks to dismiss Count 2 against Municipality Defendants and O'Connor and McNamara in their official capacities, and is otherwise DENIED;

3. The Motion to Dismiss of the City of Springfield (Dkt. No. 92) is GRANTED;

4. The Motion for Judgment on the Pleadings of the City of Chicopee (Dkt. No. 101) is GRANTED;

5. Pursuant to the Town of Hudson's Notice of Joinder to the Municipality Defendants' Motion to Dismiss (Dkt. No. 115), Count 2 against the Town of Hudson is DISMISSED; and

6. The claims of Comm2A as a plaintiff-relator under Count 2 and Count 3 are DISMISSED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  June 30, 2021                                     Chief Judge, United States District Court