**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS<br>*ex rel.* MYKEL POWELL, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>BRIAN HOLMES, *et al.*,<br><br>Defendants. | ) CIVIL ACTION NO.<br>) 1:18-cv-11336-FDS |

**PLAINTIFFS' OPPOSITION TO THE**
**<u>MUNICIPALITIES' MOTION TO QUASH</u>**

# TABLE OF CONTENTS

I)   Introduction ..................................................................................................... 1

II)  The "Reverse" False Claim Against Village Vault Still Concerns 30 Transactions
     Involving 15 Police Departments ..................................................................... 2

III) The "Reverse" False Claim Concerns Guns with a Particular Set of Characteristics ............ 4

IV)  The Subpoenas Seek Evidence that is Both Relevant and Important ..................... 7

     a.   An Essential Element of the Claim is that the Guns Sold to Village Vault Were
          "One Year Guns" that had Become the Property of the Commonwealth—Not
          Just that Police Sold them, or that § 129D Applied ........................................ 7

     b.   The Current Subpoenas Seek Necessary Details About the Guns that the
          Municipalities Identified in Response to the Earlier Subpoenas ..................... 7

     c.   In the Context of the Issues that are Actually Relevant, the Municipalities'
          Claims About Irrelevance, Undue Burden and Bad Faith are Meritless ......... 8

     d.   The Evidence the Plaintiffs Seek is Material and Important ........................ 10

V)   The Municipalities' Alleged Public Disclosure Bar Defense is Not a Basis for Avoiding
     Compliance with the Subpoenas—and Even if it were, it is Meritless ............... 11

     a.   The Municipalities' Arguments About the Merits of the Case are Not a Ground
          for Quashing a Subpoena .......................................................................... 11

     b.   The Cited Public Disclosures Did Not Disclose the Essential Elements of the
          Claim ........................................................................................................ 13

          i.    The *Lowell Sun* and *Evidence Log* Articles About Tyngsborough ........ 14

          ii.   The *Opposing Views* Article ............................................................. 16

          iii.  Lawrence Mirsky's Court Filings and Letter to the Government ........... 16

VI)  Conclusion ..................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1-4, 577*, 736 F. Supp. 2d 212
    (D.D.C. 2010) ..........................................................................................................12

*First Time Videos, LLC v. Does 1-500*, 276 F.R.D. 241 (N.D. Ill. 2011).............................12, 13

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................................................20

*Grant v. News Corp.*, 55 F.3d 1 (1st Cir. 1995) ........................................................................20

*Malibu Media, LLC v. Doe*, No. 14-CV-4808, 2016 WL 4574677
    (E.D.N.Y. Sept. 1, 2016) .........................................................................................12

*Malibu Media, LLC v. John Does 1-6*, 291 F.R.D. 191 (N.D. Ill. 2013).....................................13

*Mirsky v. Barkas*, 28 Mass. L. Rptr. 384, 2011 WL 2371879 (Sup. Ct. 2011)...........................19

*Mirsky v. Barkas*, 84 Mass. App. Ct. 1116, 995 N.E.2d 1151 (2013) .........................................19

*Rosenberg v. JPMorgan Chase & Co.*, 487 Mass. 403, 169 N.E.3d 445 (2021)..................14, 19

*TCYK, LLC v. Does 1-47*, No. 2:13-cv-539, 2013 WL 4805022
    (S.D. Ohio Sept. 9, 2013) .......................................................................................12

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85 (2d Cir. 2021)........................................17

*United States ex rel. Poteet v. Bahler Medical, Inc.*, 619 F.3d 104 (1st Cir. 2010) .....................14

*United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016) ...........19

*United States v. Chattanooga-Hamilton Co. Hosp. Auth.*, 782 F.3d 260 (6th Cir. 2015) ...........17

*West Bay One, Inc. v. Does 1-1, 653*, 270 F.R.D. 13 (D.D.C. 2010) .........................................12

## Statutes

31 U.S.C. § 3730..........................................................................................................................14

M.G.L. c. 12, § 5B....................................................................................................................2, 3

M.G.L. c. 12, § 5G.................................................................................................................14, 17

M.G.L. c. 140, § 129D ........................................................................................................*passim*

M.G.L. c. 140, § 131Q ................................................................................................. 6

M.G.L. c. 209A, § 3B ................................................................................................. 6

M.G.L. c. 278A, § 16 ................................................................................................. 6

M.G.L. c. 44, § 55 ...................................................................................................... 2

## Other Authorities

*A Tale of Four Cities*, The Evidence Log (2008 No. 4) ............................................ 15

Dabney Bailey, *Are Massachusetts Police Illegally Seizing and Selling Privately-Owned Guns for Profit?*, Opposing Views (updated Mar. 1, 2018; original May 9, 2013) ................ 16

*Tyngsboro chief cleaning out dept.'s closets*, Lowell Sun (Aug. 28, 2007) ............................... 14

## Rules

Fed. R. Civ. P. 37 ........................................................................................................ 20

Fed. R. Civ. P. 45 .................................................................................................. 11, 12

