UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *ex rel.* MYKEL POWELL, COMMONWEALTH SECOND AMENDMENT, INC. and BRENT CARLTON; and MYKEL POWELL,<br><br>Plaintiffs,<br><br>v.<br><br>SGT. BRIAN HOLMES, in his Individual and Official Capacity as Deputy Chief of the Stoughton Police Department; JAMES O'CONNOR, in his Individual and Official Capacity as Sergeant of the Stoughton Police Department; DONNA M. McNAMARA, in her Individual and Official Capacity as Chief of the Stoughton Police Department; VILLAGE GUN SHOP, INC. d/b/a VILLAGE VAULT; PETER DOWD; CITY OF SPRINGFIELD; TOWN OF PLYMOUTH; TOWN OF WINCHESTER; CITY OF CHICOPEE; TOWN OF DEDHAM; CITY OF MEDFORD; TOWN OF READING; TOWN OF WAKEFIELD; TOWN OF WILMINGTON; TOWN OF ANDOVER; TOWN OF FOXBOROUGH; CITY OF GARDNER; TOWN OF HUDSON; and TOWN OF SAUGUS,<br>Defendants.<br>                              Defendants. | CIVIL ACTION NO.<br>1:18-cv-11336-FDS |

## **MEMORANDUM IN SUPPORT OF COMMONWEALTH'S MOTION TO DISMISS COUNT II**

The Commonwealth of Massachusetts, by and through its Attorney General Maura

Healey (the "Commonwealth"), submits this memorandum in support of its motion to dismiss

Count II of the Third Amended Complaint (the "Complaint") filed by *qui tam* relators Mykel

Powell ("Powell") and Brent Carlton ("Carlton") (collectively, "Relators"). Because the Commonwealth has a statutory right to dismiss a *qui tam* action brought in its name, and to prevent the waste of government resources caused by Relators' prosecution of an unmeritorious claim, the Commonwealth moves to dismiss this *qui tam* count purportedly brought pursuant to the Massachusetts False Claims Act, G. L. c. 12, §§ 5A-5O ("MFCA").

## INTRODUCTION

Relators filed Count II of the Complaint under seal pursuant to the *qui tam* provisions of the MFCA Section 5C(2), alleging that the remaining defendants to this action violated the MFCA in connection with the confiscation, storage, and disposal of firearms pursuant to the relevant statutory scheme: G.L. c. 140 § 129D. (Complaint, ¶¶ 121-26).[1] On October 24, 2018, the Commonwealth declined intervention in this action and the following month the seal was lifted. (Dkt. #6, 8). The majority of the defendants named in the Complaint were dismissed from this case on June 30, 2021, including fourteen Massachusetts municipalities which were improperly named as defendants following the Commonwealth's declination decision. (Dkt. ## 11, 120).

Since the Commonwealth's declination, this case has demanded significant resources from Massachusetts political subdivisions, as Relators added numerous municipalities and police officers as defendants and served discovery requests upon scores of Massachusetts political subdivisions. Following the most recent round of subpoenas issued by Relators to Massachusetts municipalities in November 2021, the Commonwealth has reviewed the case, including both the

---

[1] Relators have a pending Motion to replace the Third Amended Complaint with a Fourth Amended Complaint. (Dkt. #128). The Commonwealth states that its arguments regarding Count II are directed to the Third Amended Complaint as the operative pleading, but apply equally to the proposed Fourth Amended Complaint, in which Count II is pled identically but for the substitution of different defendants. *Id.*

Complaint and Relators' proposed Fourth Amended Complaint, and concluded that it is appropriate to dismiss Count II pursuant to the Attorney General's exclusive authority under Section 5D(2) of the MFCA.

