UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS *ex rel.* MYKEL
POWELL, *et al.*,

      Plaintiffs,

      v.

BRIAN HOLMES, *et al.*,

      Defendants.

Docket No. 1:18-cv-11336-FDS

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

I.    *Introduction*

The defendants, Chief of Stoughton Police Department Donna McNamara ("Chief McNamara"), Deputy Chief Brian Holmes, and Detective Sergeant James O'Connor ("Det. Sgt. O'Connor"), now move for judgment on the pleadings as to Count Two, the reverse false claims act claim. As grounds for their Motion, the defendants join the Commonwealth's motion to dismiss, and further state that the Plaintiff's reverse false claims act claim should be dismissed because: (1) the public disclosure bar prevents the Plaintiff from being considered a relator[1]; (2) the defendants are immune from suit based on common law immunity[2]; (3) the Plaintiff failed to make presentment to the Attorney General's Office when it amended its complaint to vastly widen the scope of its claims; (4) the Town of Stoughton, as a municipality, is a legal entity of the

---

[1] During argument at the January 5, 2022 hearing, the court stated that it was not inclined to consider public disclosure bar arguments in a motion to quash; as a result, the defendants file this instant motion.

[2] In its order, allowing in part the motion to dismiss, the Court, in a footnote, acknowledged the argument but noted that since the moving party raised it for the first time in its reply, the argument was waived for purposes of the motion to dismiss (Document 120, note 9).

Commonwealth and is functionally the same party; thus, the individual police officers cannot enrich the municipality at the expense of the Commonwealth because they are the same entities.

This is an appropriate time to bring a motion under Rule 12(c) because it will not delay any trial, as one has not been scheduled. This motion poses no unfair prejudice to the Plaintiff, who is currently attempting to amend his complaint for a fourth time to add numerous individual public employee defendants from diverse municipalities that are not currently parties to this case.

The present motion serves to promote fairness and judicial economy by narrowing the issues in the Plaintiff's operable Complaint to potentially viable legal claims and theories for discovery and summary judgment.

II.     *Facts and firearms statute*

For background, the Plaintiff filed the immediate action in June 2018 (Dkt. #1). He filed a similar and related action in May 2017, which he voluntarily dismissed. (See *Powell v. Holmes, et al.,* Case No. 1:17-cv-10776-FDS). The Plaintiff has reformulated his claims four times, each time the allegations have grown exponentially in scope. The fourth motion to amend the complaint is currently pending before this court, as is the Commonwealth's motion to dismiss the claim under the state false claims act.

The underlying statute at issue in this case is G.L. c. 140 § 129D. It contains five unnumbered paragraphs. The Plaintiff's false claims act claims are based on the allegation that certain firearms and ammunition seized pursuant to a non-criminal offense and held for more than one year by the Police Department were thereafter transferred to Village Vault in exchange for credits to the Department, rather than to the state police for auction as it is allegedly required to do under the statute.

The first paragraph of the statute states that when a licensing authority revokes a person's Firearms Identification Card or License to Carry Firearm ("former licensee"), then the former licensee must surrender all their firearms and ammunitions to the licensing authority. After the former licensee relinquishes this property, the former licensee is granted one year to direct the police to either (1) transfer the property to a third person or (2) transfer the property to a licensed dealer for safekeeping. G.L. c. 140 § 129D.

According to the second paragraph, if the former licensee does not direct the licensing authority to transfer the firearms, the licensing authority, now in possession of the former licensee's property, has certain rights with respect to that property. The licensing authority may either (1) hold the firearms for one year or (2) transfer the firearms to a licensed dealer for safekeeping. G.L. c. 140 § 129D ¶ 2. If the licensing authority invokes this second option, the former licensee is on the hook for the storage fees while the property is in the possession of the licensed dealer. G.L. c. 140 § 129D.

