# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS *ex rel.* MYKEL POWELL, *et al.*, )<br><br>Plaintiffs, )<br><br>-against- )<br><br>BRIAN HOLMES, *et al.*, )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:18-cv-11336-FDS |

## PLAINTIFFS' OPPOSITION TO THE
## MUNICIPALITIES' MOTION TO QUASH

**I)      Introduction**

The Attorney General's motion to dismiss rests on the errant premise that (p. 11) § 129D provides only "discretionary options" for police to follow when they transfer, store and dispose of firearms seized from owners. That is, the Attorney General reasons that because there was never any obligation to transfer guns to State Police, the complaint fails to state a claim, and also constitutes an unwarranted drain on government resources. But contrary to the Attorney General's claim, the statutory directive at issue is mandatory, not permissive, because it directs that guns "not disposed of after delivery or surrender according to the provisions of this section *shall* be sold at public auction by the colonel of the state police . . . and the proceeds shall be remitted to the state treasurer." M.G.L. c. 140, § 129D (emphasis added). While § 129D contains some components that are discretionary options—particularly the option to transfer the storage

obligation to a licensed dealer—the mandate to transfer guns that police have not otherwise disposed of is not one of them.

Although the Supreme Judicial Court has not explicated a standard for dismissal over the objection of the relator, *see* M.G.L. c. 12, § 5D(2), the Appeals Court has addressed the issue in a decision that is surprisingly absent from the Attorney General's briefing. *See Chawla v. Gonzalez*, No. 15-P-483, 2016 WL 4426379 (Mass. App. Ct. Aug. 22, 2016). There, the Appeals Court did not definitively resolve the issue, but suggested that the standard from *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139 (9th Cir. 1998), was more consistent with Massachusetts law and used that standard to decide the case. *See Chawla*, 2016 WL 4426379 at *2. This Court should follow the lead of the Appeals Court in *Chawla* and use *Sequoia*'s rational-basis standard. Under that standard, the Attorney General's motion fails because it rests on an incorrect proposition of law, and otherwise, because a generalized and nonspecific desire to conserve government resources is not sufficient to justify dismissal.

Beyond that, this brief shows that the Attorney General's failure to certify compliance with Local Rule 7.1 is significant here because there are indications that compliance would have resolved or narrowed the issues in this motion. Finally, to the extent the Court is inclined to consider the government's motion on "waste of resources" grounds, rather than just rejecting the nonspecific assertion outright, Plaintiffs request a hearing to address the issue of whether there is indeed a rational basis for concluding that the case's continuation would result in unwarranted governmental expenditures.

## II)   The Standard Governing Dismissal

The Massachusetts False Claims Act provides that the Attorney General "may dismiss [an] action notwithstanding the objections of the relator" if, pertinently, "the court has provided the relator with an opportunity for a hearing on the motion." M.G.L. c. 12, § 5D(2). This

provision of the MFCA is substantively identical to the federal False Claims Act, *see* 31 U.S.C. §

3730(c)(2)(A), which makes it appropriate to look to decisions that construe the federal False

Claims Act, *see Scannell v. Attorney General*, 70 Mass. App. Ct. 46, 49 n.4 (2007); *see also*

Memorandum and Order p. 24 (Doc. No. 120). Among the federal appellate courts, the Ninth and

Tenth Circuits have interpreted the federal language to require the government to provide "(1)

identification of a valid government purpose; and (2) a rational relation between dismissal and

accomplishment of the purpose." After this initial showing, "the burden switches to the relator to

demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *See United States*

*ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998)

(quotation omitted); *see also Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 936 (10th Cir. 2005).

The D.C. Circuit, in contrast, has construed the same language "to give the government an

unfettered right to dismiss an action," subject perhaps to an exception for "fraud on the court."

*See Swift v. United States*, 318 F.3d 250, 252-53 (D.C. Cir. 2003).

