UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS *ex rel.* MYKEL POWELL, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>BRIAN HOLMES, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 1:18-cv-11336-FDS |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**I)** **Introduction**

Defendants' purported "motion for judgment on the pleadings" raises no grounds on which Defendants are entitled to relief, and indeed, it relies substantially on grounds this Court has already rejected. First, Defendants' public disclosure argument is just as inapplicable to a Rule 12(c) motion as it is to a motion to quash. Even if it were not, Defendants identify no public disclosures that disclosed the sale of guns that, pursuant to M.G.L. c. 140, § 129D, Defendants were instead required to transfer to the State Police due to the passage of one year—an essential element of the claim presented here. Beyond this, the False Claims Act[1] does not require service of an amended complaint on the Attorney General, and indeed, such a requirement would serve little purpose. Notably, in recycling this previously asserted argument, Defendants ignore the ruling this Court has already made. Defendants also recycle their common law immunity

---

[1] We generally refer to the Massachusetts False Claims Act as the "False Claims Act."

-1-

argument, disregarding (as before) that this case concerns a nondiscretionary obligation, rather than a discretionary one. And, Defendants' argument about being entitled to dismissal because they are "the same as" the Town of Stoughton is wholly unsupported and runs afoul of the plain text of the False Claims Act. Finally, to the extent Defendants purport to join the Attorney General's motion (notwithstanding their lack of standing to do so), Plaintiffs refer the Court to their brief in opposition to that motion (Doc. No. 147).

## II)     The Public Disclosure Bar Does Not Apply

A provision commonly known as the public disclosure bar precludes False Claims Act actions where "substantially the same allegations or transactions" have been "publicly disclosed" in one of three specified sources:

> (1) in a Massachusetts criminal, civil or administrative hearing in which the commonwealth is a party; (2) in a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation; or (3) from the news media[.]

M.G.L. c. 12, § 5G(c). Defendants point to several news articles, a prior civil case and a submission made to the government to contend that the bar applies here. *See* Defts. Br. pp. 9-13 (Doc. No. 147). But as we explain, the bar does not apply because the articles do not disclose the sale of § 129D "one year" guns that had become the property of the Commonwealth, an essential element of the claim. Furthermore, and other issues aside, Lawrence Mirsky's previous case is immaterial because the Commonwealth was not a party to it, and his letter is immaterial because it is not a report by the government.

However, there is no reason to even reach these issues because Defendants' public disclosure claim is—plainly—not one that is amenable to a Rule 12(c) motion for judgment on the pleadings. Certainly, such a motion can rely on documents the complaint incorporates by reference, as well as "matters susceptible to judicial notice" and "matters of public record." *See,*

*e.g., In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003) (quotation and citations omitted). Significantly, while Defendants (p. 9) recite the correct standard in a footnote, they provide no explanation of how one of these three categories might apply to the articles they append to their motion without.

Nonetheless, and in an abundance of caution, Plaintiffs respond to the merits of Defendants' argument. In doing do, a preliminary matter is Defendants' incorrect construction of the "original source" exception. The False Claims Act provides an exception to the public disclosure bar where, pertinently, "the relator is an original source of the information." M.G.L. c. 12, § 5G(c); *see also* 31 U.S.C. § 3730(e)(4). Defendants incorrectly construe the statute by claiming that this *exception* is actually an affirmative requirement for proceeding with any claim—that "the Plaintiffs must be the 'original source' of the information." *See* Defts. Br. pp. 5, 9. However, as this Court has already recognized, the "original source" provision is "an exception to the public-disclosure bar," rather than "a requirement for an individual to qualify as a relator in the first instance." *See* Memorandum and Order p. 19 (Doc. No. 120).