**I)      Introduction**

There is no basis for quashing the subpoenas, which seek evidence that is not just directly relevant, but also highly important to proving the "reverse" false claim that is pending before the Court. In arguing to the contrary, the Municipalities[1] substantially mischaracterize the pending claim in two ways. First, the Municipalities ignore that Village Vault is still a Defendant to that claim, meaning that all 30 of the transactions the complaint identifies are still in issue. Second, the Municipalities incorrectly characterize using an unfounded level of generality, saying the issue is simply the "systemic failure of police departments across Massachusetts to dispose of guns pursuant to G.L. c. 140, § 129D." However, § 129D governs a number of different "dispositions" related to firearms in police custody, and (as the Court has already recognized) the claim at bar is significantly more specific than "any guns sold" or "guns that § 129D applied to." Rather, the claim here concerns only the subset of § 129D guns that became the beneficial property of the Commonwealth—ergo the need for the subpoenaed documents.

The Municipalities devote the substantial bulk of their motion to their claim that materials they recently located are a complete defense under the "public disclosure bar" of the MFCA. On examination, however, this is clearly not the case. The actual "public disclosures" they identify disclose that police departments sell guns, and that they once failed to hold surrendered guns for the requisite one year period—but they do not disclose an arrangement to sell "one year guns" to Village Vault.

What's more remarkable is that the Municipalities are attempting to raise this supposed knock-out defense *in a motion to quash*. An alleged defense to liability is not a basis for resisting compliance with a subpoena, and accordingly, the argument is not before the Court. Yet, while it

---

[1] The terms "Municipalities" and "Village Vault" have the same meanings that they have in the Municipalities' motion.

is not properly before the Court, we are mindful that the Municipalities' apparent motivation is to influence the pending motion for leave to amend. Since the argument plainly lacks merit, but would have pertinence to that motion, we respond to it.

Ultimately, we submit, the Municipalities' present motion is a useful case study in why, on the facts presented here, the Court should grant the pending motion for leave.

## II)  The "Reverse" False Claim Against Village Vault Still Concerns 30 Transactions Involving 15 Police Departments

The Plaintiffs' "reverse" false claim concerns 30 transactions that took place between Defendant Village Vault and officials at 15 police departments. *See* Third Amended Complaint ¶¶ 46-112 (Doc. No. 78). As discussed in Section III, the claim concerns a particular subset of guns that, after a period of one year, were to be transferred to the State Police for the benefit of the Commonwealth. *See id.* ¶¶ 32-34. The complaint asserts, pertinently, that Village Vault has "arrangements" with the 15 police departments to buy these "one-year" guns, "most commonly by providing a dollar-denominated 'credit' that the police departments can then use to purchase equipment, supplies and other valuable consideration[.]" *Id.* ¶ 46. The "credit" arrangement was an attempt to evade M.G.L. c. 44, § 55, which required the departments to remit "[a]ll moneys" they received to their respective general funds, rather than using them for unapproved purchases.

Accordingly, the police officials "transmitted [the] guns and other items of property to Defendant Village Vault, rather than to the Colonel of State Police," and further, "[i]n contravention of these obligations, Defendant Village Vault has retained the proceeds of the guns and other items it sold, rather than remitting said sums to the State Treasurer." *Id.* ¶¶ 123, 125. The cause of action concludes that the "Defendants are accordingly liable pursuant to M.G.L. c. 12, § 5B and related provisions of the Massachusetts False Claims Act." *Id.* ¶ 126. The MFCA imposes liability on anyone who, among other things, "knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth," or "conspires to commit a violation." M.G.L. c. 12, § 5B(a)(3), (9). Village Vault both concealed and avoided an obligation to transmit property to the Commonwealth, and it also agreed to do so by virtue of agreeing to purchase the guns.

Last June, the Court dismissed the Municipalities as defendants because it concluded that public corporations are not "persons" within the MFCA's definition. *See* Memorandum and Order p. 25 (Doc. No. 120). However, the Court also *denied* a motion from individual Defendants O'Connor and McNamara that contended the Plaintiffs failed to state a claim. *See id.* at 26-31. In rejecting this motion, the Court explained that "the MFCA is violated not only when the government does not actually receive payment but also when an 'obligation to pay' the government is 'conceal[ed],'" and that "[t]he complaint therefore states a claim under the MFCA." *Id.* at 30-31. Thus, while the Court dismissed the MFCA claim "against the Municipality Defendants as well as O'Connor and McNamara in their official capacities," it did not dismiss the claim against Village Vault, or against O'Connor and McNamara in their individual capacities. *See id.* at 31. The MFCA claim against Village Vault thus remains pending, and it concerns all 30 transactions that both the Third Amended Complaint and the Fourth Amended Complaint identify.

Accordingly, the Municipalities' argument (pp. 12-13) that the subpoenas seek evidence that is "entirely irrelevant" because (according to them) the remaining claim only concerns the three gun transactions that involved Stoughton is, quite simply, wrong. The MFCA cause of action asserts claims against Village Vault, so all 30 transactions involving all 15 police departments are at issue in the case. *See* Third Amended Complaint ¶¶ 123, 125 (Doc. No. 78). What's more, it is difficult to understand how the Municipalities have misapprehended this (if

indeed they have), given the arguments the Plaintiffs have made in support of the pending motion leave to amend. There, the Plaintiffs emphasized that "the resolution of the case as it presently stands, whether by trial or motion, will require the same essential proof even in the absence of the proposed amendment." This is because, "in order to establish the liability of Village Vault and Dowd, the Plaintiffs will need to introduce witness testimony, records or other evidence establishing the details of each of the 30 transfers and the value of the transferred property." Plaintiffs' Motion pp. 1-2 (Doc. No. 128).