Without waiving jurisdictional and merits-based arguments for dismissal, the Commonwealth states that the Attorney General has the statutory authority to dismiss any *qui tam* suit filed in the name of the Commonwealth under the MFCA. *See* G. L. c. 12, § 5D(2). Some courts recognize this right to dismiss as an absolute right not subject to judicial review and others require the government to articulate a rational basis for the dismissal. Even under a rational relationship test, dismissal pursuant to § 5D(2) is warranted in this case where the Commonwealth sets forth as its interests or purposes: (1) preventing a complaint that fails to state an MFCA claim to continue in the Commonwealth's name, and (2) avoiding waste of government resources.

## STANDARD OF REVIEW

The MFCA authorizes the Attorney General to dismiss a *qui tam* suit "notwithstanding the objections of the relator if the relator has been notified by the attorney general of the filing of the motion and the court has provided the relator with an opportunity for a hearing on the motion." G. L. c. 12, § 5D(2). Courts in Massachusetts have not articulated a standard of review for a dismissal under § 5D(2) of the MFCA. The MFCA is modeled on the federal False Claims Act, however, and Massachusetts courts look to interpretations of the federal False Claims Act for guidance on the MFCA. *Scannell v. Attorney General*, 70 Mass. App. Ct. 46, 49 n.4 (2007) (looking for guidance to cases and treatises interpreting the federal False Claims Act in light of the dearth of decisional law interpreting the MFCA).

In interpreting the identical provision in the federal False Claims Act, 31 U.S.C. § 3730(c)(2)(A), some courts concluded that the text gives the government "an unfettered right to dismiss." *Swift v. United States*, 318 F.3d 250, 252-53 (D.C. Cir. 2003). In reaching its conclusion, the *Swift* court reasoned that the government's decision to dismiss a false claims *qui tam* "amounts to" an unreviewable decision not to prosecute. *Swift*, 318 F.3d at 253 (citing *Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985)). "Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States" the court held, further "conclud[ing] that the function of a hearing when the relator requests one is simply to give the relator a formal opportunity to convince the government not to end the case." *Swift*, 318 F.3d at 253.

Assuming arguendo that *Swift* does not require the automatic dismissal of Count II, other courts have applied minimal scrutiny to the government's decision to ensure the government has a "valid" and "rational" reason to dismiss. *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.,* 151 F.3d 1139, 1145 (9th Cir. 1998) ("*Sequoia*").[2] In so doing, dismissal has been ordered where the government identifies: (1) a valid government purpose and (2) a rational relationship between dismissal and accomplishment of that purpose. *Id*. The relationship between the dismissal and the governmental purpose can be somewhat loose. *United States ex. rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F.Supp. 1325, 1341 (E.D. Cal. 1995) ("[T]here need not be a 'tight fitting relationship' between the [dismissal and the governmental purpose]; it is enough that there are 'plausible,' or 'arguable,' reasons supporting

---

[2] The *Swift* Court expressly rejected the rational basis dismissal standard adopted in *Sequoia*, reasoning that even when the government moves to dismiss an action that it brought itself, "courts presume the Executive is acting rationally and in good faith," and further reasoning that the holding in *Sequoia* was based on a misreading of a portion of the the federal False Claims Act's legislative history referring to a proposed but unenacted 1986 amendment. *Swift,* 318 F. 3d at 253.

4

the agency decision."), *aff'd*, 151 F.3d 1139 (9th Cir. 1998). "If the government satisfies the two-step test, the burden switches to the relator to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Sequoia*, 151 F.3d at 1145 (internal quotation marks omitted).[3]

Although both standards are highly deferential to the government, the *Swift* standard should apply in Massachusetts. The rationale in *Swift* comports with important separation of powers concerns that are reflected in the law of the Commonwealth, namely, that matters within the purview of the Attorney General should not be subject to judicial review. *See Shepard v. Attorney Gen.*, 409 Mass. 398, 401 (1991) ("Judicial review of decisions which are within the executive discretion of the Attorney General 'would constitute an intolerable interference by the judiciary in the executive department of the government and would be in violation of art. 30 of the Declaration of Rights.'" (*quoting Ames v. Attorney Gen.*, 332 Mass. 246, 253 (1955))). The decision whether to allow a suit under the MFCA to proceed is such a matter. In addition, the *Swift* standard recognizes the Commonwealth's status as the real party in interest in *qui tam* cases, *see Scannell,* 70 Mass. App. Ct. at 50 ("The MFCA further subordinates the interests of a would-be relator to those of the Commonwealth, the real party in interest, by placing restrictions on the ability of a would-be relator to file a *qui tam* lawsuit."), and its absolute discretion to decide whether to bring an action in its own name. *Swift*, 318 F.3d at 253.