The third paragraph, the paragraph relied upon to form the basis for the Plaintiff's false claims act claims, states that firearms and ammunition that are not "disposed of" after delivery or surrender to the police department "shall be sold at public auction" and the proceeds "shall be remitted to the state treasurer." G.L. c. 140 § 129D

In this case, the Plaintiff is focused on firearms that have been held by the police for more than one year. In the Plaintiff's reading of the statute, a licensing authority (police departments in this case) that has failed to transfer firearms to a licensed firearms dealer within that one-year period is thereafter foreclosed from doing so, and must instead transfer the property to the state police where it must be sold at auction.  According to the Plaintiff's multiple complaints, police departments across the Commonwealth routinely violated this statute; in the Plaintiff's reading of

the statute, while the police departments were entitled to transfer the property to the licensed dealer *before* the one year period ran and could, after one year, direct the licensed dealer to sell the firearm, the police departments were foreclosed from doing this if they had retained the firearm *after* one year. If the firearm were "abandoned" (i.e. the owner was unknown), then the police department was free to send the firearm to a licensed storage facility in exchange for credits. G.L. c. 140 § 129D. However, according to the Plaintiff, any arrangement that resulted in the police receiving credits from licensed storage facilities in exchange for firearms held by police departments for over one year is barred by G.L. c. 140 § 129D, and is defrauding the state out of money to which it is entitled.

## III.    Argument

Fed. R. Civ. P 12(c) allows for a party to move for judgment on the pleadings once the pleadings are closed and so long as trial will not be delayed. Fed. R. Civ. P 12(c). "A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss." *Perez–Acevedo v. Rivero–Cubano,* 520 F.3d 26, 29 (1st Cir. 2008). However, "[a] Rule 12(c) motion, unlike a Rule 12(b) motion, implicates the pleadings as a whole." *Kimmel & Silverman, P.C. v. Porro,* 969 F. Supp. 2d 46, 49 (D. Mass. 2013) (quoting *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54 (1st Cir. 2006)). To survive a 12(c) motion, a plaintiff's complaint must contain sufficient facts to "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Perez–Acevedo*, 520 F.3d at 29 (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 559 (2007)). In ruling on a motion for judgment on the pleadings, the court should view the facts contained in the pleadings in the light most favorable to the non-moving party, supported by reason, and must draw all reasonable inferences in the non-movant's favor. *Id.* at 29.

In this case, the Court should grant the Defendants' motion for judgment on the pleadings on five bases: first, for the reasons set forth in the Attorney General's memorandum; second, because the Plaintiff cannot be a relator because of the public disclosure bar; third, because the claim is foreclosed by common law immunity; fourth, because the Plaintiff has failed to make presentment on the Attorney General's Office; fifth, because the Town of Stoughton, as a municipality, is a legal entity of the Commonwealth and is functionally the same party; thus an individual police officer cannot enrich the municipality at the expense of the Commonwealth as they are the same entities.

A.   *The Plaintiff's claim under false claims fails due to the public disclosure bar.*

The Plaintiff cannot be an "original source" under the false claims act because the firearms transfer arrangement between numerous municipalities and Village Vault has been public for many years, including by appearing in the news media.

In order to bring a reverse false claim, the Plaintiffs must be the "original source" of the information:

> An "original source" is an individual who: (1) **prior to a public disclosure under paragraph (3) of section 5G,** has voluntarily disclosed to the commonwealth or any political subdivision thereof the information on which allegations or transactions in a claim are based; **or (2) has knowledge that is independent of and materially adds to the publicly- disclosed allegations or transactions**, and who has voluntarily provided the information to the commonwealth or any political subdivision thereof before filing a false claims action. (emphasis added).

G.L. c. 12 § 5A.

Further, G.L. c. 12 § 5G (c) provides the circumstances upon which the so-called public disclosure bar operates:

> The court shall dismiss an action or claim pursuant to sections 5B to 5O, inclusive, unless opposed by the commonwealth or any political subdivision thereof, **if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed**: (1) in a Massachusetts criminal, civil or administrative hearing in which the commonwealth is a party; **(2) in a**

5

> **Massachusetts** legislative, administrative, auditor's or inspector general's report, hearing, audit or **investigation; or (3) from the news media, unless the action is brought by the attorney general, or the relator is an original source of the information** (emphasis added).