   For many years, these two approaches framed the conversation. In 2016, the

Massachusetts Appeals Court addressed the issue and articulated the question as a choice

between "two different standards." *See Chawla*, , 2016 WL 4426379 at *2.[1] One standard, from

*Sequoia*, required a reasonable relationship to a legitimate government purpose, while the other,

from *Swift*, made the decision to dismiss "essentially unreviewable," at least in the absence of

"fraud on the court or other similar circumstances that might merit an exception." *See id.* The

court reasoned that the *Sequoia* standard was "arguably consistent with our cases holding that 'in

the absence of allegations that the Attorney General acted arbitrarily and capriciously,

---

[1] This decision is inexplicably absent from the Attorney General's brief, even though the
Attorney General participated in the case.

discretionary executive decisions made by the Attorney General are beyond judicial review.'"
*See id.* (quoting *Shepard v. Attorney General*, 409 Mass. 398, 402 (1991); citing *Secretary of Administration & Finance v. Attorney General*, 367 Mass. 154, 159 & n. 4, 165 (1975)).

However, the Appeals Court concluded that it did not need to resolve the issue, for "[w]hile the relator's action would have little chance of survival under the *Swift* standard, it ultimately fares no better under *Sequoia*." *Id.* (citing *Sequoia*, 151 F.3d at 1144). The plaintiff-relators in that case sought to recover unpaid (state) controlled substance tax payments from individuals facing federal drug charges. *See id.* at *1. However, because of the Double Jeopardy Clause, the plaintiff-relators' pursuit of the drug-tax payments would bar the Commonwealth from thereafter initiating criminal charges. *See id.* at *3 (citing *Commissioner of Revenue v. Mullins*, 428 Mass. 406, 416-17 (1998)). Thus, the collection of the taxes "implicates prosecutorial discretion" and "the executive's prerogative with respect to prosecuting the trade in illegal narcotics." *Id.* at *3. Indeed, if the Attorney General could not dismiss the claim, then the result would be that "private parties could use the MFCA to effectively determine who is punished by the Commonwealth for narcotics offenses, how they are punished, and, in some circumstances, how often they are punished," which would be "surely impermissible." *Id.* Several other courts have taken this same basic approach—of declining to resolve the split between *Sequoia* and *Swift* on the rationale that the appellant's claim would fail even under the higher standard. *See United States ex rel. Health Choice Alliance, L.L.C. v. Eli Lilly & Co.*, 4 F.4th 255, 267 (5th Cir. 2021); *Chang v. Children's Advocacy Center of Delaware Weih Steve Chang*, 938 F.3d 384, 387 (3d Cir. 2020); *United States ex rel. Borzilleri v. Abbvie, Inc.*, 837 Fed. Appx. 813, 917 (2d Cir. 2020).

In the recent past, courts have developed two other approaches. First, the Seventh Circuit concluded that Rule 41 provides the standard governing a motion to dismiss, meaning that a pre-answer dismissal would be effective immediately, while a post-answer motion could only be granted "on terms that the court considers proper." *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 850-51 (7th Cir. 2020) (quoting Fed. R. Civ. P. 41(a)(2)). In the normal course, "where the government's conduct does not bump up against the Rules, the statute, or the Constitution, the notice and hearing . . . serve no great purpose." *Id.* at 853 (citing 31 U.S.C. § 3730(c)(2)(A)). The Third Circuit has now adopted this same approach. *See Polansky v. Executive Health Resources Inc.*, 17 F.4th 376, 389-90 (3d Cir. 2021) (citing *CIMZNHCA*, 970 F.3d at 849-50). Although the most advisable course for this Court to follow is the one charted in *Chawla*, we note that any dismissal predicated on this standard would need to be "on terms the court considers proper," Fed. R. Civ. P. 41(a)(2), which is a standard that should—if used to decide dismissal motions that are adverse to a plaintiff—consider fairness and the plaintiff's reasonable expectations. After all, while the government is the ultimate beneficiary in a False Claims Act case, the statutory scheme "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" to the plaintiff-relator, who has "an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772-73 (2000).

Finally, the First Circuit weighed in very recently with a new approach that relies on "well-established 'background constraints on executive action.'" *Borzilleri v. Bayer Healthcare Pharmaceuticals, Inc.*, No. 20-1066, 2022 WL 190264, *6 (1st Cir. Jan. 21, 2022) (quoting *CIMZNHCA*, 970 F.3d at 851). These well-established constraints would preclude dismissals made impermissible equal protection classifications, or that were "arbitrary in the constitutional

sense," as well as the circumstance where, "in moving to dismiss the qui tam action, the government is attempting to perpetrate a fraud on the court." *See id.* at *7 (quotations and citations omitted). The First Circuit rejected the D.C. Circuit's approach in *Swift* and the Ninth Circuit's approach in *Sequoia*, and it also concluded that Rule 41 was "not an appropriate guide" because the rule serves to protect defendants, not plaintiffs. *See id.* at *6; *see also Sequoia*, 151 F.3d at 1145. It's unclear how this approach could be used in the context of the Massachusetts False Claims Act, given that the approach rests on using basic principles of federal law to fill in perceived gaps in a federal law. It is probably better to just observe that there is no reason for supposing that the courts of Massachusetts would adopt this approach. Rather, the only guidance available from Massachusetts courts is *Chawla*.