### a. The *Lowell Sun* and *Evidence Log* Articles About Tyngsborough

The article *Tyngsboro chief cleaning out dept.'s closets*, Lowell Sun (Aug. 28, 2007) announces the Tyngsborough police chief's "plan to clean out the evidence room and sell guns and other abandoned property," and that, in the course of doing so, "[a]bout 100 guns will be sold through Village Vault." Exhibit 1 (Doc. No. 143-1). The article specifically refers to "property not needed for pending cases," and says that "the guns to be sold had not been used in violent crimes." *Id.* Furthermore, "[s]ome of the guns were seized after cases of domestic violence, which made the owners ineligible to possess firearms." *Id.*

The article *A Tale of Four Cities*, The Evidence Log (2008 No. 4) likewise states that the town "is planning to sell approximately 100 firearms to a federally licensed firearms dealer."

Exhibit 2 p. 20 (Doc. No. 143-2). In language the Defendants emphasize, the article relays the chief's statement that "the Department does not usually destroy firearms that have resale value; these are traded in to a firearms dealer where they are reconditioned and resold. This helps offset the cost of new firearms for its officers." The article states further (in language the Defendants omit) that the dealer, Village Vault, "complies with all state gun laws."

These articles disclose that a Massachusetts police department was selling guns to Village Vault—but that, standing alone, does not indicate impropriety. As discussed previously,[2] police departments often sell guns, including guns that are no longer needed as evidence. True, the *Lowell Sun* article says that "some" guns "were seized after cases of domestic violence," but there are many cases in which police might be lawfully entitled to sell guns that were seized after cases involving domestic violence. Among other things, police might seize guns connected to a domestic violence incident for reasons unconnected to a license suspension or revocation—for example, if the owner was not lawfully in possession of them in the first place, or if the "owner" denied they owned the gun. Moreover, even if a seizure came within § 129D, the owner might choose to relinquish their rights in the gun and instead donate it to the police, particularly if they were no longer going to be able to possess it. In any of these instances, the police would be lawfully entitled to sell the gun. Thus, the articles do not disclose the key essential element that the guns *had become the property of the Commonwealth under § 129D due to the passage of one year*, but were being sold to Village Vault regardless.

b.  **The *Opposing Views* Article**

The article on the Opposing Views website concerns an individual's "claim that local police are systematically violating the rights of gun owners." *See* Dabney Bailey, *Are*

---

[2] See Plaintiffs' opposition to the Municipalities' motion to quash (Doc. No. 137) at pp. 4-7.

*Massachusetts Police Illegally Seizing and Selling Privately-Owned Guns for Profit?*, Opposing Views (updated Mar. 1, 2018; original May 9, 2013), Exhibit 6 (Doc. No. 143-6). Lawrence Mirsky's specific claim was that "Quincy Police are revoking pistol licenses at the drop of a hat, seizing privately owned firearms, and then illegally selling the guns to fund the department." *Id.* In "laymen's terms," according to the article, Mr. Mirsky was "accusing the local police of running a racket *against gun owners*." *Id.* (emphasis added).

This article likewise does not disclose the key essential elements of the claim at bar—that the police were selling *"one year guns" that had become the property of the Commonwealth*, instead of transferring them to State Police. To the contrary, Mr. Mirsky's claim concerned an alleged "racket against gun owners" that involved "revoking pistol licenses" without sufficient cause and then "illegally selling" seized guns to the detriment of their original owners—meaning that it was those owners, not the Commonwealth, that were being defrauded. And indeed, nothing in the article indicates the *reason* the sales were illegal. Were the alleged sales illegal because the police had conducted them during the one year that they were obliged to hold guns following a suspension or revocation? Were they illegal because the police accidentally concluded that the guns at issue were ones they could sell (*e.g.* as lost or donated guns) when they were actually guns they were obligated to hold? If anything, the article suggests that the issue was *not* "one year guns" because that would be a "racket against the Commonwealth," not a "racket against gun owners."

    c. **Lawrence Mirsky's Court Filings and Letter to the Government**

The Defendants focus much of their argument on the court filings and government submissions that Lawrence Mirsky made after the Quincy Police Department seized his guns. However, these documents are plainly not public disclosures. Court submissions are not pertinent unless "the commonwealth is a party." M.G.L. c. 12, § 5G(c)(1). Indeed (and once again), the

Court has already expressly recognized this. *See* Memorandum and Order p. 21 (Doc. No. 120). And further, while the reports *of* a Commonwealth agency can be within M.G.L. c. 12, § 5G(c)(2), the documents that the Defendants cite—complaints submitted *to* a Commonwealth agency—are not. Rather, "disclosures to government officials do not constitute public disclosures for purposes of the public disclosure bar." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 124 (2d Cir. 2021) (citing *United States v. Chattanooga-Hamilton Co. Hosp. Auth.*, 782 F.3d 260, 268-69 (6th Cir. 2015)).