### III)   The "Reverse" False Claim Concerns Guns with a Particular Set of Characteristics

Police departments, and their officers, can possess guns for a number of different reasons. Furthermore, when the police possess guns, there are a number of different statutory provisions that may potentially govern or be relevant. As this Court has already recognized, the Plaintiffs' reverse false claim concerns a particular subset of guns in police custody. It concerns guns that § 129D applies to—most notably, guns "surrender[ed] . . . by individuals whose licenses have been suspended or revoked"—which have then, pursuant to § 129D become the property of the Commonwealth because they remained in police custody for more than one year, without being otherwise disposed of. *See* Memorandum and Order p. 27 (Doc. No. 12). However, there are many circumstances in which police departments are free to sell or trade guns. Thus, the mere fact that police are selling guns does not indicate that they are selling the "one year guns" that this case concerns. Rather, as this Court has also already explained, "answering th[e] question" of whether certain gun transfers concerned one-year guns or instead concerned guns that the police had authority to sell "*requires discovery*." *See id.* at 29 (emphasis added).

Indeed, there are several statutory requirements and other considerations that are pertinent to the holding and disposition of guns by police. One is M.G.L. c. 140, § 129D, which

comprises five unnumbered paragraphs. Pertinently, its first paragraph upon that "[u]pon revocation, suspension or denial of an application for" a gun license, a person must "without delay deliver or surrender to the licensing authority[2] where the person resides all firearms, rifles, shotguns and machine guns and ammunition which the person then possesses." M.G.L. c. 140, § 129D. The person then has "the right, at any time up to 1 year after the delivery or surrender, to transfer the [guns] to any licensed dealer or any other person legally permitted to purchase or take possession." *Id.* The police must "observe due care in the receipt and holding of any such" guns. *Id.* Notably, § 129D gives police the option to "transfer possession of such weapon for storage purposes to a federally and state licensed dealer[.]" *Id.* If the police do this, then "[t]he owner shall be liable to such dealer for reasonable storage charges[.]" *Id.* Furthermore, if "storage charges for such weapon have been in arrears for 90 days," then the dealer can auction the guns to pay the charges *See id.*

Aside from governing guns surrendered in connection with gun license issues, § 129D also governs "surplus, donated, abandoned or junk firearms, rifles, shotguns or machine guns or ammunition," providing that if the police "cannot reasonably ascertain a lawful owner within 180 days of acquisition by the authority, the authority may, in its discretion, trade or dispose of" such guns. *See id.* In contrast with guns surrendered in connection with license issues, the statute authorizes the police department to either transfer the proceeds to the pertinent municipality, or alternatively, to use them for certain purposes. *See id.*; *see also* Memorandum and Order pp. 28-29 (Doc. No. 120). The statute further specifies that "no [gun] classified as having been used to

---

[2] The "licensing authority" is "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." M.G.L. c. 140, § 121.

carry out a criminal act pursuant to [M.G.L. c. 140,] section 131Q shall be considered surplus, donated, abandoned or junk for the purposes of this section." *See* M.G.L. c. 140, § 129D.

The final aspect of § 129D that is pertinent is its direction that guns "not disposed of after delivery or surrender according to the provisions of this section shall be sold at public auction by the colonel of the state police . . . and the proceeds shall be remitted to the state treasurer." M.G.L. c. 140, § 129D. It is this statutory directive, when it applies, that gives rise to the reverse false claim that is pending before the Court.

But other statutes are also pertinent. Under Chapter 209A, for example, a court issuing an order of protection can also order a person to "surrender" all guns. *See* M.G.L. c. 209A, § 3B. If so, the statute specifically directs that, other issues aside, police do not have authority to "transfer . . . any weapons surrendered by the defendant to anyone other than a licensed dealer." *Id.* Thus, if a person who was subject to an order of protection wants to get their guns back, or to transfer them to a third party, they must deal with the licensed dealer that the police transfer the guns to.

Beyond all this, Police also hold guns as evidence. If an investigation results in a conviction, then police must retain all evidence, including guns, "for the period of time that a person remains in the custody of the commonwealth or under parole or probation supervision in connection with that crime[.]" M.G.L. c. 278A, § 16(a). Furthermore, if a gun was in fact "used to carry out a criminal act," then (as stated previously) police normally cannot sell it. *See id.* c. 140, §§ 129D, 131Q. However, if a gun was not used to commit a crime, and if the police do not need to (or no longer need to) hold that gun due to a person's conviction, then police would be free to sell it if they were unable to "readily ascertain a lawful owner," as provided in § 129D.

Finally, it must also be observed that police departments normally have guns that are for the use of their own officers, whether as duty weapons, for special purposes (*e.g.* the SWAT

team) or for training. The statutes governing surrendered (etc.) guns, donated (etc.) guns, guns under restraining orders and guns held as evidence do not cover these guns. Police departments often sell their own guns, and nothing about doing so is unlawful (so long as they comply with the laws that otherwise govern the purchase and sale of firearms).