---

[3] More recently, the Seventh Circuit, while recognizing the government's "absolute" right of dismissal, reasoned that a *qui tam* can be dismissed without relator's consent so long as the relator receives notice and an opportunity to be heard. *United States ex rel. Cimznhca v UCB*, 970 F.3d 835, 850 (7th Cir. 2020), *cert. denied*, 2021 WL 2637991 (June 28, 2021). The *Cimznhca* court arrived at its conclusions by applying the standard of Federal Rule of Civil Procedure 41, thereby treating the government's motion to dismiss as necessarily also containing a motion to intervene. *Id.* at 839, 849-50. Circuits are split as to whether intervention is technically required to dismiss a *qui tam,* but agree on this remedy. *See Swift,* at 252. ("if there were [an intervention] requirement, [the court] could construe the government's motion to dismiss as including a motion to intervene" both of which are deemed granted by an order of dismissal.)

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.) Summary of Count II**

Count II of the Complaint ("Count II") alleges that the remaining defendants to this action violated § 5B(9) of the MFCA – the so-called "reverse false claim" liability provision – by failing to remit certain monies to the Office of the Treasurer and Receiver General of Massachusetts (the "Treasurer") in connection with the disposal of guns confiscated by Massachusetts police departments. (Complaint, ¶¶ 121-26). The relevant portion of MFCA § 5B(9) makes it a violation of the MFCA when a person "improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

Relators claim that the defendants' obligation to pay the Treasurer is codified in G.L. c. 140 § 129D ("129D"), which law governs the transfer, storage, and disposal of certain weapons confiscated by Massachusetts police in their role as firearms licensing authority. *Id.* Specifically, Count II claims that defendants "had the obligation [under 129D] to transmit any guns or other items that had been left in their custody for more than one year to the colonel of the state police for auction" and that "under M.G.L. c. 140, § 129D the Defendants had an obligation to pay any proceeds from the sale of such guns or other items to the State Treasurer." (Complaint, ¶¶ 121-22).

Relator Powell surrendered two guns to the Stoughton Police on November 29, 2015, which were transferred to a licensed bonded warehouse, Village Vault, for storage. (Complaint, ¶ 37). One of Relator's confiscated weapon, a handgun, was allegedly sold by Village Vault "on or about November 28, 2016." (Complaint, ¶ 44). Relators allege that Powell's guns were transferred to Village Vault as part of a batch of 21 guns, and that the Stoughton Police

Department received $2,850 in "credit" from Village Vault in exchange for the transfer. (Complaint, ¶¶ 55-59).

Based on these facts, Relators allege a widespread practice whereby multiple Massachusetts police departments purchase equipment from Village Vault with "credits" received upon the transfer of confiscated weapons. (Complaint, ¶ 124). Relators allege that these "credit" payments, which are not contemplated by the text of 129D, violated the MFCA because they represent the constructive "proceeds" of Village Vault auctioning the guns. *Id*. Relators do not provide specific details regarding any other confiscated weapons, but make 31 speculative allegations based "on information and belief" that the same scheme applies to numerous guns confiscated by various Massachusetts police departments. (Complaint, ¶¶ 50, 52, 54, 60, 62, 64-67, 69, 71, 74, 76-77, 79, 81, 83, 85, 87, 89, 91, 93-94, 96-97, 99, 102, 104, 106, 108, 110).