"The act also provides an incentive for an individual, referred to as a relator, with 'direct and independent knowledge of information that an entity is defrauding the Commonwealth to come forward by awarding to such individuals a percentage of the Commonwealth's recovery from the defrauding entity.'" *Phone Recovery Servs., LLC v. Verizon of New England, Inc.,* 480 Mass. 224, 228 (2018) citing *Scannell v. Attorney Gen.*, 70 Mass. App. Ct. 46, 48 (2007).

To be entitled to a recovery, "an individual in possession of such knowledge must attain the status of a 'relator' by filing suit against the defrauding entity in Superior Court in the name of the Commonwealth or a subdivision thereof" (citation omitted). *Id.* quoting *Scannell* 70 Mass. App. Ct. at 48-49. Moreover, "[a] relator cannot bring a qui tam suit based on publicly disclosed facts, even if [his or] her expertise makes [him or] her the first to understand the alleged fraud." *Commonwealth ex rel. Rosenberg v. JPMorgan Chase & Co.,* No. SUCV2014-03323-BLS1, 2019 WL 3643035, at *9 (Mass. Super. July 23, 2019), *aff'd sub nom. Rosenberg v. JPMorgan Chase & Co.*, 487 Mass. 403, 169 N.E.3d 445 (2021) quoting *United States ex rel. Conrad v. Abbott Labs., Inc.*, 2013 WL 682740, *4 (D. Mass. Feb. 25, 2013) (noting that "only question is whether the material facts exposing the alleged fraud are already in the public domain, not whether they are difficult to recognize").

In *Commonwealth ex rel. Rosenberg*, a Massachusetts Superior Court judge relied on an explanation from a "frequently cited" D.C. Circuit Court of Appeals case analyzing the federal public disclosure bar in interpreting the Massachusetts state public disclosure bar:

> [I]n common parlance, the term "allegation" connotes a conclusory statement implying the existence of provable supporting facts. See Webster's Third New International Dictionary 55 (1976). The term "transaction" suggests an exchange

between two parties or things that reciprocally affect or influence one another…. On the basis of plain meaning, and at the risk of belabored illustration, if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. The language employed in ... [the False Claims Act] suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or *the critical elements of the fraudulent transaction themselves* were in the public domain (emphasis supplied).

2019 WL 3643035, at *9–10 quoting *United States ex rel. Springfield Term. Ry. Co. v. Quinn*, 14 F.3d 645, 653-44 (D.C. Cir. 1994) (*Springfield*).

"Applying this methodology to the instant case, X and Y (the essential and critical elements of the fraudulent transaction) are all in the public domain, and therefore, the 'transactions' as alleged in the relator's complaint were publicly disclosed." *Id.* citing *Springfield.*

The fact that the relator may have some specialized knowledge or background concerning the a particular industry or that he spent one thousand hours dissecting public information does not, in itself, allow him to file and prosecute a qui tam action. *United States ex rel. Conrad v. Abbott Labs., Inc.*, No. 02-11738-RWZ, 2013 WL 682740 at *4. *See United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d at 1160 ("[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If the latter were enough to qualify the relator as an 'original source,' then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase."). See also *United States ex rel. Alcohol Foundation, Inc. v. Kalmanovitz Charitable Foundation, Inc.*, 186 F. Supp. 2d 458, 461-464 (S.D.N.Y. 2002) (dismissing relator's complaint based on allegations that arose out of a

"perspective" that plaintiff obtained by spending hundreds of hours compiling facts into a "mosaic" and concluding that relator was not an original source).

In the present case, since the alleged transaction was publicly disclosed, he does not qualify as a relator.