### III)   The Obligations to Transmit One-Year Guns to State Police, and to Remit Funds to the Treasurer, are Not Discretionary

The Attorney General hangs its justification for dismissal largely on its claim that the complaint fails to state a claim under the Massachusetts False Claims Act. *See* Com. Br. pp. 9-14. Even its second justification, "waste of government resources," relies substantially on the claimed need to prevent the waste "caused by Relators' prosecution of an unmeritorious claim," and asserts this interest "is particularly compelling" because "the Complaint fails to state an MFCA claim." *See id.* at 2, 15. Particularly, the Attorney General claims that the complaint does not state a claim because § 129D merely provides "discretionary options for the transfer, storage, and disposal of confiscated weapons." *Id.* at 11. They say the provision regarding auction by the State Police "is inapplicable here because the police exercised their discretion in transferring all of the guns at issue in this case to Village Vault for storage." *Id.* at 13. They further claim that there is no obligation to the Commonwealth because § 129D discusses the payment of auction proceeds to gun owners, rather than to the Commonwealth. *See id.* at 13-14.

However, this argument relies on an untenable construction of § 129D, as it conflates: (1) the discretion to transfer guns for storage during the one-year period; and (2) the obligation to transfer guns to State Police after the period has ended.

Notably, while the Attorney General asserts (p. 10 n.6) that prior motions this Court has already decided "asserted wholly distinguishable grounds," this is not actually the case. The Stoughton Defendants, in their opposition to Plaintiffs' motion for leave to amend (Doc. No. 76) made pretty much the exact same argument, as they asserted (pp. 7-8) that the claim was futile because "the statute authorizes police to transfer possession of lawfully confiscated firearms and associated property to licensed storage facilities, such as Village Vault" and "the state garners proceeds from confiscated property – if at all – only if the police abjure the use of a private storage facility, retain possession of the confiscated property, and the owner fails to transfer or reclaim the property within one year." The Court tacitly rejected this argument when it granted Plaintiffs' motion. *See* Doc. No. 79. In subsequent motion practice, the Stoughton Defendants asserted the related argument that the complaint failed to state a claim because § 129D "expressly permitted" them to trade or dispose of firearms whose owners were unknown, but the Court rejected this argument because that aspect of § 129D did not concern the mandatory directive at issue in this case. *See* Memorandum and Order pp. 28-29 (Doc. No. 120). Rather, separating unknown-owner guns from one-year guns "requires discovery." *Id.* at 29.

In any event, the actual statutory history of § 129D refutes the Attorney General's proposed construction. The General Court enacted § 129D in 1968, as a part of the bill that (pertinently) first required people to obtain licenses in order to possess firearms of any type (handgun, rifle or shotgun). *See* 1968 Mass. Acts c. 737, § 7 (copy attached as Exhibit 1). As originally enacted, the statute consisted of four sentences in three paragraphs. The first paragraph

began by providing that "[u]pon revocation, suspension or denial of an application for" a gun license, an individual would "without delay deliver or surrender, to the licensing authority where he lives or resides, all firearms, rifles and shotguns which he then possesses[.]" *Id.* It next provided that the person would "have the right, at any time up to one year after said delivery or surrender, to transfer such firearms, rifles and shotguns to any licensed dealer or any other person legally permitted to purchase or take possession of" them. *Id.* Finally, the first paragraph directed the licensing authority to "deliver such firearms, rifles and shotguns to [any such] transferee or purchaser" within 10 days, and to otherwise observe "due care . . . in the receipt and holding of any such firearm, rifle or shotgun." *Id.* After this, the second paragraph provided that guns "not disposed of after delivery or surrender according to the provisions of this section shall be sold by the commissioner to the highest bidding licensed dealer and the proceeds shall be remitted to the state treasurer." *Id.* Finally, the last paragraph authorized the commissioner of public safety to "make and promulgate such rules and regulations as are necessary to carry out the provisions of this section." *Id.*