Although these court filings and letters are not within § 5G(c)'s public disclosure provisions in the first place, it is still significant to note that Mr. Mirsky's case was substantially different from the case presented here. Mr. Mirsky's letter to the Executive Office of Public Safety and Security recounted that the Quincy Police "were systematically, and corruptly violating the civil rights *of firearms owners* in order to profit from the sale of their property." *See* Exhibit 3, ¶ 1 (Doc. No. 143-3) (emphasis added). This was taking place because even though an owner had "one year to transfer their property into the hands of one who is permitted under law to possess it," there was instead a "departmental policy never to return firearms." *See id.* at ¶¶ 2, 4. Mirsky stated his firearms were seized in December 2008, but were sold in October 2009— less than one year later. *See id.* at ¶ 7. Mr. Mirsky concluded that this evidenced "an regular and ongoing practice to profit by denying the civil rights *of property owners*." *Id.* at ¶ 9 (emphasis added). The core of the grievance was thus that Quincy Police were depriving individual gun owners of their rights by selling seized firearms *too early*. In claiming that this disclosed the scheme at issue in the present case, the Defendants point to the Village Vault receipts that Mirsky included with his letter, contending that there was a public disclosure because someone

might have seen the reference to "credits" and put the whole scheme together by supposition—even though there's no indication that anyone did.

Mr. Mirsky's court complaint likewise concerned the alleged "illegal sale of [his] property, stemming from a years long campaign waged by the defendants to harass and alienate [Mirsky], to paint him as mentally ill, to drive him from his home, to imprison him, to deprive him of his civil rights, his property, and dissuade him from taking legal action against the defendants themselves." *See* Exhibit 4, ¶ 1 (Doc. No. 143-4); *see also* Exhibit 5, ¶ (Doc. 143-5). The bulk of the alleged facts concerned Mirsky's interactions with a female supermarket employee, which he claimed had been misunderstood or mischaracterized. *See* Exhibit 4 at ¶¶ 1, 9-23, 25, 28-35, 37-39, 43.

As to § 129D, one of Mirsky's ten causes of action asserted "Violation of Massachusetts General Law. Chapter 140, section 129D." *See id.* at ¶¶ 63-66. The precise basis for this was Mirsky's claim that "[t]he Quincy Police Department sold or otherwise disposed of nearly $11,000 worth of plaintiff Mirsky's firearms property before the one year period in which they were to hold them, pending transfer to another individual of Mirsky's choice, was up." *Id.* at ¶ 64. In this respect, Mr. Mirsky's claim was somewhat analogous to Mykel Powell's original claim—that the police had failed to hold his guns for the mandated one year period and had instead sold them, whether accidentally or maliciously. *See* Complaint ¶¶ 9, 18-20, 25 (Doc. No. 2) in *Powell v. Holmes*, No. 1:17-cv-10776 (D. Mass. filed May 3, 2017) (guns seized on November 14, 2015 and "sent for disposal" on October 3, 2016, less than one year later). Indeed, the essential pertinence of Mr. Mirsky's prior case was that (as this Court has already observed) it established that there was no right of action for a violation of § 129D. *See* Memorandum and Order p. 11 n.4 (Doc. No. 25) in *Powell v. Holmes*, No. 1:17-cv-10776 (D. Mass. filed Feb. 1,

2018). Mr. Mirsky went on to assert that aside from this, "by not submitting said property to the State Police for auction as prescribed . . . the Quincy Police are effectively guilty of defrauding the Commonwealth." Exhibit 4 (Doc. No. 143-4) at ¶ 65; *see also id.* at ¶ 44. This statement could be true, but is not necessarily so,[3] and a missive about what might have been happening is not the same as a disclosure that provides the details of what actually is happening.