### IV)   The Subpoenas Seek Evidence that is Both Relevant and Important

#### a.   An Essential Element of the Claim is that the Guns Sold to Village Vault Were "One Year Guns" that had Become the Property of the Commonwealth—Not Just that Police Sold them, or that § 129D Applied

The "reverse" false claim in both the Third Amended Complaint and the proposed Fourth Amended Complaint centers on police officials' disposition of a particular category of guns and ammunition. Specifically, the case at bar concerns guns that an owner: (1) "delivered or surrendered" to the police; (2) because the police had revoked, suspended or denied the owner's gun license; and (3) which the police then held for a period of more than one year, thus becoming the property of the Commonwealth. Pursuant to M.G.L. c. 140, § 129D, the Defendants "had the obligation to transmit [them] . . . to the colonel of the Massachusetts State Police for auction." *See* Third Amended Complaint ¶¶ 32-34, 121 (Doc. No. 78); Fourth Amended Complaint ¶¶ 34-36, 123 (Doc. No. 128-1). We refer to these guns as "one year guns." As explained in further detail below, there are many other reasons that police may have guns in their possession—and many times, police can lawfully sell or transfer those guns to licensed gun dealers. Thus, the bare fact that police have sold or transferred guns to a licensed gun owner does not, standing alone, indicate that there has been a violation of the False Claims Act.

#### b.   The Current Subpoenas Seek Necessary Details About the Guns that the Municipalities Identified in Response to the Earlier Subpoenas

The subpoenas that the Plaintiffs served during the spring and summer of 2020 sought significantly less information than do the present subpoenas—essentially, contracts and receipts

with Village Vault, as well as inventory records for guns transferred to Village Vault. *See* Apr.

2020 Subpoena (Doc. No. 136-6). The Plaintiffs had good reason to believe that guns transferred

to Village Vault, in particular, might be one year guns because Village Vault's principal,

Defendant Peter Dowd, had testified at a deposition that Village Vault did this on a regular basis:

> After a year, guns that are at a police department are considered
> abandoned and they are able to do whatever they want to with the guns.
> Many times we go there while we're picking up restraining order guns or
> whatever, they'll say, We have these guns that were donated or abandoned
> or these guns have been sitting here a year and a half. We've talked to the
> owner of record. He never came and got them, never did anything. Take
> them and put them in storage. . . .
> We wouldn't take it if it was less than a year old unless – unless we
> took it under the other circumstances: is there a restraining order, safe keep,
> or something like that.

 [Exhibit 1, P. Dowd Tr. at pp. 9-10, 21]

The information that many police departments, including those of the Municipalities,

provided in response to the earlier subpoenas showed the transfer of what were likely one year

guns. This allowed the Plaintiffs to amend their complaint to identify and focus on specific

transactions involving the specific Municipalities. However, it did not conclusively establish that

each particular gun was in fact a one year gun. The present subpoenas, narrowed down to the

Municipalities at issue in this case, seek to do that by asking for records that reflect, most

pertinently, how and when each police department came to possess each gun identified.

### c.  In the Context of the Issues that are Actually Relevant, the Municipalities' Claims About Irrelevance, Undue Burden and Bad Faith are Meritless

Once viewed in context with the issues that actually matter, the Municipalities' claims

rapidly lose their force. Yes, the new subpoenas do seek (in essence, as the Municipalities put it

at p. 13) "all documentation relating to the transfer of [the] firearms" identified in the subpoenas,

rather than just the more limited information sought before (essentially, lists of guns). But the

need for this additional information is clear. The fact that guns were transferred or sold to

Village Vault does not establish the existence of a reverse false claim. Rather, one must be able to show that particular guns come within § 129D's one-year directive in the first place. Indeed, the Plaintiffs articulated that need (to everyone's apparent satisfaction at the time) at the last conference with this Court on November 16, 2021, and the Court suggested that the Plaintiffs proceed with serving the subpoenas, rather than wait on a decision on the motion for leave.

Likewise, the Municipalities' complaints about the length of the gun lists attached to the respective subpoenas, or that some lack dates (pp. 13-14), are duplicitous. These are the *exact same lists* that the respective Municipalities themselves provided in response to the earlier subpoenas. The present subpoenas do nothing but ask the police departments to look at their own records, and to then provide the additional records that relate to the guns listed there.

Finally, the Municipalities' claim (p. 15) that the Plaintiffs did not issue the subpoenas "in good faith" because it is "improper" to use subpoenas to "'flesh out' a pattern of facts that are *not* known" is based on a nonexistent premise. Specifically, it is based on the Municipalities' incorrect claim that the subpoenas seek information going beyond the 30 gun transactions that are already at issue in this case, and which would likewise continue to be at issue under the Fourth Amended Complaint. But as the Plaintiffs have already shown, these subpoenas seek information that is directly relevant to the claims already presently asserted. *See generally* Third Amended Complaint ¶¶ 50-112 (Doc. No. 78) (identifying the 30 transactions); Fourth Amended Complaint ¶¶ 52-114 (Doc. No. 128-1) (same). And plainly, the Municipalities have no entitlement to attorney's fee, given that (among other things) their motion relies largely on improper grounds for resisting compliance with the subpoenas, and it otherwise relies on materially mischaracterizing the issues that are before the Court.