**2.) Procedural Background and the Burden on Government Resources**

Village Vault's disposal of confiscated weapons under 129D has been a subject of protest and litigation by gun rights activists for many years. In 2012, Commonwealth Second Amendment, Inc. ("Comm2a")[4] filed suit against Village Vault in this Court, unsuccessfully alleging that Village Vault was violating citizens' Constitutional rights while acting under color of law when it disposed of confiscated guns whose owners failed to pay its fees for 90 days. *See Jarvis v. Village Gun Shop,* 805 F.3d 1 (1st Cir. 2015), *cert. denied* 578 U.S. 976 (2016).

This case is also not the first time that Powell has sued Massachusetts officials over his confiscated guns. His initial suit against two Massachusetts police officers was filed in this Court in 2017, and voluntarily dismissed two days after the filing of this case on June 26, 2018. *See*

---

[4] Comm2A was dismissed from this case for being an improperly-named relator on June 30, 2021. (Dkt. # 120).  Relator Cartlon, the President of Comm2A, "asserts claims in this action…to the extent that Comm2A lacks standing to do so itself." (Complaint, ¶ 9).

7

*Powell v. Holmes*, 2018 WL 662482 (D. Mass. Feb. 1, 2018); (Dkt #1). It is during the pendency of that suit that Powell alleges Relators first learned of the "basis" for this action, the existence of the alleged "credits." (Complaint, ¶ 2).

The Commonwealth declined intervention in this case on October 28, 2018. (Dkt. #6). Following declination, Relators amended their complaint to add fourteen Massachusetts municipalities as defendants, and subsequently amended their complaint twice more. (Dkt. #11, 59, 78).[5] In 2020, according to the recently-filed Non-Party Municipalities' Joint Motion to Quash Plaintiff's Subpoenas ("Motion to Quash"), Relators served subpoenas on 86 Massachusetts political subdivisions. (Dkt. # 136, at 2). All of the municipal defendants were subsequently dismissed from the case on June 30, 2021 after the Court found they were not "persons" subject to prosecution under the MFCA, as were the three police officer defendants sued in their official capacities. *Mass. ex rel. Powell v. Holmes*, 2021 WL 2685330, at *12 (D.Mass. 2021), (Dkt. #120). Currently, the only remaining defendants to Count II are Village Vault, Village Vault's alleged owner, Peter Dowd, and three police officers named in their personal capacities for alleged misconduct committed in their official roles.

On September 24, 2021, after dismissal of the 14 municipal defendants, Relators moved for leave to amend their complaint for a fourth time. (Dkt. #128). The Fourth Amended Complaint seeks to add another 16 Massachusetts police officers and officials as defendants in their personal capacities. *Id.* Although the discovery deadline in this case is set to expire on February 17, 2022, still 56 of the 114 paragraphs in the body of Relators' proposed Fourth

---

[5] Following its declination, the Commonwealth was not served with copies of filings in this case as requested in its declination Notice pursuant to G.L. c. 12 § 5C(6). (Dkt. #3). The Commonwealth consequently noticed an appearance in this case as an interested party on January 5, 2021. (Dkt. # 118).

Amended Complaint contain specualtive allegations concerning 15 municipal police departments made on "information and belief." *Id.* In late November 2021, Relators served each of the dismissed municipalities with a subpoena seeking discovery of additional material to support these claims, which subpoenas are the subject of the Motion to Quash. (Dkt. # 136).

## ARGUMENT

As noted in the above discussion of the applicable standard of review, under the *Swift* standard, Count II should be dismissed with no further judicial review. *Swift*, 318 F.3d at 252-53 (discussing the government's "unfettered" right to dismiss qui tam action).  Dismissal is also required under the *Sequoia* standard because the Commonwealth has at least two valid interests or purposes that would be achieved by dismissal: (1) preventing a complaint that fails to state an MFCA claim to continue in the Commonwealth's name , and (2) avoiding waste of government resources. There is a rational relationship between dismissal and each of these purposes. *See United States ex. rel. Sequoia Orange Co.*, 912 F.Supp. at 1341 ("[T]here need not be a 'tight fitting relationship' between the [dismissal and the governmental purpose]; it is enough that there are 'plausible,' or 'arguable,' reasons supporting the agency decision.").