The Court in its Memorandum and Order (Dkt. 120) summarized the facts which give rise to the Plaintiffs' reverse false claims act claims as follows[3]:

> The complaint alleges that Village Vault and Dowd maintain "arrangements" with several cities and towns in Massachusetts through which police departments transfer to Village Vault certain firearms that have been surrendered under Massachusetts law. (Id. ¶ 46). In exchange, Village Vault either pays the police departments by check or "credits" them an amount that can be used to make purchases from Village Vault. (Id. ¶¶ 46, 48). Village Vault then sells the firearms for its own profit. (Id. ¶ 47). The complaint identifies 15 municipalities— Stoughton and the fourteen named Municipality Defendants—that operate pursuant to such alleged agreements. (Id. ¶ 46).2 It details specific transactions between those municipalities and Village Vault, including the date of each transaction, the number of firearms transferred, and the payment or credit provided to the relevant police department. (Id. ¶¶ 50-112). It further alleges (on information and belief) that Village Vault and Dowd maintain similar arrangements "with police departments and/or police department personnel throughout the Commonwealth of Massachusetts. (Id. ¶ 49).

In the Plaintiff's proposed fourth amended complaint[4], the Plaintiff describes the same arrangement as that outlined above, but also includes additional proposed individual defendants (Plf's Fourth Amended Complaint (Dkt. # 127) ¶¶ 123-128) (describing the basis for his "reverse false claim").

Thus, the reverse false claim is based on the Plaintiffs' contentions that the following facts were *not* publicly disclosed prior to filing a complaint in 2018:

---

[3] The court has taken the fourth motion to amend the complaint under advisement. As the court has not yet ruled on this, the Defendants address both the operative third amended complaint and the proposed fourth amended complaint to show that whichever complaint is ultimately operative, the result is the same: the allegations the Plaintiff makes concerning the false claims act claims have been in the public sphere for years.

[4] *See* note 3.

(1)   that police departments transferred to Village Vault firearms seized pursuant to (a) a non-criminal offense and (b) whose owners were known and (c) that were more than one year old;

(2)   that individual departments or individual police officers received payments or credits from Village Vault for these transferred firearms and did not submit these payments to the state treasurer;

(3)   that Village Vault retained the proceeds of the guns rather than remit payment to the state treasurer.

The Defendants take each item in turn:

First, the Plaintiff asserts that the Defendants illegally transferred seized firearms unrelated to a criminal offense whose owners were known after one year to Village Vault, rather than to the state police. (Complaint at ¶¶ 46-112). In order to assert a viable claim, the Plaintiff must be the original source of that information. The material appended to this Motion[5] demonstrates that the same "scheme" the Plaintiff now alleges constitutes his reverse false claim have been reported in the news media since 2007, and in any event, long before he filed his 2018 complaint.

Indeed, on August 28, 2007, the Lowell Sun reported that firearms seized unrelated to criminal offenses were sold to Village Vault, rather than the state police. Exhibit 1, Lowell Sun Article; see also Exhibit 2 at p. 20 (reported in the Evidence Log, a free online publication). The Lowell Sun article reported that Tyngsboro was selling hundreds firearms to Village Vault, and "[s]ome of the guns were seized after cases of domestic violence which made the owners ineligible to possess firearms." The article states:

> the Town Selectman recently approved the Chief Mulligan's plan to sell firearms and other select items in the evidence room. According to the chief, **the Department does not usually destroy firearms that have resale**

---

[5] On a Motion to Dismiss, a district court may consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12, 20 (1st Cir. 2003); *Giragosian v. Ryan,* 547 F.3d 59, 65 (1st Cir. 2008). A court may consider any documents incorporated into a complaint, including "documents the authenticity of which are not disputed by the parties; [ ] official public records; [ ] documents central to plaintiff's claim; or [ ] documents sufficiently referred to in the complaint." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993).

> value; **these are traded in to a firearms dealer** where they are reconditioned and resold. **This helps offset the cost of new firearms for its officers** (emphasis added).

Exhibit 1, *see also* Exhibit 2 (summary of the article was published in a "The Evidence Log," a publicly available online magazine).

A reading of these articles puts a person on notice that the police department is (1) transferring firearms in exchange for money; (2) at least some of the owners of the firearms being transferred in exchange for money after one year were known (i.e. the firearms were not abandoned); (3) at least some of the firearms were being transferred in exchange for money did not involve a criminal offense.