The meaning of the original statute is clear: after a license suspension, revocation or denial, the police must hold guns and ammunition for a year, and transfer them as directed by the owner—but after a year, any guns "not disposed of" pursuant to those directions are to be "sold by the commissioner to the highest bidding licensed dealer and the proceeds shall be remitted to the state treasurer." *See id.* And significantly, this same basic structure remains in place today. That is, § 129D still begins by directing individuals with denied, suspended or revoked licenses to "deliver or surrender" their guns and ammunition to the licensing authority, it still provides that individuals "have the right, at any time up to 1 year after the delivery or surrender, to transfer the" guns and ammunition to a qualified person, and it still directs that guns and

ammunition "not disposed of after delivery or surrender according to the provisions of this

section shall be sold at public auction . . . and the proceeds shall be remitted to the state

treasurer." *See* M.G.L. c. 140, § 129D.

In claiming that this direction is merely a discretionary option, or that its mandatory

nature is ambiguous, the Attorney General focuses on the 1998 amendment of the statute.[2] This

amendment inserted a new paragraph, between the original first and second paragraphs, which

provided that "after taking possession of any [gun] by any means," the licensing authority "may

transfer possession of such weapon *for storage purposes* to a federally and state licensed dealer."

*See* 1998 Mass. Acts c. 180, § 36 (emphasis added). If so, "[t]he owner shall be liable to such

dealer for reasonable storage charges and may dispose of any such weapon as provided under

this section by transfer to a person lawfully permitted to purchase or take possession of such

weapon." *Id.* Furthermore, the 1998 amendment appended language to the next paragraph, which

continued to otherwise provide that guns and ammunition "not disposed of . . . according to this

section" would be auctioned with "the proceeds . . . remitted to the state treasurer." *See id.* § 37.

The new language added that any gun "*stored and maintained* by a licensed dealer as provided

---

[2] The General Court made amendments that are not substantive (at least to the issue at bar) in
1969, 1973, 1986 and 1996. These amendments concerned things like changes to grammar, word
choice and word order, and the identity of government officials. *See* 1996 Mass. Acts c. 151 §§
323, 324; 1986 Mass. Acts c. 481, § 1; 1973 Mass. Acts c. 893, § 6; 1969 Mass. Acts c. 799, § 9.
In addition, the General Court amended § 129D in 2014 to include a new fourth paragraph
providing that if police "cannot reasonably ascertain a lawful owner within 180 days," then they
could "in [their] discretion, trade or dispose of surplus, donated, abandoned or junk [guns] to
properly licensed distributors or firearms dealers," so long as the guns had not "been used to
carry out a criminal act pursuant to [M.G.L. c. 140,] section 131Q" *See* 2014 Mass. Acts c. 284,
§ 44. By its terms, this fourth paragraph does not apply to guns that owners have surrender as
these individuals are, by definition, known—and the Attorney General does not cite this part of
the statute in making its argument. The Court has previously observed (correctly) that discovery
is needed to differentiate between "one year guns" that were surrendered following a license
denial, suspension or revocation and those for whom a lawful owner cannot reasonably be
ascertained. *See* Memorandum and Order p. 29 (Doc. No. 12).

under this section" could be auctioned if either "at the expiration of one year following initial surrender or delivery to such licensing authority" or if "the storage charges for such weapon have been in arrears for 90 days." *See id.* (emphasis added). In such a case, the proceeds would (after the deduction of storage charges and expenses) be "immediately returned to the owner." *See id.* Thus, the 1998 amendment gave police a discretionary option to transfer guns to licensed dealers "for storage," and if they chose to use that option, and an auction thereafter occurred, then the net proceeds would be paid to the original gun owner, not the Commonwealth.[3] But if the police did not use this option, the next paragraph continued to provide that any guns "not disposed of" pursuant to the statute would be auctioned by State Police for the benefit of the Commonwealth.