More to the point, a review of these "disclosures" shows why the public disclosure bar does not include court filings that do not involve the government and reports *to* the government (rather than reports *by* the government). Literally anyone can file a lawsuit or submit letters to the government, making myriad allegations of impropriety and malfeasance. People doing so may have little or no basis for their accusations, and officials receiving those allegations may have little or no reason to take them seriously. Thus, this is not a situation where it can be said that the "fraud [is] already apparent from information in the public domain." *Rosenberg v. JPMorgan Chase & Co.*, 487 Mass. 403, 409, 169 N.E.3d 445, 456 (2021) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 206 (1st Cir. 2016)). Notably, neither of the reported cases that concern Mr. Mirsky reference anything about a scheme to sell one year guns. *See Mirsky v. Barkas*, 28 Mass. L. Rptr. 384, 2011 WL 2371879 (Sup. Ct. 2011) (recounting that "the Quincy Police had improperly disposed of his [guns and other] property due to [defendant's] paperwork error"); *see also Mirsky v. Barkas*, 84 Mass. App. Ct. 1116, 995 N.E.2d 1151 (2013). Allowing these types of documents to preclude meritorious claims as

---

[3] If police were selling guns during the period they were obliged to hold them, but would have ultimately transferred them to State Police at the end of this period, then the premature sale would have directly deprived the individual gun owner at the time it took place, but would have ultimately deprived the Commonwealth—if the owner would not have taken action to transfer the gun to someone else so that the guns would then have become the Commonwealth's property. But how do we know this would have happened?

supposed "public disclosures" would not advance the policies underlying the False Claims Act, since the fraud at issue was not actually known in the public domain, and would instead frustrate these goals by giving otherwise liable defendants an undeserved "pass."

### III) The False Claims Act's Provisions on Sealing and Investigation by the Attorney General do Not Apply to Amendments

Defendants reiterate their previous argument (pp. 15-16) that the Plaintiffs' claim fails because, according to them, "presentment"—a term that comes from the Defendants, not the False Claims Act—"must be re-made to the Attorney General's Office each time [a relator] is adding parties," a proposition for which they cite no authorities other than the text of the False Claims Act itself. Various parties have previously made this same substantive argument. *See* Memorandum pp. 9-10 (Doc. No. 100-1); Opposition pp. 4-5 (Doc. No. 74-1). In its June 30, 2021 decision, the Court observed that it was "unclear whether plaintiff-relators were required to serve the amended complaint upon the Attorney General" because, among other things, the False Claims Act states no such requirement. *See* Memorandum and Order p. 22 (Doc. No. 120). Nonetheless, in light of its ultimate ruling the Court declined to conclusively decide the matter. *See id.* pp. 22-23.

Other issues aside, Defendants' construction of the statute would present practical problems. The False Claims Act claim provides that a "complaint shall be filed under seal and shall remain so for 120 days," and that during this period—when only the plaintiff-relator and court personnel know of the case's existence—the plaintiff will serve it on the Attorney General along with "written disclosure of substantially all material evidence and information the relator possesses." M.G.L. c. 12, § 5C(3). The Attorney General then decides whether or not to intervene, after which the case is unsealed. *See id.* By its terms, the False Claims Act does not require formal service of an amended complaint (as the Court has already observed), and indeed,

it is unclear how one would proceed with *re*-sealing the case, nor whether it would serve much of a purpose because the context at the time of amendment is materially different than it is at the tiem of commencement. At the time of commencement, the Attorney General receives not just the contents of the then-filed complaint, but also the plaintiff-relator's other "material evidence and information." *See* M.G.L. c. 12, § 5C(3). And, of course, once the case has already been unsealed, the interest in keeping the matter secret to facilitate an investigation becomes much less acute—or to put it more simply, the cat is already out of the bag. As this Court has observed, the Attorney General already has the right to receive copies of pleadings and to intervene on a showing of good cause, *see* M.G.L. c. 12, § 5D(6); Memorandum and Order p. 22 (Doc. No. 120), meaning that it is not a situation where the Attorney General needs to be made aware of the matter for the first time. *See, e.g., United States ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 972 F. Supp. 2d 1317, 1326-27 (N.D. Ga. 2013); *Wisz ex rel. United States v. C/HCA Development, Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998); *United States ex rel. Mikes v. Straus*, 931 F. Supp. 248, 259 (S.D.N.Y. 1996); *United States ex rel. Milam v. Regents of the University of California*, 912 F. Supp. 868, 890 (D. Md. 1995). The False Claims Act contains no requirement of further service, and it would be nonsensical to read one in.