### d.  The Evidence the Plaintiffs Seek is Material and Important

The Municipalities also object (p. 14) to the fact that the subpoenas also seek, in addition to the pertinent background details of the implicated guns, documentation, including "emails, letters, policies and procedures regarding selling or transferring gun." But the reality is that these types of documents are likely to be highly relevant to the claims that are pending in this action. To show this, we detail two items of similar evidence that the Plaintiffs have already obtained.

The first item, an email, shows that the Reading Police Department was specifically advised that there was no "legal way" to sell one year guns, which needed to be turned over to State Police, and in any event, that the Department needed remit moneys to the Town's general fund, rather than using them funds for their own off-the-books purposes:

> *If you get cash, it has to go to the general fund not the PD which is why people usually get the credit for guns or ammo.* It has been done frequently and is still done today. However if you were to ask me if it was entirely legal, that would be a more difficult question to answer. There is always the concern that when IA resells the gun that it could turn up in a crime. *But as to the legality, the statute mentions turning the guns over to MSP for auction.* The reality is that the Colonel doesn't auction guns. MSP destroys them. Best case scenario is that you give all your confiscated/forfeited guns to MSP for destruction and never have to worry about them again. Having said that, plenty of PDs continue to sell the guns for credit to dealers - even local dealers. *Is there a legal way to do it? Not that I've ever found. The practice is discouraged by the general counsel for the Mass Chiefs of Police, but PDs still do it because of the costs involved of purchasing new guns or ammo.*

Exhibit 2, J. Glidden Email (emphasis added). Notwithstanding this, the town sold guns to Village Vault and used a "credit" arrangement to bypass the general fund. *See* Third Amended Complaint ¶¶ 79-80 (Doc. No. 78). Notably, the Town of Reading is one of the Municipalities that is currently seeking to avoid providing material evidence (as well as to again be impleaded by means of an individual capacity claim).

A second example of pertinent evidence comes from the City of Springfield. When it sold guns to Village Vault, it used a contract that specifically referenced the obligation to turn over certain guns for auction, and placed the obligation for compliance on Village Vault:

> *Vendor must comply with the requirements of MGL c. 140, sec. 129D, including the disposition of such weapons by auction or otherwise*, as well as its procedures for notifying owners of firearms, billing of storage fees to owners (never to the City), and disposition of proceeds to owners after deduction of costs of storage, transfer and surrender. These procedures apply to firearms which have been turned over to SPD due to restraining orders, for safekeeping, and/or for firearms license revocations, suspensions or denials.

Exhibit 3, Springfield contract (emphasis added). This shows, among other things, that Village Vault was aware that § 129D required the disposition of certain guns "by auction," as well as that Springfield Police Commissioner John Barbieri (who signed the agreement) was also aware. *See* Fourth Amended Complaint ¶¶ 61-64 (Doc. No. 128-1). Springfield is another of the Municipalities that is presently seeking to avoid providing any further evidence, as well as to avoid the impleader of Commissioner Barbieri.

Evidence related to the Municipalities' emails, letters, policies and procedures is directly relevant because it shows both the state of mind and culpability of Village Vault, as well as of the additional individuals who would become defendants under the Fourth Amended Complaint.

### V) The Municipalities' Alleged Public Disclosure Bar Defense is Not a Basis for Avoiding Compliance with the Subpoenas—and Even if it were, it is Meritless

#### a. The Municipalities' Arguments About the Merits of the Case are Not a Ground for Quashing a Subpoena

Rule 45 provides six grounds on which a court can quash or modify a subpoena.

Specifically, Rule 45 requires a court to quash or modify a subpoena if it:

(i)   fails to allow a reasonable time to comply;
(ii)  requires a person to comply beyond the geographical limits specified in Rule 45(c);

> (iii)    requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv)    subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A). Rule 45 also permits a court to quash or modify a subpoena if it would disclose "a trade secret or other confidential research, development, or commercial information" or "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." *Id.* 45(d)(3)(B). A deponent's claim that a pending case will fail on its merits—as the Municipalities attempt to advance here—is plainly outside any of these grounds.

It is accordingly well established that "the merits of [a] case are not relevant to the issue of whether the subpoena is valid and enforceable." *Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1-4, 577*, 736 F. Supp. 2d 212, 215 (D.D.C. 2010); *see also Malibu Media, LLC v. Doe*, No. 14-CV-4808, 2016 WL 4574677, *6 (E.D.N.Y. Sept. 1, 2016) ("whether Defendant ultimately has meritorious defenses to Plaintiff's claims is not relevant for purposes of the instant motion to quash or Plaintiff's ability to obtain the discovery sought in the Verizon Subpoena" (citations omitted)); *West Bay One, Inc. v. Does 1-1, 653*, 270 F.R.D. 13, 15 (D.D.C. 2010). "A general denial of liability is not relevant as to the validity or enforceability of a subpoena, but rather should be presented and contested once parties are brought properly into the suit." *First Time Videos, LLC v. Does 1-500*, 276 F.R.D. 241, 250 (N.D. Ill. 2011) (citation omitted). "[A]rguments related to the merits of the allegations are appropriately addressed in the context of a motion to dismiss or a motion for summary judgment, rather than on a motion to quash." *TCYK, LLC v. Does 1-47*, No. 2:13-cv-539, 2013 WL 4805022 (S.D. Ohio Sept. 9, 2013) (citation omitted). "[A] subpoena cannot be quashed on the basis of general denials of liability."