1.) **A Complaint that Fails to State A Claim Should Not Continue in the Commonwealth's Name**

The Attorney General has a rational basis to dismiss Count II because it fails to state an actionable claim for relief under the MFCA. *See United States ex rel. Graves v. Internet Corp. for Assigned Names & Numbers, Inc.*, 398 F. Supp. 3d 1307, 1311 (N.D. Ga. 2019) (finding the government's reason for dismissal – "the allegations in the Complaint fail to state a valid claim under the FCA" – would, standing alone, satisfy *Sequoia*). In this case, despite substantial

litigation and discovery, Relators' MFCA claim suffers from fatal defects and offers no hope of an MFCA recovery in this matter.[6]

"The false claims law is not an all-purpose anti-fraud statute," and not every instance of unlawful conduct or statutory violation will also implicate the broad liability provisions of the MFCA. *US ex rel Escobar v. United Health Services,* 579 U.S. 176, 194 (2016)(citing *Alison Engine*, 553 U.S. 662, 672 (2008)). Count II represents an attempt to frame the same allegedly improper gun disposal scheme complained of in Relators' prior private actions as a "reverse false claim" under § 5B(9) of the MFCA. After Relators have conducted substantial discovery and filed multiple amended complaints, it is clear this attempt has not succeeded.

### A. Reverse False Claims Require an Existing Obligation

Section 5B(9) imposes MFCA liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof." A key element of any 5B(9) claim is the identification of a valid "obligation" within the meaning of the MFCA. Section 5A of the MFCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation or from the retention of any overpayment after the deadline for reporting and returning the overpayment under paragraph (10) of section 5B." For the purposes of analyzing Count II, this statutory definition of "obligation" is identical to that of the Federal False Claims Act, 31 U.S. Code § 3729(b)(3).

---

[6] The Commonwealth acknowledges that Count II survived prior 12(b)(6) Motions in this case, but respectfully notes that those Motions asserted wholly distinguishable grounds for dismissal. (Dkt. ## 93, 100, 103).

To recover under 5B(9), Relators must show that defendants avoided "a specific, legal obligation…in the nature of those that gave rise to actions of debt at common law for money or things owed." *US v. Q Intern. Courier, Inc.*, 131 F. 3d 770, 773 (8th Cir. 1997). To provide the basis of a reverse false claim allegation, an "obligation" must be "existing" *prior* to the alleged MFCA violation, whether it is an established, ongoing duty or one that arose by the prior occurrence of some contingent event. *See US ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006)(for reverse false claims purposes, "the obligation must arise from a source independent of the 'allegedly fraudulent acts taken to avoid it.'"). Nor can an "obligation" under the MFCA depend upon the occurrence of future "discretionary government acts." *US ex rel. Booker v. Pfizer, Inc.*, 9 F.Supp.3d 24, 50 (D.Mass. 2014).

Finally, as a matter of *scienter* under the MFCA, an existing "obligation" cannot be based on statutory language that could be reasonably read *not* to create such an obligation. *See US ex rel. Martino-Fleming v. South Bay Medical Centers*, 2021 WL 2003016, at * 7 (D.Mass. 2021) ("Where a defendant "knowingly" violated a regulation can depend on the reasonableness of defendant's interpretation of the regulation.")(citing *US ex rel. Herman v. Colorplast Corp.*, 327 F.Supp. 300, 310 (D.Mass. 2018); *see also Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 70 fn. 20 (2007)("Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a *knowing* or *reckless* violator.")