The Plaintiff's attempts to minimize this public disclosure are unavailing. In his opposition to Defendants' Motion to Quash (Dkt. 137) the Plaintiff claims:

> 'some' guns 'were seized after cases of domestic violence,' but there are many cases in which police might be lawfully entitled to sell guns that were seized after cases involving domestic violence. Among other things, police might seize guns connected to a domestic violence incident for reasons unconnected to a license suspension or revocation—for example, if the owner was not lawfully in possession of them in the first place, or if the "owner" denied they owned the gun. Moreover, even if a seizure came within § 129D, the owner might choose to relinquish their rights in the gun and instead donate it to the police, particularly if they were no longer going to be able to possess it. In any of these instances, the police would be lawfully entitled to sell the gun. Thus, the articles do not disclose the key essential elements that the guns had become the property of the Commonwealth due to the passage of one year, but were being sold to Village Vault regardless.

This argument fails for two reasons.

First, the article states that "Some of the guns were seized after cases of domestic violence, which made the owners ineligible to possess firearms. The firearms were not seized *during* a case *connected to domestic violence*. They were seized *after* such case, when a person was not able to possess firearms anymore. Parsing the statute in this way is disingenuous because the Plaintiff, himself, in his motion to quash, refers the court to Chapter 209A, which only permits the court to

order a person to "surrender" firearms to the police, but does not give the right for the police to "seize" them.

Second, assuming *arguendo* that the reading of the Plaintiff's view is accurate (a position the Defendants do *not* concede), it creates an inference of wrongdoing on the part of the police department. In other words, although the article "may not have constituted an explicit, formal allegation of either fraud or the essential elements of fraud, it certainly presented enough facts to create an inference of wrongdoing on the part of [the police department and Village Vault]" assuming that transferring firearms with known owners after a year is some kind of violation of the false claims act. *See id.*

The second part of the Plaintiff's reverse false claim is that individual departments received payments from Village Vault and did not submit those payments to the state treasurer. The Plaintiffs must also be the original source of that information in order to possess a viable reverse false claims act claim. However, as just stated, "substantially the same allegations or transactions as alleged" were "publicly disclosed" as early as 2007. Exhibit 1 and 2.

Third, the Plaintiff contends that Village Vault retained the proceeds of the guns rather than remit payment to the state treasurer. Again, the Plaintiff must be the original source of this information, and yet again, he is not. Exhibit 3; Exhibit 4; Exhibit 5. Indeed, beginning in 2010 (eight years before the Plaintiff filed suit in this case), Massachusetts resident Lawrence Mirsky engaged in a years-long quest to show that a police department in Massachusetts had the very "arrangement" with Village Vault that forms the basis for the Plaintiffs' current false claims act claim. Mr. Mirsky allegedly[6] made presentment to the Commonwealth *seven times* for

---

[6] The Defendants made public records requests for this information to the Attorney General's Office, but have withdrawn the requests pending the court's decision on the Commonwealth's Motion to Dismiss.

substantially the same allegations (on December 2, 2009, December 28, 2009, December 28, 2009,

January 13, 2010, February 16, 2010, May 24, 2010, April 22, 2013). Exhibit 3.

In his 2010 civil complaint, filed eight years before the Plaintiffs filed the above-captioned

complaint, Mirsky addressed the conduct of which the Plaintiffs complain explicitly:

> 44. …**Subsequently Mirsky learned that the Quincy Police have not been handing the firearms that they have seized due to license revocations over to the State Police for auction <u>after the expiration of one year</u>, as required by Massachusetts General Law Chapter l 40 ss l29d,, [sic] but are in fact selling them themselves, effectively violating the rights of those whose property was taken and misappropriating state funds.**
> …
> 65.   **The one year's requirement for holding said property aside, by not submitting said property to the State Police for auction as prescribed under Massachusetts General Law, Chapter 140, section 129D, whereby the profits were to be directed to the state treasury, the Quincy Police are effectively guilty of defrauding the Commonwealth** (emphasis added).

Exhibit 5.