To advance its "discretionary options" argument, the Attorney General mischaracterizes the Plaintiff's claim as being the contention "that police opted to transfer custody to Village Vault, which 129D explicitly authorizes them to do." *See* Com. Br. pp. 11-12. But this is incorrect on two levels. First, it's not what the complaint alleges. Rather, the complaint contends that "[t]he Defendants had ongoing arrangements to improperly *sell* abandoned guns for their own benefit." Third Amended Complaint ¶ 1 (Doc. No. 78) (emphasis added); *see also id.* at ¶ 46 ("Dowd and Village Vault pay the police departments for the guns and other items, most commonly by providing a dollar-denominated 'credit' that the police departments can then use to purchase equipment, supplies and other valuable consideration, but also by sometimes providing check payments"). The complaint alleges *sales* and makes no contention that the police officials transferred the guns at issue for storage purposes. Second, this argument is also wrong because this is not what the statute actually says. The second paragraph of § 129D gives police officials

---

[3] We do not know the General Court's rationale for doing this, but note that it may have been a matter of practicality—i.e., that once guns are in the custody of a dealer, it may be impractical for the dealer to transfer them to State Police, particularly if the dealer is owed storage charges.

to transfer guns to licensed dealers "for storage purposes," but if the one-year period has expired

then the issue of storage is off the table, as the owner has lost their right to transfer the guns to

another person and has nothing left to store. Rather, because the guns have been "not disposed of

after delivery or surrender according to the provisions of" § 129D, they fall within the mandatory

direction that they "section shall be sold at public auction by the colonel of state police . . . and

the proceeds shall be remitted to the state treasurer." M.G.L. c. 140, § 129D.

Contrary to the Attorney General's claim, the First Circuit's decision in *Jarvis v. Village*

*Gun Shop, Inc.*, 805 F.3d 1 (1st Cir. 2015), is largely inapposite to the issue presented here. That

case concerned storage by a licensed dealer, as permitted by the 1998 amendment, not guns that

that the police retained for the full year. *See id.* at 4-5. Contrary to the Attorney General's claim

(pp. 13-14), the First Circuit did not rule or even suggest that, after one year has passed, the

police could avoid the obligation to turn guns over to the State Police by instead turning them

over to a licensed dealer "for storage" (that is to be billed to the former owner, who no longer has

an interest in the property). Rather, the First Circuit explained that a dealer providing storage had

statutory authority to auction guns if its fees were unpaid or if the one year period expired, and it

then added a footnote explaining that if "the police choose to retain custody of the confiscated

property rather than transferring it to an authorized storage facility," then the proceeds of any

auction would, per § 129D, be "remitted to the state treasurer." *See id.* at 5 & n.2 (citing M.G.L.

c. 140, § 129D). Thus, § 129D's direction as to one-year guns was clear to the First Circuit.

Moreover, the First Circuit's conclusion about what the police must do if they retain custody is a

tacit rejection of the statutory end-run that the Attorney General proposes—to instead send guns

to licensed dealers for the ostensible purpose of "storage," even though the police no longer have

the obligation to store them.

**IV)     A Generalized and Nonspecific Interest in Avoiding Governmental Costs is Insufficient**

The Attorney General also (pp. 14-15) cites an interest in "avoiding governmental costs of litigation" and makes the nonspecific assertion that "[t]his case has already demanded significant government resources as numerous municipalities have answered burdensome discovery requests." The Attorney General asserts that dismissal is appropriate "in the interest of preventing this ongoing burden on governmental resources," which "is particularly compelling where, as described above, the Complaint fails to state an MFCA claim."

Of course, all litigation involves burdens, and oftentimes those burdens fall on government bodies that must hear and decide cases, produce records and witnesses, serve process, and the like. Burdens on the government are particularly likely with claims under the False Claims Act, which almost always concerns dealings between people and the government. If a generalized and nonspecific interest in "avoiding governmental costs of litigation" were sufficient, then pretty much any False Claims Act case is subject to dismissal.