    **IV)    Common Law Immunity**

Defendants also reassert the common law immunity argument they previously made in opposition to Plaintiffs' motion for leave to amend. *See* Defts. Br. pp. 15-16; *see also* Joint Opposition pp. 13-15 (Doc. No. 100-1). But contrary to Defendants' claim, common law immunity does not apply because the Defendants were not acting within their discretion, and in any event, because they were not acting in good faith, but were instead agreeing to act in contravention of their legal obligations in exchange for consideration.

The Plaintiffs assert that the police officials had a <u>nondiscretionary</u> duty to "turn[] . . . guns over to State Police, for the benefit of the State Treasurer, as the law mandates." *See* Third Amended Complaint ¶ 1 (Doc. No 78); *see also id.* ¶¶ 34, 50, 52, 54, 60, 62, 64, 67, 69, 71, 74, 77, 79, 81, 83, 85, 87, 89, 91, 93-94, 97, 99, 101-02, 104, 106, 108, 110, 121-25; *see also* Complaint (Doc. No. 1) ¶¶ 1, 18, 46-50. The Plaintiffs have never asserted that (for example) the police officials improvidently exercised a discretionary authority to do as they pleased with the guns and ammunition that they had held for more than a year. Rather, with respect to that issue—the disposition of one-year guns—the statute uses mandatory language to direct that such guns and ammunition "shall be sold at public auction by the colonel of the state police . . . and the proceeds shall be remitted to the state treasurer." M.G.L. c. 140, § 129D. Indeed, in its previous decision, this Court (correctly) observed that the basis of Plaintiffs' "reverse" false claim is that the False Claims Act "imposes liability for reverse false claims when a person avoids an <u>obligation</u> to pay or transfer property to the Commonwealth." *See* Memorandum and Order p. 26 (Doc. No. 120) (citing M.G.L. c. 12, § 5B(a)(9)) (emphasis added).

This fact—that § 129D imposes an obligation to remit property to the Commonwealth, not the discretion to do so—readily and properly distinguishes every single case that the Defendants cite. *See* Defts. Br. pp. 15-16.

Specifically, *Nasir v. Town of Foxborough*, No. 19-cv-11196-DJC, 2020 WL 1027780 (D. Mass. Mar. 3, 2020), concerned police officers who assisted a woman in moving out of her husband's home, and there was no dispute that the officers' decision to assist the woman was an act of discretion—something they were not required to do, nor prohibited from doing. *See id.* at *17. Likewise, *Nelson v. Salem State College*, 446 Mass. 525, 845 N.E.2d 338 (2006), concerned campus safety officers who installed a hidden camera to investigate criminal activity and then

unwittingly recorded the plaintiff changing her clothes. *See id.* at 529-30. The defendants were "act[ing] within their discretion by implementing an investigatory policy to use a surveillance camera." *Id.* at 538.