*Malibu Media, LLC v. John Does 1-6*, 291 F.R.D. 191, 197 (N.D. Ill. 2013) (citations omitted);

*see also First Time Videos*, 276 F.R.D. at 250.

      If the Municipalities would like to assert defenses on the merits, then they can do so after

being impleaded by means of claims against their individual employees.

> **b. The Cited Public Disclosures Did Not Disclose the Essential Elements of the Claim**

      The Municipalities' real angle appears to be influencing the pending motion for leave to

amend. That is, by suggesting that the Plaintiffs' claim might not have merit—in the context of a

motion in which the merits are irrelevant—the Municipalities hope to nudge the Court towards

denying amendment on the rationale that there may not actually be that much at stake. Then, the

respective police departments would avoid being held responsible for engaging in illegal

conduct, even though at least some of those police departments had actual knowledge that what

they were doing was illegal. This would be manifestly unjust, as the Municipalities' newly found

defense is plainly inapplicable. Thus, while the Municipalities' arguments about the public

disclosure bar are not properly before the Court, the Plaintiffs address them anyway to avoid

creating the false impression that they could be meritorious.

      The Municipalities' public disclosure bar argument has the same essential problem as the

their relevance argument. In both cases, the Municipalities ignore the actual claim and instead

offer up their own simplified narrative about a "systemic failure of police departments across

Massachusetts to dispose of guns pursuant to G.L. c. 140, § 129D." *See* Motion to Quash p. 15

(Doc. No. 136). The Municipalities then beat up the straw man they have erected by pointing to

anyone's prior grievance with § 129D as an alleged public disclosure.

However, the public disclosure bar does not turn on the simplified mischaracterizations of a party seeking to avoid liability. Rather, it applies only if "substantially the same allegations or transactions" have been "publicly disclosed" in one of the following three sources:

> (1) in a Massachusetts criminal, civil or administrative hearing in which the commonwealth is a party; (2) in a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation; or (3) from the news media[.]

M.G.L. c. 12, § 5G(c).[3] Notably, this provision Massachusetts False Claims Act is substantively the same as the federal False Claims Act, and it is accordingly appropriate to consider federal False Claims Act authorities. *See* 31 U.S.C. § 3730(e)(4)(A); *Rosenberg v. JPMorgan Chase & Co.*, 487 Mass. 403, 409 & n.12, 169 N.E.3d 445, 455 & n.12 (2021). Public disclosures that are in one of these three forms will bar a claim only if they provide "the essential elements exposing the fraud." *Rosenberg*, 487 Mass. at 410, 169 N.E.3d at 456 (citing *United States ex rel. Poteet v. Bahler Medical, Inc.*, 619 F.3d 104, 110 (1st Cir. 2010)).

Once considered in light of what is actually at issue, it is clear that the Municipalities' cited "public disclosures" do not (to the extent they are public disclosures in the first place) set forth the essential elements of the reverse false claim pending here.

### i.   The *Lowell Sun* and *Evidence Log* Articles About Tyngsborough

The article *Tyngsboro chief cleaning out dept.'s closets*, Lowell Sun (Aug. 28, 2007) announces the Tyngsborough police chief's "plan to clean out the evidence room and sell guns and other abandoned property," and that, in the course of doing so, "[a]bout 100 guns will be sold through Village Vault." Exhibit 2(c) p. 73 (Doc. No. 136-2). The article specifically refers to "property not needed for pending cases," and says that "the guns to be sold had not been used

---

[3] Even if there has been a public disclosure, the action can still proceed if either the Attorney General brings the action or if the relator is an "original source." *See* M.G.L. c. 12, § 5G(c).

in violent crimes." *Id.* Furthermore, "[s]ome of the guns were seized after cases of domestic violence, which made the owners ineligible to possess firearms." *Id.*

The article *A Tale of Four Cities*, The Evidence Log (2008 No. 4) likewise states that the town "is planning to sell approximately 100 firearms to a federally licensed firearms dealer." Exhibit 2(b) p. 31 (Doc. No. 136-2). In language the Municipalities emphasize, the article relays the chief's statement that "the Department does not usually destroy firearms that have resale value; these are traded in to a firearms dealer where they are reconditioned and resold. This helps offset the cost of new firearms for its officers." The article states further (in language the Municipalities omit) that the dealer, Village Vault, "complies with all state gun laws."