### B.  Defendants Had No Existing "Obligation" Under 129D

Count II rests entirely on a flawed reading of 129D, which statute provides police with discretionary options for the transfer, storage, and disposal of confiscated weapons. As to all of the guns at issue in the Complaint, Relators allege that police opted to transfer custody to Village

Vault, which 129D explicitly authorizes them to do at any time after confiscating a weapon.[7] The statute also allows a storage facility like Village Vault to charge the weapon owner "reasonable" storage fees after taking custody.[8] Count II alleges an "obligation" imposed on the defendants by 129D, but these allegations are unsupported by the text of 129D.

### 1. The Weapon Disposal Provisions of 129D are Discretionary

Relators baselessly claim that 129D imposes an obligation on both police and gun shops like Village Vault "to transmit any guns or other items that had been left in their custody for more than one year to the colonel of the Massachusetts State Police for auction." (Complaint, ¶ 121). This interpretation of 129D is wholly illusory as the statute lacks any such deadline for police or gun shops to dispose of guns within a certain time period.[9]

---

[7] "The licensing authority, after taking possession of any firearm, rifle, shotgun, machine gun or ammunition by any means, may transfer possession of such weapon for storage purposes to a federally and state licensed dealer of such weapons and ammunition who operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure storage of firearms and a weapon box or similar container for the secure storage of other weapons and ammunition." G.L. c. 140 § 129D.

[8] "The [weapon] owner shall be liable to such dealer for reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon." G.L. c. 140 § 129D.

[9] The actual "1 year" deadline established by 129D applies to the *owners* of confiscated weapons, who have a window of "up to 1 year after the delivery or surrender [of a gun]" during which the "statutory scheme provides gun owners with a plethora of alternatives for how to direct their confiscated property" out of the custody of the police or a storage facility like Village Vault. *Jarvis,* 805 F.3d, at 10, fn. 5. The only other statutory mention of this one year transfer period is in a provision authorizing storage facilities like Village Vault to auction off guns *after* the one year transfer period expires, with any net profit remitting to the gun owner, in direct contradiction of Relators' claim that defendants were forbidden from retaining or selling guns after one year: "Any such weapon that is stored and maintained by a licensed dealer as provided under this section may be so auctioned at the direction of: (i) the licensing authority at the expiration of one year following initial surrender or delivery to such licensing authority… provided, however, that … after deduction and payment for storage charges and all necessary costs associated with such surrender and transfer, all surplus proceeds, if any, shall be immediately returned to the owner of such weapon." G.L. c. 140 § 129D.

12

129D provides for confiscated guns to be transferred to the State Police for auction in certain circumstances, but that provision is inapplicable here because the police exercised their discretion in transferring all of the guns at issue in this case to Village Vault for storage (Complaint, ¶ 123). *See 129D*:

> Firearms, rifles, shotguns or machine guns and ammunition *not disposed of after delivery or surrender* according to the provisions of this section shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess said firearms, rifles, shotguns or machine guns and ammunition and the proceeds shall be remitted to the state treasurer.

(emphasis added). The First Circuit has previously stated that any requirement to pay the Treasurer uder 129D applies "if the police sell the property at public auction," which may happen in situations where "police choose to retain custody of the confiscated property rather than transferring it to an authorized storage facility." *Jarvis,* 805 F.3d at 4 fn. 2. In other words, 129D provides discretionary disposal options to police and, because all of the guns at issue in this case were transferred to Village Vault for storage, there was no obligation to pay the Treasurer.

### 2. Proceeds of Village Vault Gun Auctions Under 129D Remit to Gun Owners

Count II goes on to state that "Defendant Village Vault has retained the proceeds of the guns and other items it sold, rather than remitting said sums to the State Treasurer," and further characterizes the "credits" allegedly received by police departments as constructive "proceeds" of Village Vault's auctions. (Complaint, ¶¶ 124-125). Again, this allegation is in direct conflict with the First Circuit's statement in *Jarvis* that 129D's procedure for transferring guns to the State Police applies to guns that were *not* sent to an authorized storage facility. *Jarvis,* 805 F.3d at 4 fn. 2. However, the fact most fatal to Relators' reading of 129D is that the statute *does* create

an express payment obligation for Village Vault as to the proceeds of any confiscated gun it auctions, but that obligation is not owed to the Commonwealth.