In Mirsky's May 2013 presentment letter (Exhibit 3), he alleges that "The Quincy police

have been…violating the civil rights of firearm owners in order to profit from the illicit sale of their

property." Furthermore, the materials supplied to the Commonwealth show the receipts Village

Vault provided to the Quincy Police Department that specifically state the Quincy Police received

"credits" from Village Vault in exchange for firearms. Exhibit 3.

In his 2011 complaint, Mirsky alleges that he:

> **found from speaking to local gun shops the Quincy police have been profiting by the sale of said weapons, and have not been disposing of them in accordance with MGL chapter 140 § 129d. Proper presentment was submitted as required under G.L.c. 258, § 4 on 2/21/2011, as well as on 12/2/2009,12/28/2009, 01/13/2010, 2/16/2010, and 5/24/2010 (**emphasis added).

Exhibit 5.

In May 2013, "Opposing Views" published an article about the Mirsky case entitled, "Are

Massachusetts Police Illegally Seizing and Selling Privately-Owned Guns for Profit? Exhibit 6.

The article states: "According to Lawrence Mirsky, Quincy Police are revoking pistol licenses at the drop of a hat, seizing privately owned firearms, and **illegally selling the guns to fund the department** (emphasis added)." Exhibit 6.

The Plaintiff argues that the individual firearm owners' rights were violated in these cases, not the Commonwealth's, but this is not true; Mirsky cited the specific issue of the policy not sending the firearms to the police for auction in his complaint. In other words, the proverbial X and Y (as discussed in *Springfield*) were not just disclosed to the public, so was the Z.

The Plaintiff appears to take issue with the fact that the Commonwealth was not a party to Mirsky's case, and therefore it had not conducted an "investigation" as that word is contemplated by the public disclosure bar statute. But the court has held that it simply cannot be the case that a person can be an original source where the information he is alleging is already contained in a public court record—likely because a court record is a publicly disclosed document and an allegation that articulates the same fraud that someone else has already disclosed is barred by the public disclosure bar. *See United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d at 1160 (It simply cannot be said that the Plaintiffs were "original sources" where "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" *prior* to the Plaintiffs' filing the above-captioned suit.).

   B.  *The Plaintiff failed to make presentment to the Attorney General's Office.*

The false claims act claim requires that the relator first make presentment to the Attorney General's Office.  G.L. c. 12 § 5C (4-6). Specifically, "When a relator brings an action pursuant to [the false claims act], no person other than the attorney general may intervene or bring a related action based on the facts underlying the pending action." G.L. c. 12 § 6. A lack of standing is a lack of subject matter jurisdiction. See Mass. R. Civ. P. 12(h)(3) ("Whenever it appears by

suggestion of a party or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"); *Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court,* 448 Mass. 15, 21, and cases cited ("The issue of standing is one of subject matter jurisdiction").

As the Commonwealth stated in its memorandum, "One of the MFCA's central purposes is to curb government waste, and numerous courts have held that avoiding governmental costs of litigation is also a legitimate Government objective justifying the dismissal of a false claims *qui tam* (citations omitted). Commonwealth's Motion to dismiss (Dkt #6, at p. 15).

In its motion to Dismiss, the Commonwealth states that it declined intervention in this case on October 28, 2018. (Dkt. #6). Following declination, Relators amended their complaint to add fourteen Massachusetts municipalities as defendants, and subsequently amended their complaint twice more to add seventeen individual defendants. (Dkt. #11, 59, 78). The Commonwealth further states in note 5, that, following its declination, the Commonwealth was not served with copies of filings in this case as requested in its declination notice, and as required by G.L. c. 12 § 5C(6).[7] (Dkt. #3).  The Commonwealth consequently noticed an appearance in this case as an interested party on January 5, 2021. (Dkt. # 118, p. 8, n. 5).