As such, "where the government claim[s] an interest in controlling litigation expenses," courts "have required legitimate investigation into the costs and benefits of continued litigation before granting a government motion to dismiss." *Polansky v. Executive Health Resources, Inc.*, 422 F. Supp. 3d 916, 927 (E.D. Pa. 2019), *aff'd*, 17 F.4th 376 (3d Cir. 2021) (citations omitted). The need for a more searching review arises when the government's cited basis for dismissal turns on "the factual record," rather than the existence of "any conceivable justification." *See United States v. Academy Mortgage Corp.*, No. 16-cv-02120, 2018 WL 1947760 (N.D. Cal. Apr. 25, 2018) (citations omitted), *appeal dismissed*, 968 F.3d 996 (9th Cir. 2020). Here, the Attorney General has submitted no evidence, nor does it proffer to have conducted an investigation. Rather, the Attorney General merely asserts (p. 15) that municipalities have incurred "significant

government resources" to "answer[] burdensome discovery requests," and that they will need to incur more expenses to comply with the outstanding subpoenas. But as a point of fact, the municipalities have answered *no* discovery requests, but instead just a single subpoena (each) seeking records. Moreover, and likely more importantly, neither the Attorney General nor anyone else knows *how* burdensome it will be to respond to the current subpoenas because the municipalities moved to quash those subpoenas without making any attempt to determine what information was available and how burdensome compliance would actually be.

Concededly, most courts wind up granting governmental motions to dismiss False Claims Act claims. However, this is not the case where the government cites a factual issue—like the desire to avoid undue litigation expense—but fails to show that it has actually investigated the factual issue and made a reasoned determination that it justifies the action taken. For example, in *United States v. Academy Mortgage Corp.*, No. 16-cv-02120, 2018 WL 3208157 (N.D. Cal. Jun. 29, 2018), *appeal dismissed*, 968 F.3d 996 (9th Cir. 2020), the government moved to dismiss a case in which it had previously (as here) declined to intervene on the ground "that proceeding with the suit would drain its resources." *See id.* at *1. However, the government's investigation had "consisted only of interviewing the Relator and examining documents produced by her," and the government had not submitted any evidence, even after the court requested it. *See id.* Because the government "did not fully investigate the amended complaint," the court denied the government's motion to dismiss. *Id.* at *3.

Another pertinent case is *United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, No. 17-CV-765, 2019 WL 1598109 (S.D. Ill. Apr. 15, 2019), *rev'd*, 970 F.3d 835 (7th Cir. 2020). There, the court recognized that "the Government has a valid interest in avoiding litigation costs, particularly in cases it deems lacking in factual and legal support." *Id.* at *3 (citing *See United*

*States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1146 (9th Cir. 1998)). However, the mere recitation of a valid interest was not in and of itself sufficient. Rather, for the purpose to be valid and rationally related to dismissal, the government's "decision to dismiss must have been based on a minimally adequate investigation, including a meaningful cost-benefit analysis." *Id.* There, the government had "collectively investigated" various related cases, but had with respect to the pending case only "reviewed the Complaint and disclosure materials attached to the Complaint." *Id.* The government had not reviewed any additional materials, nor had it conducted any cost-benefit analysis. *See id.* This "f[e]ll[] short of [the] minimally adequate investigation [needed] to support the claimed governmental purpose." *Id.* Thus, the court denied the government's motion to dismiss. *See id.* at *4. The Seventh Circuit reversed—but because it disagreed as to the applicable standard of review, not because it disagreed with the district court's rational-basis analysis. *See United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 849-50 (7th Cir. 2020). (Under the Seventh Circuit's approach, dismissal was automatic because Rule 41 governed and the defendant had not filed an answer. *See id.*)

Significantly, in the cases the Attorney General relies upon (p. 15), courts generally did not grant dismissal on the government's mere assertion that continued litigation would unduly drain government resources. In *Sequoia*, for example, the fact that "the government would continue to incur enormous internal staff costs" was *one* reason that justified the district court's decision to dismiss, but the primary focus was on other considerations—most notably, on a government agency's interest in ending disputes in the citrus industry it regulated, combined with the fact that the order at issue had been invalidated. *See Sequoia*, 151 F.3d at 1146. And, in *United States ex rel. Backer*, No. 17 Civ. 2709, 2019 WL 5593302 (S.D.N.Y. Oct. 30, 2019), the