Many of the decisions the Defendants invoke concern local officials who exercised discretion to approve or disapprove of permits or approvals, or to manage ongoing projects—which stand in marked contrast to the issue presented here, where a statute directs local officials to act in a particular manner. For example, *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134 (1st Cir. 2016), concerned a water official's decision to oppose approval of a residential development—something that was on its face a discretionary determination. *See id.* at 139. Indeed, the court did not even address the issue of discretion at any significant length. *See id.* at 146. *South Boston Betterment Trust Corp. v. Boston Redevelopment Auth.*, 438 Mass. 57, 777 N.E.2d 812 (2002), concerned a tortious interference claim that arose out of a mayor's decisions and communications in managing and overseeing a redevelopment project. *See id.* at 61-62, 68. Again, the underlying conduct was inherently discretionary. *Foster from Gloucester, Inc. v. City Council of Gloucester*, 10 Mass. App. Ct. 284, 407 N.E.2d 363 (1980), concerned a local government's decision to revoke a business's licenses to sell and store diesel fuel due to the business's violation of local restrictions. *See id.* at 288-89. Once again, this was plainly discretionary; the standard of review was whether the local government had acted arbitrarily and capriciously. *See id.* at 296. *Lee v. Quincy Housing Auth.*, No. 16-11631-RGS, 2017 WL 402972, at *2 (D. Mass. Jan. 30, 2017), contains the statement that a defendant official "cannot be liable for an intentional tort if she 'acted in good faith, without malice, and without corruption,'" *see id.* at *6 (*quoting Nelson*, 446 Mass. at 537). However, the context of that case was a decision by a local housing administrator to deny an individual a Section 8 voucher based on a finding that the

plaintiff had repeatedly violated lease conditions—a decision that, again, is discretionary on its face. *See id.* at *3.

The remainder of the Defendants' cases likewise concern discretionary determinations, like the decision to adopt a policy, or the decision to withhold exculpatory evidence. Specifically, the decision in *Duarte v. Healy*, 405 Mass. 43, 537 N.E.2d 1230 (1989), concerned an official's decision to adopt a policy requiring drug testing and directing the termination of certain employees who failed it. *See id.* at 50. And, *Echavarria v. Roach*, No. 16-cv-11118-ADB, 2017 WL 3928270 (D. Mass. Sept. 7, 2017), concerned the alleged fabrication of evidence and withholding of exculpatory evidence during a criminal investigation—decisions that would have intrinsically between discretionary—and in any event focused on the issues of malice and corruption. *See id.* at *30-31. The remaining cases do not address discretion at all. *See Brothers v. Town of Millbury*, No. 14-10122-TSH, 2014 WL 4102436, at *20-21 (D. Mass. Aug. 14, 2014) (wrongful termination case that focused on whether the evidence supported a finding of malice); *Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 416, 8 N.E.2d 895 (1937), *overruled*, *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505 (1975) (shareholder lawsuit that discussed the meaning of the term "bad faith" in the context of corporate management, but is otherwise oblique); *McGurk v. Cronenwett*, 199 Mass. 457, 461-62, 85 N.E. 576 (1908) (malicious interference claim that discussed the meaning of the term "malice" in that context).

Far more on point than any of these cases is *Breault v. Chairman of the Board of Fire Commissioners*, 401 Mass. 26, 513 N.E.2d 1277 (1987), where state law required the defendant official to reinstate the plaintiff employee after a period of leave ended. *See id.* at 33-34. The conduct at issue there—like the conduct at issue here—was not discretionary because the statute

used mandatory "shall" language to direct the defendant to take a particular course of action. *See id.* & nn.7-8.

Apparently recognizing that the acts at issue were not discretionary, the Defendants instead attempt to deflect attention to the question of whether they acted in bad faith, with malice or corruptly—even though this question arises only in connection with acts that are discretionary. *See Breault*, 401 Mass. at 33, 37-38 (declining to address bad faith issues because the conduct at issue was not discretionary) (citations omitted). But in any event, the Defendants' argument would fail because this case concerns acts that were corrupt. That is, this case asserts that even though the Defendants were obligated to turn over possession of guns and other items to the State Police, they instead agreed to turn over possession to Village Vault because Village Vault and Dowd offered to give them things of value in return, all in violation of Massachusetts laws that prohibit bribery. *See, e.g.*, Third Amended Complaint (Doc. No. 78) at ¶¶ 137-39. Indeed, this scheme is the "pattern of racketeering activity" that gives rise to Plaintiffs' RICO claim against Dowd. *See id.* at ¶ 140.