These articles disclose that a Massachusetts police department was selling guns to Village Vault—but that, standing alone, does not indicate impropriety. As discussed previously, police departments often sell guns, including guns that are no longer needed as evidence. True, the *Lowell Sun* article says that "some" guns "were seized after cases of domestic violence," but there are many cases in which police might be lawfully entitled to sell guns that were seized after cases involving domestic violence. Among other things, police might seize guns connected to a domestic violence incident for reasons unconnected to a license suspension or revocation—for example, if the owner was not lawfully in possession of them in the first place, or if the "owner" denied they owned the gun. Moreover, even if a seizure came within § 129D, the owner might choose to relinquish their rights in the gun and instead donate it to the police, particularly if they were no longer going to be able to possess it. In any of these instances, the police would be lawfully entitled to sell the gun. Thus, the articles do not disclose the key essential elements that the guns *had become the property of the Commonwealth due to the passage of one year*, but were being sold to Village Vault regardless.

-15-

### ii.     The *Opposing Views* Article

The article on the Opposing Views website concerns an individual's "claim that local police are systematically violating the rights of gun owners." *See* Dabney Bailey, *Are Massachusetts Police Illegally Seizing and Selling Privately-Owned Guns for Profit?*, Opposing Views (updated Mar. 1, 2018; original May 9, 2013), Exhibit 2 p. 116 (Doc. No. 136-2). Lawrence Mirsky's specific claim was that "Quincy Police are revoking pistol licenses at the drop of a hat, seizing privately owned firearms, and then illegally selling the guns to fund the department." *Id.* In "laymen's terms," according to the article, Mr. Mirsky was "accusing the local police of running a racket *against gun owners*." *Id.* (emphasis added).

This article likewise does not disclose the key essential elements of the claim at bar—that the police were selling *"one year guns" that had become the property of the Commonwealth*, instead of transferring them to State Police. To the contrary, Mr. Mirsky's claim concerned an alleged "racket against gun owners" that involved "revoking pistol licenses" without sufficient cause and then "illegally selling" seized guns. Nothing in the article indicates the *reason* the sales were illegal. Were the alleged sales illegal because the police had conducted them during the one year that they were obliged to hold guns following a suspension or revocation? Were they illegal because the police accidentally concluded that the guns at issue were ones they could sell (*e.g.* as lost or donated guns) when they were actually guns they were obligated to hold? If anything, the article suggests that the issue was *not* "one year guns" because that would be a "racket against the Commonwealth," not a "racket against gun owners."

### iii.     Lawrence Mirsky's Court Filings and Letter to the Government

The Municipalities focus much of their "public disclosure" argument on the court filings and government submissions that Lawrence Mirsky made after the Quincy Police Department seized his guns. However, these documents are plainly not public disclosures. Court submissions

are not pertinent unless "the commonwealth is a party." M.G.L. c. 12, § 5G(c)(1). Indeed, the

Court has already expressly recognized this. *See* Memorandum and Order p. 21 (Doc. No. 120).

And further, while the reports *of* a Commonwealth agency can be within M.G.L. c. 12, §

5G(c)(2), the documents that the Municipalities cite—complaints submitted *to* a Commonwealth

agency—are not. Rather, "disclosures to government officials do not constitute public

disclosures for purposes of the public disclosure bar." *United States ex rel. Foreman v. AECOM*,

19 F.4th 85, 124 (2d Cir. 2021) (citing *United States v. Chattanooga-Hamilton Co. Hosp. Auth.*,

782 F.3d 260, 268-69 (6th Cir. 2015)).

Although these court filings and letters are not within § 5G(c)'s public disclosure

provisions in the first place, it is still significant to note that Mr. Mirsky's case was substantially

different from the case presented here. Mr. Mirsky's letter to the Executive Office of Public

Safety and Security recounted that the Quincy Police "were systematically, and corruptly

violating the civil rights *of firearms owners* in order to profit from the sale of their property." *See*

Exhibit 2 p. 77, ¶ 1 (Doc. No. 136-2) (emphasis added). This was taking place because even

though an owner had "one year to transfer their property into the hands of one who is permitted

under law to possess it," there was instead a "departmental policy never to return firearms." *See*

*id.* at ¶¶ 2, 4. Mirsky stated his firearms were seized in December 2008, but were sold in October

2009—less than one year later. *See id.* at p. 78, ¶ 7. Mr. Mirsky concluded that this evidenced

"an regular and ongoing practice to profit by denying the civil rights *of property owners*." *Id.* at ¶

9 (emphasis added). The core of the grievance was thus that Quincy Police were depriving

individual gun owners of their rights by selling seized firearms *too early*. In claiming that this

disclosed the scheme at issue in the present case, the Municipalities point to the Village Vault

receipts that Mirsky included with his letter, contending that there was a public disclosure

because someone might have seen the reference to "credits" and put the whole scheme together by supposition—even though there's no indication that anyone did.

Mr. Mirsky's court complaint likewise concerned the alleged "illegal sale of [his] property, stemming from a years long campaign waged by the defendants to harass and alienate [Mirsky], to paint him as mentally ill, to drive him from his home, to imprison him, to deprive him of his civil rights, his property, and dissuade him from taking legal action against the defendants themselves." *See* Exhibit 5 p. 8, ¶ 1 (Doc. No. 136-5). The bulk of the alleged facts concerned Mirsky's interactions with a female supermarket employee, which he claimed had been misunderstood or mischaracterized. *See id.* at ¶¶ 1, 9-23, 25, 28-35, 37-39, 43.