The statute states that "…after deduction and payment for storage charges and all necessary costs associated with such surrender and transfer, all surplus proceeds [of auctions by a licensed dealer], if any, shall be immediately returned *to the owner of such weapon*." (emphasis added). If this obligation owed by Village Vault to individual gun owners was improperly avoided, as alleged, such avoidance caused no shortfall in the public fisc and has no implications for the MFCA. In *Jarvis*, the First Circuit summarized the gun owners' complaints about Village Vault's conduct in disposing of their confiscated weapons as "nothing more than a garden-variety dispute between a debtor and a creditor." *Jarvis,* 805 F. 3d, at 12.

Count II fails because 129D does not create any "obligation" – on defendants or anyone else – within the meaning of the MFCA.

### 2.) The Commonwealth has a Legitimate Interest in Avoiding Waste of Governmental Resources.

One of the MFCA's central purposes is to curb government waste, and numerous courts have held that avoiding governmental costs of litigation is also a legitimate Government objective justifying the dismissal of a false claims *qui tam*. *See US ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F. 3d 1139, 1146 (9th Cir. 1998)(In moving to dismiss a *qui tam* "the government can legitimately consider the burden on taxpayers by its litigation…even if the relators were to litigate the FCA claims the government would continue to incur enormous internal staff costs."); *Ridenour v. Kaiser-Hill Co. LLC*, 397 F.3d 925, 937 (10th Cir. 2005)(dismissing *qui tam* and holding waste of government resources was a "plausible, or arguable" reason supporting dismissal); *Swift v. US,* 355 U.S.App.D.C. 59, 63 (2003)("although [relator] believes that the costs [of litigation] would be relatively small, the government's goal of

14

limiting its expenses is still a legitimate objective, and dismissal of the suit furthered that objective")(citing *Heckler*, 470 U.S., at 831); *US ex rel Henneberger v. Ticom Geomatics Inc.*, 427 F.Supp.3d 701, 705 (E.D.Va, 2019)(allowing dismissal on resource grounds, where no discovery had yet been requested, because "[e]ven if the Government would not incur any expenses related to discovery, it would surely devote resources in monitoring the case."); *US v. Cooperative Bank UA,* 2019 WL 5593302, at *3 (SDNY, 2019)("the government persuasively argues that, if continued, the litigation will require considerable governmental resources to" respond to discovery requests)(citing *US ex rel. Borzilleri v. AbbVie, Inc.,* 2019 WL 323000, at *2 (SDNY, 2019)(*qui tam* dismissed due to government's interest in avoiding the burden of monitoring the litigation and coordinate third party discovery)).

 This case has already demanded significant government resources as numerous municipalities have answered burdensome discovery requests. Fourteen municipalities also successfully moved to extricate themselves from being improperly named as MFCA defendants. Relators are attempting to fill the void left by the municipal defendants by naming still more police officer defendants in their individual capacities. Relators' recent round of subpoenas shows that the discovery burden for adding these new defendants will still fall on the municipalities that employ them. (Dkt. # 136). The Commonwealth now moves to dismiss Count II in the interest of preventing this ongoing burden on governmental resources from continuing in its name. This governmental interest is particularly compelling where, as described above, the Complaint fails to state an MFCA claim.

**CONCLUSION**

For the foregoing reasons, dismissal of Count II of Relators' Complaint is appropriate under both the *Swift* and the *Sequoia* standards. Accordingly, the Attorney General respectfully requests this Court grant the Commonwealth's Motion to Dismiss Count II of the Complaint.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

Dated: January 19, 2022

_____/s/ *Jeff Walker*_____
Jeffrey Walker, BBO # 673328
Assistant Attorney General
Office of Attorney General Maura Healey
One Ashburton Place
Boston, MA 02108
(617) 727-2200
jeffrey.walker@mass.gov

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Jeff Walker*
Jeff Walker
Assistant Attorney General