The Plaintiff's maelstrom of a fourth amended complaint is a case study in why presentment must be re-made to the Attorney General's Office each time it is adding parties; the Commonwealth must have an opportunity to determine whether the claim has become such a burden on municipalities that it should be dismissed. The failure to make presentment on the Commonwealth requires dismissal of the false claims act claim, particularly now, where the

---

[7] The Court previously echoed this concern in its Memorandum and Order on Defendants' Motion to Dismiss when it stated that "…there is some force to the argument that when an action fundamentally changes, relators should be required to serve the Commonwealth. The present case offers a particularly acute example, where the action not only dramatically expanded in scope but also is now brought against subdivisions of the Commonwealth itself." (See Dkt 120 at 21-23).

Commonwealth is arguing that the drain on municipal resources is too great for this claim to continue

### C.  Chief McNamara and Sergeant O'Connor are protected by Common Law Immunity

Common law immunity protects Chief McNamara and Sergeant O'Connor from the Plaintiffs' claim under the MFCA. Under common law immunity, government employees acting within their discretion as public officials and in good faith are shielded from liability. *Nasir v. Town of Foxborough*, 2020 WL 1027780, at *8 (D. Mass. Mar. 3, 2020), citing *Nelson v. Salem State Coll.*, 446 Mass. 525, 537–38 (2006); *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 145–146 (1st Cir. 2016) (affirming dismissal of intentional tort claims, where "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption" quoting *Nelson,* 446 Mass. at 537; *Duarte v. Healy*, 405 Mass. 43, 50 n.5 (1989).

The common law immunity takes "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." *S. Bost. Betterment Trust Corp. v. Bost. Redev. Auth.*, 438 Mass. 57, 69 (2002), quoting *Foster from Gloucester, Inc. v. City Council of Gloucester*, 10 Mass. App. Ct. 284, 294 (1980). "Bad faith has been defined to suggest a 'breach of a known duty through some motive of interest or ill will." *Brothers v. Town of Millbury*, 2014 WL 4102436, at *11 (D. Mass. Aug. 14, 2014), quoting *Spiegel v. Beacon Participations*, 297 Mass. 398, 416 (1937). "Malice means a wrongful act, done intentionally, without just cause or excuse." *Brothers,* 2014 WL 4102436, at *11, quoting *McGurk v. Cronenwett*, 199 Mass. 398, 416 (1937). To overcome a claim of common law immunity, Plaintiffs must allege facts to establish that McNamara and O'Connor acted with bad faith or malice. *See Echavarria v. Roach*, 2017 WL 3928270, at *14 (D. Mass. Sept. 7, 2017).

Here, the Third Amended Complaint contains no allegations to support an inference that either Chief McNamara or Sergeant O'Connor acted with malice or bad faith. Rather, the Plaintiff merely alleges that Sergeant O'Connor did not comply with M.G.L. c. 140, § 129D when disposing of firearms. The Plaintiff alleges "[a]t the direction of McNamara and O'Connor Village Vault used 'credit' proceeds to pay third parties for the purchase of equipment, supplies and other things. On May 31, 2008, Village Vault issues a check for $4,994.99, payable to 'Stoughton Police Dept.'" Third Amended Complaint, ¶ 58. Even on the most liberal reading of these alleged facts, Plaintiffs' allegations do not overcome the presumption that Chief O'Connor and Sergeant O'Connor were acting in good faith in carrying out their official duties. *Nasir*, 2020 WL 1027780, at \*8 (D. Mass. Mar. 3, 2020), citing *Najas Realty, LLC*, 821 F. 3d at 145–146 (affirming the dismissal of a tort claim because "conclusory allegations" of bad faith or malice "are not enough" to overcome Massachusetts' common law immunity); *Lee v. Quincy Hous. Auth.*, 2017 WL 402972, at \*2 (D. Mass. Jan. 30, 2017) (dismissing tort claims because the plaintiff put forth "no facts to suggest that [the defendant's] actions fell short" of the common law immunity standard).

As such, based on the Plaintiff's allegations a reasonable jury could not infer that either Chief McNamara or Sergeant O'Connor acted in a corrupt manner or with improper motives so that they would lose protection of common law immunity. The Plaintiff has therefore failed to state a claim and Count II of his Third Amended Complaint should be dismissed.