pro se plaintiff alleged that the Department of Justice "should have extracted a greater monetary penalty" as part of a deferred prosecution agreement. *See id.* at *1. While "the objective of conserving governmental resources" was one consideration that justified dismissal, there also several other considerations. *See id.* at *3 (citation omitted). Specifically, the claim "in essence" sought to re-open a "multi-year, fraud-based investigation" that the government had concluded by reaching the deferred prosecution agreement with the defendant. *See id.* In other words, the continuance of the case would have consumed government resources in a manner in which the government had already expended resources and made a decision to stop. Finally, *Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925 (10th Cir. 2005), concerned security at a nuclear manufacturing facility that had since closed and become the subject of a CERCLA "Superfund" cleanup. *See id.* at 929. The primary ground the court relied upon in sustaining the government's motion to dismiss was that "classified documents required in the litigation would present a risk of inadvertent disclosure, implicating national security." *See id.* at 936-37. However, a secondary ground was that the continued litigation "would delay the clean-up and closure" because it would require personnel to divert from the cleanup effort in order to review classified documents that had been requested in the litigation. *See id.* at 937. In none of these cases did the court grant the government's motion to dismiss solely on the basis of the government's assertion that continuation of the case would consume government resources.

Indeed, it was only in *United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15-CV-7881, 2019 WL 3203000 (S.D.N.Y. Jul. 16, 2019), that the desire to conserve government resources was central justification for the decision to dismiss—but there the government showed that, for specific reasons, the continuation of the cases would be particularly demanding on the government. Specifically, the claim there concerned "a wide-ranging scheme . . . to defraud

Medicare," *AbbVie*, 2019 WL 3203000 at *1—which is a claim that, by its very nature, is likely to rest largely on records and testimony from the Department of Health and Human Services, as well as to involve records and personnel in multiple locations. Thus, continuation of the claim would require "attorneys from multiple offices . . . to monitor the litigation and likely coordinate third-party discovery," as well as compelling DHHS staff "to divert time and resources to respond to discovery requests." *See id.* at *2. Again, the mere fact that the case would require some amount of governmental resources was not, standing alone, sufficient.

### V)   The Attorney General Failed to Comply with Local Rule 7.1

Local Rule 7.1 requires any motion to include counsel's certification "that they have conferred and have attempted in good faith to resolve or narrow the issue." However, the Attorney General's motion lacks any such certification, as the Attorney General did not confer (with Plaintiffs, at least) regarding its current set of arguments. And, while the failure to include a Local Rule 7.1 certification does not normally warrant the automatic denial of motion, that is not the case where there are indications that conferral would have resolved or narrowed the issues. *See Blanchard v. Swaine*, No. 08-40073, 2010 WL 4922699, *5 (D. Mass. Nov. 29, 2010) (citing *Converse, Inc. v. Reebok Int'l, Ltd.*, 328 F. Supp. 2d 166, 174 n.7 (D. Mass. 2004)). These indications are present here. Specifically, in December 2021 the Attorney General's office contacted Plaintiffs' counsel to advise that they intended to move for dismissal on the basis of the public disclosure bar, as well as on their understanding that the only claims that remained in issue were those that concerned Stoughton. In response, Plaintiffs provided the Attorney General with a copy of their response to the pending motion to quash (Doc. No. 137), which refuted both contentions in some detail. Presumably, the Plaintiffs would have again been able to address the Attorney General's concerns, had such a conference occurred on the present motion. As such, this is an appropriate occasion to deny the Attorney General's motion under Local Rule 7.1.

**VI)     Conclusion**

Contrary to the Attorney General's claim—and as this Court has already concluded—the complaint states a valid claim because the obligation to turn over "one year guns" to the State Police was mandatory, not discretionary. Beyond this, the Attorney General has done nothing to document any investigation of this case or any assessment of costs and benefits, and its nonspecific averment that litigation will impose burdens on the government is an insufficient basis for dismissing this case, particularly after it has already been pending for a period of years. To whatever extent the Court is inclined to entertain this argument as justification for dismissal, Plaintiffs respectfully request the opportunity for a hearing to address and decide the issue. However, because the showing the Attorney General has made is plainly inadequate, the better course is to just deny the motion outright.

Dated: February 3, 2022

Respectfully submitted,

THE PLAINTIFFS,
By their attorneys,


 /s/ David D. Jensen
David D. Jensen
David Jensen PLLC
33 Henry Street
Beacon, New York 12508
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Margarita Smirnova, Esq.
BBO No. 680429
7 Greenbriar Drive, Unit 109
North Reading, Massachusetts 01864
Telephone: (617) 875-8663
margarita.smirnova@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on Feb. 3, 2022.

 /s/ David D. Jensen
David D. Jensen