And on that point, the Defendants cite various cases that for the most part concern situations where there was simply no indication of bad faith, malice or corruption. *See, e.g., Nasir*, 2020 WL 1027780 at *18; *Nelson*, 446 Mass. at 537-38; *S. Boston Betterment Tr.*, 438 Mass. at 69. *But see Echavarria*, 2017 WL 3928270 at *30-31 (claim that defendants fabricated evidence and withheld exculpatory evidence states claim of malice and corruption). But that is not the situation presented here, where a key part of the scheme at issue is bribery—providing consideration in order to induce an official to take action. None of the decisions that the Defendants invoke concern this situation.

**V)      "McNamara and O'Connor cannot be liable . . . because the Town of Stoughton is a municipal subdivision of the state"**

Defendants' final argument (pp. 16-18) is that McNamara and O'Connor cannot be held liable because "Stoughton is a legal entity of the Commonwealth (and thus the same party)" and "as a matter of law they cannot violate the statute by enriching a subdivision of the state." In making this argument, Defendants rely on one case, *United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995), which they claim this Court misconstrued in its prior decision.

However, the Court's discussion of this case arose in the context of the Defendants' argument that the False Claims Act claim failed because (according to them) the Commonwealth suffered no loss. Specifically, Defendants asserted that the State Police would not have auctioned the guns and that, accordingly, the Commonwealth would not have thereafter realized any proceeds. *See* Defts. Opposition pp. 7-8 (Doc. No. 76). The Court cited *Rivera* to support its conclusion that even if the Commonwealth suffered no damage, the Defendants would still be liable for statutory False Claims Act penalties. Thus, Defendant's argument was not a ground for dismissing Plaintiffs' claim. *See* Memorandum and Order p. 30 (Doc. No. 120). Put simply, the *Rivera* decision has no bearing on the point that Defendants attempt to advance here—that if a municipality is not a "person" within the False Claims Act, then neither is any individual that a municipality employs.

Given that Defendants provide *no* support for their argument, we begin at the beginning—with the statutory language imposing liability. The False Claims Act provides, pertinently, that "[a]ny *person* who . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof . . . shall be liable" for statutory penalties, damages, penalties and attorneys fees. *See* M.G.L. c. 12, § 5B(a) (emphasis added). It defines a "person" to include,

pertinently, "a natural person." *See* M.G.L. c. 12, § 5A. Defendants McNamara and O'Connor are natural persons, so they are by all indications subject to False Claims Act liability.

Not only does the False Claims Act explicitly include "natural persons" within the sweep of "persons," it also expressly contemplates that this sweep will include individuals who hold positions with the Commonwealth. Specifically, after casting its broad "person" definition, the Act then provides that there is no jurisdiction for actions "against the governor, the lieutenant governor, the attorney general, the treasurer, the secretary of state, the auditor, a member of the general court, the inspector general or a member of the judiciary, if the action is based on evidence or information known to the commonwealth when the action was brought." M.G.L. c. 12, § 5G(a). If the False Claims Act did not apply to individuals holding positions with the Commonwealth, as Defendants substantively contend, then this exception would be meaningless—the very individuals exempted from liability would not face liability in the first place.

Thus, Defendants have failed to provide any support for their final argument—which is a reflection of the fact that it lacks any merit.

**VI)  Conclusion**

Defendants' motion does not raise any grounds on which they are entitled to judgment on the pleadings, and indeed, this Court's prior rulings have already largely rejected many of the grounds that Defendants now seek to raise again. While Defendants apparently want to say "us, too" in respect to the Attorney General's motion, they have no standing to make such a motion, and the motion they have in fact filed lacks merit.

Dated: February 16, 2022

        Respectfully submitted,

        THE PLAINTIFFS,
        By their attorneys,


        /s/ David D. Jensen
        David D. Jensen
        David Jensen PLLC
        33 Henry Street
        Beacon, New York 12508
        Tel:  212.380.6615
        Fax:  917.591.1318
        david@djensenpllc.com

        Margarita Smirnova, Esq.
        BBO No. 680429
        7 Greenbriar Drive, Unit 109
        North Reading, Massachusetts 01864
        Telephone: (617) 875-8663
        margarita.smirnova@gmail.com


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Feb. 16, 2022.

        /s/ David D. Jensen
        David D. Jensen