As to § 129D, one of Mirsky's ten causes of action asserted "Violation of Massachusetts General Law. Chapter 140, section 129D." *See id.* at p. 29, ¶¶ 63-66. The precise basis for this was Mirsky's claim that "[t]he Quincy Police Department sold or otherwise disposed of nearly $11,000 worth of plaintiff Mirsky's firearms property before the one year period in which they were to hold them, pending transfer to another individual of Mirsky's choice, was up." *Id.* at ¶ 64. In this respect, Mr. Mirsky's claim was somewhat analogous to Mykel Powell's original claim—that the police had failed to hold his guns for the mandated one year period and had instead sold them, whether accidentally or maliciously. *See* Complaint ¶¶ 9, 18-20, 25 (Doc. No. 2) in *Powell v. Holmes*, No. 1:17-cv-10776 (D. Mass. filed May 3, 2017) (guns seized on November 14, 2015 and "sent for disposal" on October 3, 2016, less than one year later). Indeed, the essential pertinence of Mr. Mirsky's prior case was that (as this Court has already observed) it established that there was no right of action for a violation of § 129D. *See* Memorandum and Order p. 11 n.4 (Doc. No. 25) in *Powell v. Holmes*, No. 1:17-cv-10776 (D. Mass. filed Feb. 1, 2018). Mr. Mirsky went on to assert that aside from this, "by not submitting said property to the

State Police for auction as prescribed . . . the Quincy Police are effectively guilty of defrauding the Commonwealth." *Id.* at ¶ 65; *see also id.* at p. 25, ¶ 44. This statement could be true, but is not necessarily so,[4] and a missive about what might have been happening is not the same as a disclosure that provides the details of what actually is happening.

More to the point, a review of these "disclosures" shows why the public disclosure bar does not include court filings that do not involve the government and reports *to* the government (rather than reports *by* the government). Literally anyone can file a lawsuit or submit letters to the government, making myriad allegations of impropriety and malfeasance. People doing so may have little or no basis for their accusations, and officials receiving those allegations may have little or no reason to take them seriously. Thus, this is not a situation where it can be said that the "fraud [is] already apparent from information in the public domain." *Rosenberg v. JPMorgan Chase & Co.*, 487 Mass. 403, 409, 169 N.E.3d 445, 456 (2021) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 206 (1st Cir. 2016)). Notably, neither of the reported cases that concern Mr. Mirsky reference anything about a scheme to sell one year guns. *See Mirsky v. Barkas*, 28 Mass. L. Rptr. 384, 2011 WL 2371879 (Sup. Ct. 2011) (recounting that "the Quincy Police had improperly disposed of his [guns and other] property due to [defendant's] paperwork error"); *see also Mirsky v. Barkas*, 84 Mass. App. Ct. 1116, 995 N.E.2d 1151 (2013). Allowing these types of documents to preclude meritorious claims as supposed "public disclosures" would not advance the policies underlying the False Claims Act,

---

[4] If police were selling guns during the period they were obliged to hold them, but would have ultimately transferred them to State Police at the end of this period, then the premature sale would have directly deprived the individual gun owner at the time it took place, but would have ultimately deprived the Commonwealth—if the owner would not have taken action to transfer the gun to someone else so that the guns would then have become the Commonwealth's property. But how do we know this would have happened?

since the fraud at issue was not actually known in the public domain, and would instead frustrate these goals by giving otherwise liable defendants an undeserved "pass."

**VI)    Conclusion**

The Municipalities have provided no grounds that would justify quashing the pending subpoenas. The evidence sought is directly relevant, and important, and the Municipalities' newly discovered "public disclosures" would not be a basis for avoiding compliance with the subpoenas even if they had merit—which, as the foregoing discussion shows, they do not.

As we stated from the outset, the Municipalities' motion is actually an exemplar of why, on the facts presented here, the Court should grant the pending motion for leave. The proposed amendment will serve the interest of judicial economy because it will allow the Plaintiffs to obtain the pertinent evidence and testimony through discovery requests and notices, rather than subpoenas. Moreover, the fee-shifting standards in Rule 37 will (at least hopefully) avoid the need for the Court to decide motions such as the present one. At the same time, there is no undue prejudice because the Municipalities, which employ the individuals who would be impleaded, have been involved in this litigation for a significant amount of time—and indeed, will continue to remain involved. Moreover, there have been *no* prior amendments to address pleading deficiencies—rather, the need for amendment is the determination of an unresolved issue of law, not a delay that lacks justification. Contrary to the stage that the Municipalities seek to set with their misplaced argument about the merits, this is a situation where leave to amend "should, as the rules require, be 'freely given.'" *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also, e.g., Grant v. News Corp.*, 55 F.3d 1, 5 (1st Cir. 1995).

Dated: December 29, 2021

Respectfully submitted,

THE PLAINTIFFS,
By their attorneys,


 /s/ David D. Jensen
David D. Jensen
David Jensen PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

Margarita Smirnova, Esq.
BBO No. 680429
7 Greenbriar Drive, Unit 109
North Reading, Massachusetts 01864
Telephone: (617) 875-8663
margarita.smirnova@gmail.com


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on Dec. 29, 2021.

 /s/ David D. Jensen
David D. Jensen