D. *McNamara and O'Connor cannot be liable for violations of the false claim act for accepting credits to the Department in exchange for firearms because the Town of Stoughton is a municipal subdivision of the state.*

Because the Town of Stoughton is a legal entity of the Commonwealth (and thus the same party), McNamara and O'Connor cannot enrich the municipality at the expense of the Commonwealth. As this Court previously held in its Memo and Order on the Defendants' Motion

16

to Dismiss, "'cities' and 'towns' are explicitly included in a part of the statute that defines 'political subdivision' as 'a city, town, county or other governmental entity authorized or created by law, including public corporations and authorities.'"( Dkt 120 at p. 23). It further held that "[T]he statutory text makes clear that 'political subdivisions' are intended beneficiaries of the statute. *Id.* The Court explained:

> If municipalities could be held liable under the MFCA, actions against them would be brought by the Commonwealth against its own subdivisions—a situation where a party would effectively be suing itself.  Any interpretation of the MFCA that allows for such a result would be nonsensical and should be rejected.

(Dkt 120 at pp 23-24).

In its memo, the Court held that the Plaintiff had articulated a false claims act claim when firearms were transferred to Village Vault in exchange for credits to the municipalities and that a false claims act complaint need not allege that the Commonwealth suffered damages to state a claim under the state false claims act. In so ruling, the Court cited to a First Circuit case considering a false claim under the federal false claims act, which held that "a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss." *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995). Relying on *Rivera*, the court reasoned:

> the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.' In the court's view, Congress believed that "fraud by government contractors is best prevented by attacking the activity that presents the risk of wrongful payment, and not by waiting until the public fisc is actually damaged."  *Id.*; *see also* Claire M. Sylvia, The False Claims Act:  Fraud Against the Government § 4:60 (Apr. 2021) ("The False Claims Act does not make any reference to a requirement that a plaintiff show that the Government was damaged in order to establish liability and most courts have recognized that damage to the Government is not an element of a cause of action under the Act."). (Dkt 120 at p. 24).

This case is not analogous to *Rivera*, however; in that case, the federal court held that in "deciding whether a given false statement is a claim or demand for payment, a court should look to see if,

within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." Rivera, 55 F.3d at 708–10. In that case, the risk was that a false payment might unjustly enrich a government contractor at the expense of the Commonwealth. But in this case, a wrongful payment can never be induced because the money is going to a *municipality* and the municipality is, based on the court's prior reasoning, the Commonwealth. (Dkt # 120 at pp. 23-24) ("If municipalities could be held liable under the MFCA, actions against them would be brought by the Commonwealth against its own subdivisions—a situation where a party would effectively be suing itself. Any interpretation of the MFCA that allows for such a result would be nonsensical and should be rejected). As a result, judgment should enter for McNamara and O'Connor on the Plaintiff's claim under the state false claims act because as a matter of law they cannot violate the statute by enriching a subdivision of the state.

V.      *Conclusion*

For the reasons stated herein, judgment should under for the Defendants on Count II of the Plaintiff's Third Amended Complaint.


                              Respectfully submitted,
                              The Defendants,
                              Brian Holmes, James O'Connor, and Donna A. McNamara,
                              By their attorneys,

                              */s/ Erica L. Brody*
                              Thomas R. Donohue, BBO# 643483
                              Erica L. Brody, BBO# 681572
                              BRODY, HARDOON, PERKINS & KESTEN, LLP
                              699 Boylston Street, 12th Floor
                              Boston, MA 02116
                              (617) 880-7100
                              tdonohue@bhpklaw.com
                              ebrody@bhpklaw.com

DATED: February 2, 2022


                                  18

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)</u>

Now comes counsel for the Defendants, Brian Holmes, James O'Connor, and Donna A. McNamara in the above-captioned matter and certifies that she has conferred with counsel for the plaintiff regarding this motion in a good faith attempt to resolve or narrow the issues raised in said motion.

*/s/ Erica L. Brody*
Erica L. Brody, BBO# 681572

DATED: February 2, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Erica L. Brody*
Erica L. Brody, BBO# 681572

DATED: February 2, 2022